# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

MICHAEL RAYMOND JOHNSON,

Defendant and Appellant.

S070250

Ventura County Superior Court
CR 39376

January 3, 2022

Justice Groban authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, and Jenkins concurred.

Justice Liu filed a dissenting opinion, in which Justice Lavin[*] concurred.

_____

[*]    Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. JOHNSON

S070250

Opinion of the Court by Groban, J.

A jury convicted defendant Michael Raymond Johnson of first degree murder (Pen. Code, § 187), attempted murder (Pen. Code, §§ 187, 664), one count each of kidnapping and spousal rape (Pen. Code, §§ 207, subd. (a), 262, subd. (a)(1)), and of being a felon in possession of a firearm (Pen. Code, former § 12021, subd. (a)(1)). It found true the special circumstances of intentionally killing a peace officer engaged in the performance of his duties, and murder during the commission of a kidnapping (Pen. Code, § 190.2, subd. (a)(7), (17)(B)), as well as various sentencing enhancements. The jury returned a verdict of death at the penalty phase. The court denied the automatic motion to modify the verdict (Pen. Code, § 190.4, subd. (e)), imposed the death sentence, and imposed stayed sentences for the remaining counts. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment.

## I.     THE FACTS

According to the evidence presented at his trial, in July 1996, defendant armed himself and kidnapped his wife, G.A., from her workplace. She eventually accompanied defendant to a remote mountain area where he forced her to engage in sexual activity. Later that day, after defendant and G.A. had returned to G.A.'s home, the police, responding to a 911 call, arrived and removed G.A. from the house. Defendant then shot and killed one officer at the scene, 26-year-old Ventura County Deputy

1

Sheriff Peter Aguirre, and fired several rounds toward another officer, Deputy Sheriff James Fryhoff, who was able to disable defendant with return gunfire.

## A. Guilt Phase

### 1. *Prosecution Evidence*

Defendant and G.A. married in 1985 but they had little contact over the following years. They reestablished contact and began a romantic relationship in early 1996. G.A., her 15-year-old daughter from a different relationship, D.G., and D.G.'s boyfriend, Francisco, lived together in a one-bedroom house in Ojai. Defendant began living at the house with G.A., D.G., and Francisco in June 1996.

On July 14, defendant and G.A. went to a secluded mountain area to "make love" at a spot they had visited for this purpose a few times before. They removed their clothes, but then defendant became angry and jealous when G.A. told him she had come there before with D.G.'s father. G.A. explained to defendant that it was a long time ago, and G.A. and defendant then had sex.

On an unspecified date around that same time, G.A. was at home in the shower laughing about something. Defendant, who was also home, accused her of being in the shower with Francisco. G.A. told defendant he was "crazy" because she had been alone in the bathroom and Francisco had been in the living room with D.G..

On July 15, when G.A. returned home from work, she learned that defendant had moved out. On the phone, defendant told G.A. that she was not good enough for him and he wanted a divorce. He said he moved out because he thought G.A. had been talking to Francisco in the shower and he was jealous.

On the afternoon of July 17, defendant came to the residence where G.A. worked as a housekeeper, followed her into the house, and threw a gun on a bed. He had another gun in his pocket. He told G.A., "I love you, I can't leave, I have to stay close to you." G.A. told defendant that he could not stay with her because she needed to work. Defendant repeatedly told G.A. that he had to stay with her, "every minute of every day." He told her he would take her to Wisconsin but that they first needed to rob a bank because they did not have money. G.A., who was doing laundry while they spoke, explained that she needed to work to support her daughter and could not leave. Defendant said he would take G.A. by force.

G.A. had not seen defendant like this before. He was acting strangely, "crazy," and speaking rapidly and loudly. He had a pistol and became angry when G.A. tried to convince him to give her the pistol. He mentioned a movie he was going to write that they had previously joked about, called "Crazy Love," which was a story in which defendant thought he and G.A. were both crazy. He told G.A. they were in the movie at that moment.

While defendant and G.A. were still at her employer's house, defendant told G.A. he wanted her to remove Francisco from her home. G.A. called her daughter at G.A.'s house and told her that she and Francisco needed to leave, mentioning that defendant had two "pistolas."

Shortly after, G.A.'s employer called to tell G.A. she was free to leave. To convince defendant to leave, G.A. suggested they go for a ride. She suggested they each leave in their own car, but defendant insisted they travel in one car. They left for G.A.'s house.

When they arrived at G.A.'s home, D.G. and Francisco were still there, along with other children. Defendant said everyone could stay except Francisco. G.A. insisted that everyone leave because she was afraid defendant might shoot the children. G.A. did not feel that she could get away from defendant. She told defendant, "Let's go cruising." Because he believed he was being followed, defendant took D.G.'s dog with them because it would bark when it saw people it did not recognize.

They returned to the mountain spot they had visited on July 14. Defendant wanted to move further up the mountains, but G.A. did not want to, so defendant stopped where they were. G.A. testified that defendant kept looking around, "scared," and said that someone was following him. They brought pillows and a blanket from the car, secured the dog to a tree, undressed, and lay down. G.A. explained that she removed her clothes because defendant was removing his clothes like they had done at this location a few times before to have sex, but they had never before had sex while defendant possessed guns.

G.A. testified at trial that defendant then got on top of her and tried to have sex. She testified that defendant was unable to get an erection or ejaculate and did not penetrate her vagina. But she remembered telling Sergeant Garcia that they had sex. The jury heard G.A.'s grand jury testimony in which she said that defendant was able to insert his penis inside her vagina "a little bit."

After about 20 minutes, G.A. told defendant, "Let's go," because the mosquitos were biting her. Defendant packed everything up and they left for G.A.'s home. After they arrived at the house, D.G., who had left the house earlier, called G.A.

and asked if she should call the police. G.A. said yes. D.G. called and informed an emergency operator that G.A. was in danger, that defendant had two guns, and that he had made G.A. remove D.G. from the house. D.G. reported that defendant had a criminal record and was planning to rob a bank. Police were dispatched to G.A.'s house.

At the house, defendant wanted to have sex but G.A. told defendant to take a shower. G.A wanted to distract defendant and for him to surrender to the police. Defendant told G.A. to take a shower with him, so they got in the shower together. While showering, defendant kept the guns on a window ledge near his hands. At no point that day did G.A. feel she could get away from defendant.

Meanwhile, Deputies Aguirre and Steven Sagely responded to the domestic disturbance call, with Deputies Fryhoff and David Sparks responding as backup. Fryhoff and Sparks took positions at the rear of the house while Aguirre and Sagely approached the front and knocked on the front door.

Knowing it was the police, G.A. went to the front door in her towel. Sagely saw G.A. appearing upset, like she had been crying and she was trying to speak. As G.A. was stepping outside and Aguirre was stepping inside, G.A. told the officers that defendant had guns.

The officers remaining outside then heard rapid gunfire from inside the house. While looking in a window, Fryhoff observed defendant running for the front door, so Fryhoff ran toward the front of the house. As he rounded the front corner, he saw defendant on the front lawn, face Fryhoff and fire several rounds toward him. While taking cover, Fryhoff was able to

shoot defendant in the chest, and then saw him lying naked on his back with two guns nearby.

The officers found Aguirre inside the house, lying on his back, between a wall and a large potted plant in a corner, "[b]leeding profusely from the face," and struggling to breathe. Deputy Aguirre died from his injuries that were caused by gunshot wounds. His gun was fully loaded and holstered.

After the shootout, defendant was taken into custody and transported to a hospital for treatment of his chest gunshot wound. Psychiatrist Donald Patterson, retained by the district attorney's office, interviewed defendant that night while he was receiving treatment in a hospital emergency room.

The prosecution played portions of the interview during the trial. Defendant described his intense feelings of jealousy for G.A. and belief that she was unfaithful. He confessed to kidnapping her at gunpoint. He also described jumping out from behind a wall and shooting Aguirre after he saw the police pulling G.A. out of the house. He described feeling as if he had been in a movie that afternoon but explained that he was conscious of what he had done and that his acts had been a passive suicide attempt.

The prosecution presented expert testimony on three subjects — Deputy Aguirre's gunshot wounds, bullet forensics, and blood spatter patterns — to support its theory that defendant shot and killed Aguirre in an execution style. As to the first subject, Deputy Aguirre's gunshot wounds, he suffered three — one in his left arm and two entering the left and right side of his forehead — all with exit wounds. The medical examiner, who autopsied Aguirre's body, opined: Each of the head gunshot wounds likely caused instantaneous loss of

consciousness and motor skills. Aguirre would have been incapable of shielding himself once he received the first of the head wounds. Based on stippling wounds on Aguirre's right forehead, the gun's muzzle was approximately 12 to 18 inches from Aguirre's head when the bullet entered the right side of his forehead. Stippling wounds are caused when the muzzle of a gun is sufficiently close to the target so that gunpowder released with the bullet's discharge impacts the skin and causes injuries.

Second, the prosecution's ballistics expert opined: The trajectory of a bullet that passed into the floor in the part of the house where Aguirre was shot was consistent with being the final shot into Aguirre. Two magazines of ammunition found in a fanny pack in the home and two boxes of ammunition found in a suitcase in defendant's car were consistent with those fired from the Colt .45-caliber and Beretta .32-caliber semiautomatic handguns found outside near defendant when he was arrested.

Third, a blood spatter analyst testified about the three areas of blood spatter events on the walls and objects in the area where Deputy Aguirre was shot. The expert opined: One of the blood spatter deposits, indicating a high velocity event (gunshot), occurred while Aguirre's head was about 13 inches from the floor, facing up, between a wall and a potted plant in the corner. The bullet trajectory that went into the floor was consistent with the bullet wound in Deputy Aguirre's right forehead that had the stippling pattern. A spatter pattern on Aguirre's hand suggested that it had been in a defensive position.

The prosecution also presented evidence about defendant's criminal record to show he faced a potential life sentence when he armed himself on the day of the shooting. A

Ventura County deputy district attorney testified as an expert on sentencing, that defendant had served a prison term and had convictions for five felonies including two serious felonies. He explained that a person with two prior serious felonies faced a sentence of 25 years to life upon conviction of a new felony. Defendant's parole officer from 1991 testified about his practice of reviewing with parolees the conditions of their parole prior to their release date, including the requirement that parolees must refrain from possessing firearms. He would advise parolees that it is a felony for a felon to possess a firearm. He recalled defendant signing a parole form that informed defendant that he was prohibited from possessing firearms.

### 2. *Defense Evidence*

To contest the prosecution's case on premeditation, the defense presented wound ballistics, crime reconstruction, and optometry evidence, as well as evidence of defendant's behavior immediately after the shooting. To contest the special circumstance allegations of intentionally killing a peace officer engaged in the performance of his duties, and murder during the commission of a kidnapping, it also presented an expert on police practices and evidence that defendant did not kidnap G.A.

A defense expert on wound ballistics, Dr. Martin Fackler, opined that based on the forensic evidence, which included Deputy Aguirre's stippling wound and the angles of bullet trajectories within G.A.'s house, it was impossible to determine the sequence of the shots fired and whether Aguirre or defendant or both were in motion when the shots were fired. It was possible that defendant shot Aguirre deliberately after Aguirre was on the ground, but it was also possible, and a "little" more likely based on the rapidity of the shots, that defendant

shot Aguirre while defendant was running by, and Aguirre was falling to the ground.

The crime scene reconstructionist similarly opined that the physical evidence did not support conclusions as to the sequence of shots fired and whether the shooting was execution style, but rather that the evidence was consistent with defendant firing the gun while either or both he and Deputy Aguirre were in motion and that the final shot to Aguirre's head occurred while he was incapacitated and falling but not yet on the ground. He viewed the "scene as a dynamic, fast-moving sequence of events" with continuing changes in the position and distance between defendant and Deputy Aguirre. Defendant could have been running by as he fired the gun.

An optometrist who examined defendant in 1994 testified that defendant had 20/400 vision, which meant that he could only see at 20 feet what a person with normal vision could see at 400 feet. Movement and backlighting also affect a person's vision. A person with 20/400 vision, however, could discern whether a person was lying on the ground, the location of the person's head, whether he was wearing a badge and gun belt, and whether he was bleeding.

To show that defendant's behavior was rash and delusional rather than premeditated, the defense additionally presented testimony of a sheriff's deputy, that he heard defendant repeatedly mumbling "Hare Krishna" while he lay naked on the ground after the shootout with Fryhoff.

As part of its challenge to the special circumstance of shooting a police officer while engaged in the performance of his duties, the defense presented the testimony of Roger Clark, an expert on police practices. Clark opined that under the

circumstances, a reasonable and well-trained officer would not have concluded that exigent circumstances warranted police entry because the purported victim was already outside and nothing "was emanating from inside the house to indicate that there [was] a crime being committed or someone in danger which would create the emergency for the officer, necessitate the officer to go in." A reasonable officer would have coordinated with his partners instead of entering the house.

Regarding the kidnapping offenses including the kidnapping special circumstance, the defense read into the evidence the following portions of Sergeant Garcia's interview of G.A.: Garcia asked G.A. if defendant made any threat like he would kill or shoot her if she would not come with him. G.A. responded that defendant showed her the gun but did not point it at her and that he told G.A. that if she did not come with him, he would stay with her because he did not want to be without her for one minute. She told Sergeant Garcia that she felt afraid and hurt because defendant had forced G.A. to remove her daughter from the house that day. Because defendant had guns, G.A. explained that she was forced to leave with him so that there was "no danger to my children." Defendant did not at any time that day say anything to G.A. about shooting or killing anyone.

### 3. *Rebuttal Evidence*

The prosecution presented a police practices expert, who opined that under the circumstances, a reasonable police officer would determine that immediate entry into G.A.'s home was necessary to protect the officers and the purported victim, G.A., because the lighting conditions did not allow the officers to see inside, and because the police needed to investigate an ongoing

domestic disturbance situation. Without entering the house, Aguirre would have been unable to fulfill his role as the officer protecting the contacting officer because he was not in a position to determine where "the threat" was coming from. A reasonable police officer would not believe that retreat or doing nothing was a safe alternative because of the limited opportunity for the officers to conceal themselves and the limited exit available from the gated property. Officers are trained to respond quickly in this scenario.

## B. Penalty Phase

### 1. *Prosecution Evidence*

The prosecution presented evidence of the impact of 26-year-old Aguirre's death on his family, friends, and fellow officers (Pen. Code, § 190.3, factor (a)), defendant's criminal activity involving the use or threatened use of force or violence (*id.*, factor (b)), and his prior felony convictions (*id.*, factor (c)).

Deputy Aguirre and his wife met in high school and had a three-year-old daughter for whom Aguirre was the primary caretaker while both he and his wife worked. Aguirre's wife described the pain and loss she felt. Their daughter also felt the loss and had continued to ask when her father was returning. Aguirre's daughter had been unable to continue kindergarten. Aguirre's mother described Aguirre's generosity, close relationship with his daughter, and educational aspirations, and described seeing Aguirre's injured body at the hospital and the effect of his death. Aguirre's sister-in-law described the positive influence and support Aguirre had provided when she was struggling with substance abuse and teenage motherhood. Aguirre's childhood best friend described his struggle with

Aguirre's death and recalled Aguirre's positive qualities including his sense of humor.

Fryhoff, Sparks, and other officers also described Aguirre as a kind, religious family man, and described their deep feelings of loss and guilt and the long-lasting impacts that Aguirre's death had on the sheriff's department. They described the experience of discovering Aguirre bleeding and dying in the house and the trauma experienced by the sheriff's department that day.

A local teenager remembered Aguirre's approachability and that he stood out as an officer who showed an active interest and support toward him and other teenagers in the community.

The prosecution presented three incidents of criminal activity in which defendant used force or violence. In December 1986, defendant carjacked a woman at gunpoint, throwing her purse out the window when she exited her car. Defendant had also robbed a McDonald's restaurant at gunpoint. In November 1993, someone in a white truck hit pedestrian Johnny Reeves, collided with a parked vehicle, and drove away. In 1995, defendant reported to the sheriff's department that in November 1994, after his brother told him that gang members had assaulted him, defendant had gotten in his truck and started driving because he had decided to hit the first person who he saw that looked like a gang member. He saw a pedestrian that he thought fit the description, hit him, and drove off, possibly hitting another car. Defendant reported the incident to take responsibility as part of his Alcoholics Anonymous (AA) efforts and explained he had also reported it to the sheriff's department a year earlier.

The prosecution reminded the jury of the guilt phase evidence concerning defendant's prior felony convictions.

### 2. *Defense Evidence*

Pursuant to Penal Code section 190.3, factors (d), (h), and (k), the defense presented evidence that defendant struggled with schizophrenia and his crimes derived from his mental disease, he served in the army during the Vietnam War under difficult conditions, he would make a positive adjustment to prison, he had worked as a rehabilitation counselor, and he had sought help for his mental health difficulties.

Defendant served in the military starting in 1965 at age 18 and was stationed in Vietnam under dangerous conditions. His battery unit second commander remembered defendant as a "hard worker" and a "smart kid." Another soldier serving in the same unit testified that defendant served as a radio telephone operator (RTO), which was a "very hazardous" assignment that usually required volunteers because most RTOs would be "cracking up or burning out." Defendant served as an RTO on more than one occasion. Defendant was once found absent without leave while in Vietnam and was "issued an undesirable discharge certificate."

Defendant's mother observed he was "quiet and withdrawn" after returning from the Vietnam War. After he returned, he would often be gone for long periods of time and show up unexpectedly, homeless. During the early 1990s, defendant exhibited odd behavior around food, such as having bad dreams when he ate pork and asking his parents to remove bacon fat from the refrigerator because he believed it was contaminating his food.

In 1981, defendant worked in exchange for room and board for Jane Siemon, a Wisconsin dairy farmer. One day, Siemon sent some soup to her husband and defendant while they were working on the farm. Defendant, believing Siemon was trying to poison him, refused to eat her cooking for the remaining several months on the farm.

A Ventura County social worker performed a psychiatric assessment of defendant in 1994 and concluded he had organic delusional disorder related to brain damage from the "heavy use" of marijuana, LSD, and amphetamines. She based her conclusion on defendant's description of several delusions, e.g., that he was in an "underground" war against those who sought to brainwash "organic eaters" by poisoning the food, water, and air. Defendant believed that "people who inhabit the real world," including his parents, sought to control and read his mind. Defendant's self-reported story of hitting a pedestrian believing he was a gang member was evidence of delusional disorder. Defendant did not appear to be seeking "benefits," but instead wanted treatment because he believed himself to be a danger to others and wanted to rehabilitate himself so that he could return to work.

A county drug and alcohol counselor saw defendant for six months in 1994. Defendant had sought help because he believed he was a danger to himself or others. He explained in a letter to the counselor that he had stolen his employer's car, but that the employer had agreed "to drop all charges" if defendant would seek mental health treatment. Defendant did not miss appointments, which he would attend by bicycling from Ventura to Ojai and appeared "[v]ery much" committed to his rehabilitation. But defendant was also facing homelessness and feared returning to prison.

County psychologist Lisa Kus diagnosed defendant in 1994 with organic delusional disorder based on his history of substance abuse. Several months later, when defendant returned because his delusions were persisting, she referred him to a psychiatrist who prescribed an antipsychotic medication. Another psychiatrist on the staff, however, evaluated defendant and concluded that he did not need medication. Dr. Kus did not diagnose defendant with schizophrenia because she could not rule out that his delusions were unrelated to his substance abuse history, but she was "very confident" he suffered from a delusional disorder and described at length the delusions he had self-reported. She noted that defendant had stated that he believed he needed to maintain his sobriety because he did not want to go back to jail, but that he appeared sincere in seeking help.

A county psychiatrist saw defendant in 1995 and prescribed him with Haldol, an antipsychotic medication. The psychiatrist observed defendant to exhibit symptoms of delusion including the belief that his son wanted to harm him and had staged an event to intimidate him.

Defendant earned a certificate of completion for a two-year alcohol and drug studies program at Oxnard College around 1996. Defendant's professor in the program said defendant was an "excellent student."

Defendant volunteered as a counselor during 1995 and/or 1996 in a Salvation Army substance abuse rehabilitation program. Defendant's supervisor, who was the director of the program, said defendant was a "superior" worker and "very committed," "extremely caring," and an "extremely good listener." He had one of the "highest graduation rate[s]" for his

caseload of participants and "the actual rehabilitation of the men that worked for [defendant] was better than most." Defendant's supervisor at Primary Purpose, a recovery home for addicts where defendant worked as a paid detoxification specialist in 1995, rated defendant's work as "excellent" and "dependable." Defendant listened well to the clients and assisted them with placement in long-term programs "very well."

Defendant's supervisor at Tiber House, a sober living residence for mentally ill men, said defendant was the "best house manager" the facility had. During his yearlong employment starting in 1995, defendant demonstrated that he cared "very much" about the residents, providing counseling and support "[e]very chance he got," often at his own expense and time. Defendant was a "very good listener," and was viewed as compassionate and trustworthy. Defendant also appeared to "be struggling with something," and was committed to his own recovery and "constantly attending" AA meetings. Defendant's role was to counsel the residents and oversee the house, and he received free board in exchange.

Psychologist Charles Hinkin, assistant professor at the University of California at Los Angeles School of Medicine and director of the neuropsychology assessment lab at the West Los Angeles VA Medical Center, has treated veterans for brain diseases including schizophrenia. He reviewed defendant's records and the police investigation files and interviewed and tested defendant for approximately eight hours. Hinkin concluded defendant suffered from paranoid schizophrenia that manifested at approximately age 32.

Hinkin noted that defendant had suffered several paranoid delusions over the previous 20 years, some of which defendant had noted in his interview with Dr. Patterson upon his arrest, such as his belief that he was part of a world of organic eaters forced underground to wage war against others and that his parents were Nazis who wanted to poison him through food. He had also believed that he was a "warrior for Krishna" and robbed a McDonald's to show that "killing sacred cows" was evil. He also had delusions that his father had molested defendant's son, that G.A. was having an affair with Francisco, that he was in a movie on the day of the shooting, and that his son intentionally made him ill and staged a gang fight in order to intimidate him. Hinkin noted that defendant also reported to Patterson that he had experienced a "lot of hallucinations" while taking Haldol.

Hinkin explained that an example of the "flat affect" typical of schizophrenia was defendant's lack of emotional response during the interview with Patterson and his explanation to Patterson that he was not feeling any emotion, where a normal person would have had a "huge emotional response" to the events on the day of the shooting.

Hinkin testified that defendant's various test results and overall history, including accounts of others such as the Wisconsin farmer, suggested that defendant was schizophrenic and not feigning mental illness. Defendant had a significant score on the paranoid schizophrenia scale on a standardized test he took in 1974.

Hinkin opined defendant suffered from a psychotic episode of schizophrenia during the shooting and the days preceding it. Defendant was "under the influence of extreme mental or

emotional disturbance" that day, his capacity to conform his conduct to the law was impaired, and he committed the offense because of the disease. Hinkin noted that defendant had erroneously believed that Francisco had been in the shower with G.A., stated he believed he was in a movie, was hysterically laughing according to an account by G.A. that Hinkin had reviewed, seemed agitated and scared, kept looking around and took G.A.'s dog because he thought he was being followed, and reported to Patterson "kind of having [a] delusion" that day.

James Park, a psychologist and institutional adjustment expert, reviewed defendant's correctional records and opined that defendant would be a "reasonably good prisoner" and good worker. Defendant had previously received "recognition of outstanding performance" working on a prison building retrofit project. Based on research and his experience working in the Department of Corrections, Park opined that older prisoners like defendant (age 50 at the time of trial) are more likely to "conform" and have a positive effect on other inmates. Defendant had no history of violence in his earlier incarcerations and was unlikely to be dangerous. The prosecution questioned Park at length about Park's background and work history at the Department of Corrections, and about prisoners' access to exercise facilities, cable television, medical care, education, and visitors.

### 3. *Rebuttal Evidence*

The jury heard additional portions of defendant's interview with Patterson. In it, defendant described his evaluations by the various Ventura County mental health staff, the "real frightening" hallucinations he experienced while taking Haldol, his attendance in recovery programs, and his

self-diagnosis of schizophrenia. He described experiencing delusional thinking when in close emotional relationships such as with G.A. and with his son. He explained that he did not form close bonds with friends or family and avoided his son because he would become "pretty emotional," and his delusional thinking would become "amplified." Defendant experienced "intense paranoia" and a desire to kill his father when he believed he had molested defendant's son. He also described his criminal history, including robbing a McDonald's as part of a "religious battle" and that he "sorta had that delusion today too." He explained that he had reported his delusions to prison staff while he was incarcerated for the McDonald's robbery.

Patterson had been a court-retained psychiatric expert in criminal and other matters for over 40 years. He interviewed defendant on the night of the shooting so he could evaluate his mental status in that timeframe. Defendant appeared in contact with reality, unparanoid, nondelusional, nonhallucinatory, unconfused, responsive, and coherent, and had well-organized speech.

Patterson also reviewed defendant's mental health and other records. He agreed with the Ventura County mental health professionals' diagnosis of organic delusional disorder given defendant's 20-year history of abusing alcohol, marijuana, and methamphetamine, but there was not information available as to how often and what quantity of substances defendant had consumed. The difference between delusional disorder and schizophrenia, Patterson opined, was that the former was characterized by "non-bizarre" as opposed to bizarre delusions, e.g., believing one's internal organs have been replaced. The belief that one was being poisoned or followed, or that a partner was unfaithful, were examples of non-bizarre delusions because

such events could actually happen. Paranoid schizophrenics are characterized by delusions of persecution and are suspicious of others. The schizophrenic is not in contact with reality, whereas a person with a delusional disorder can function except in the areas of his or her delusion. Patterson agreed periods of remission can occur when the schizophrenic individual is better functioning, but the paranoia is nonetheless present. The schizophrenic individual tries to control exposure to upsetting events to avoid paranoid episodes.

Patterson opined defendant's delusions were substance-induced delusions. He acknowledged that the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) ruled out substance-based delusional disorder as a diagnosis if the subject had been substance free for four weeks. Even though defendant had denied ingesting drugs for over two years, Patterson hypothesized that defendant's belief that his father had molested his son was the result of drug use. Patterson acknowledged that defendant had provided a lot of truthful information in his interview, but believed defendant was trying to manipulate him.

Patterson concluded defendant was not suffering from delusional disorder on the day of the shooting and was able to wholly control his behavior. Defendant was apparently capable of enjoying sexual relationships with G.A., did not lack motivation as evidenced by his work at Tiber House and Primary Purpose, maintained good eye contact during the interview, and was not scattered in his discussion of topics, which all indicated the absence of schizophrenia.

Defendant's classmate at Oxnard College testified that defendant told her he began using LSD in high school.

## II.    DISCUSSION

### A.  Denial of Defendant's Motion to Suppress His Statements Made to Patterson

Defendant contends his rights under the Fifth and Fourteenth Amendments to the federal Constitution were violated when, after he had been arrested, law enforcement representatives repeatedly disregarded his multiple invocations of both his rights to silence and to have counsel present and ultimately coerced his confession.  The trial court found that defendant had invoked his rights to silence and to have counsel and accordingly suppressed some of his statements made during one of the earlier encounters with law enforcement.  The court found, however, that defendant initiated the later discussion with Patterson and knowingly and voluntarily waived his earlier invocation of his rights.

Defendant argues Patterson unlawfully interrogated him in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), ultimately obtaining his admissions and confessions that were subsequently admitted against him during the prosecution's case-in-chief.  The Attorney General does not dispute that defendant initially invoked both his rights to silence and to have counsel present but contends defendant himself eventually initiated the communication with Patterson that led to his statements, and therefore the trial court properly denied the motion to suppress.

While the issue is close, we agree with the trial court that the record, particularly the recorded interview, demonstrates that defendant initiated the conversation freely and that he knowingly and voluntarily waived his *Miranda* rights.

Nonetheless, we are troubled by the earlier law enforcement conduct. In a three-hour period, while defendant was at the hospital receiving treatment for a fresh gunshot wound, law enforcement officials repeatedly approached defendant to obtain a statement, impermissibly interviewed him, angrily confronted him about Aguirre's murder, and sent a psychiatrist to defendant's hospital room to interview him. Within this timeframe, defendant invoked his right to silence each time he was asked, on four occasions, and on at least two of those occasions also requested an attorney. The trial court acknowledged that statements were taken from defendant after he had invoked these rights and appropriately suppressed statements related to them. But we agree with the trial court that defendant initiated the subsequent conversation with Patterson and did so with a knowing and voluntary waiver and therefore the statements to Patterson were admissible.

### 1. Factual Background

#### a. Earlier Law Enforcement Contacts with Defendant

After he was arrested, paramedics transported defendant to Ojai Valley Community Hospital at about 6:15 p.m. for treatment of his injuries that included the chest gunshot wound. At approximately 7:00 p.m., Ventura County Sheriff's Detective Robert Young contacted defendant in the emergency room to obtain a statement about shooting Deputy Aguirre. Defendant was lying in a hospital gurney, naked with a cloth over his lower body, handcuffed by both hands to the gurney, and connected to monitors, intravenous fluids, and a urinary catheter.

Young informed defendant he was under arrest for the suspected murder of a police officer, advised him of his *Miranda*

rights, and asked if he was willing to talk. Defendant responded "no."

Young then informed Michael Bradbury, the District Attorney of Ventura County, that defendant had "refused to waive his *Miranda* rights and discuss the shooting" but had not requested legal counsel. At 7:20 p.m., Bradbury approached and spoke with defendant at his hospital gurney in the emergency room to verify that defendant was "advised of [his] rights to remain silent," did not want to talk to the police, and understood he would need to initiate further discussion if he decided to talk. According to Bradbury, defendant opened his eyes, and affirmed he did not want to talk, stating, "Yes, I feel a little bit in shock right now. I may want to talk to you later."

A few minutes later, at approximately 7:30 p.m., Detective Young and district attorney investigators Richard Haas and Dennis Fitzgerald contacted defendant at his hospital gurney in the emergency room to obtain his consent to search G.A.'s house.[1] After defendant gave consent, Haas asked defendant about his living situation and his occupation. Following defendant's response that he was a resident manager at a facility for patients with a dual diagnosis of mental illness and chemical dependency, Young asked defendant whether he was "a patient there or just the, uh, manager?" Defendant responded he was the manager but that he had "been a mental health patient," explaining, "two years ago I went into the mental health system." Haas asked for the name of the facility where

---

[1] "*Miranda* [is] not violated when an officer ask[s] for and obtain[s] consent to search after the defendant had exercised his privilege against self-incrimination." (*People v. James* (1977) 19 Cal.3d 99, 115 .)

defendant was the residential manager. Defendant responded, "Tyber House for men with dual diagnosis." Haas asked if there was "chemical dependency as well as mental problems"; defendant responded, "I have both, I have what they call a dual diagnosis." Haas asked, "what was your chemical dependency?" Defendant responded, "marijuana." Haas asked, "If we had someone come out and talk to you like a psychiatrist, would you be willing to talk to him?" Defendant responded, "Yes, the last time I talked to one was probably a year and a half ago." Haas asked, "[D]o you have a regular one or anything or?" Defendant responded, "No. A year and a half ago it took me nine months to see a psychiatrist (unintelligible) I saw a counselor and [then] a psychologist (unintelligible) psychiatrist." The investigators did not readvise defendant of his *Miranda* rights before asking these questions. Haas testified at the suppression hearing that he would have asked defendant if he would speak to a psychiatrist even if defendant had invoked his right to counsel. As noted below, the trial court found that Haas and Young violated defendant's right to silence by continuing to interview him after he had given consent to search the house.

At 8:25 p.m., Detective Young returned to defendant's hospital room to ask for a statement, reminding defendant he had purportedly told District Attorney Bradbury that he might be willing to speak after he felt more comfortable. Defendant responded "no," explaining, "I think I told [Bradbury] that, uh, I think I'm in a state of shock right now and I'm kinda confused so I'd rather wait to talk to a lawyer, I think that'd be a good idea." Young asked defendant if he wanted to talk to a lawyer and defendant responded, "I think so . . . I think that'd be a good idea."

At about 8:50 p.m., just before leaving the hospital, Young returned to defendant's room to address him. Upset, Young told defendant that he had not just shot a "uniform" but rather had killed a "living, productive human being, unlike" defendant. He told defendant that he wanted him to know the name of the deputy he had murdered, that he was 26 years old and had a wife and a child, and that he wanted him to remember Deputy Aguirre and his family "every minute of every day for the rest of his life." According to Young and a nurse who overheard the encounter, defendant responded that he sensed that Young was angry.

### b. *Patterson Contacts Defendant*

Defendant was then transferred to another hospital. There, psychiatrist Donald Patterson began observing defendant in the hospital's trauma observation room starting at approximately 9:15 p.m. The district attorney's office had called Patterson on the evening of the homicide and retained him to interview defendant close in time to the events that day to evaluate his mental state as a homicide suspect. Patterson had conducted 17 such evaluations of homicide suspects on behalf of the district attorney's office in the previous six years. He explained that his purpose was to determine defendant's mental status close in time to the earlier events that day but that "eliciting incriminating information" . . . "was not the purpose of my interview."

Deputy District Attorney Richard Holmes, along with a district attorney investigator, met Patterson at the hospital, gave him a tape recorder and a *Miranda* advisement card, and instructed him to contact defendant. Patterson was aware that the district attorney's office would be paying his fee. Holmes

informed Patterson that defendant had been advised of his *Miranda* rights and had been unwilling to talk but had stated he might be willing to talk later. Holmes confirmed Patterson was there to engage defendant in conversation, explaining at the suppression hearing that he told Patterson: "I'd like you to go in and do your usual thing, advise him of his rights, tell him who you are, who you work for, and see if he wants to talk now."

Holmes was unaware that defendant had invoked his right to counsel to Detective Young. Had Holmes known defendant had invoked his right to counsel earlier in the evening, he would not have permitted Patterson to speak with defendant. Holmes explained, "[b]ecause it's improper. If — if someone has unequivocally invoked counsel, it's improper for law enforcement to contact him. And I would — I would stay absolutely away from there." He testified further, "[I]t's not at all proper if they've invoked their right to counsel, and I just simply stay away from — if somebody invokes the right to counsel, I would let Dr. Patterson watch and observe and that would be it."

Patterson observed defendant for about an hour during which a surgery resident evaluated defendant's injuries. In Patterson's presence, defendant reported to the surgery resident that he was experiencing chest and neck pain, and discomfort and numbness, and noted to the surgery resident his understanding that it was "against the rules to give prisoners anything for pain." The surgery resident explained, "it's not against the rules, however, the doctor needs to evaluate you when you're not under the influence of any medication because if we give you something that altered your sensorium. Then we're not gonna be able to treat[]you appropriately so when the doctor says that they've gotten all the information that they

need, then that will be —" The surgery resident testified at the hearing that she told defendant this — that she needed to delay the administration of pain medication — so that the surgery resident could assess defendant. Defendant was still handcuffed to his gurney and connected to monitors, intravenous fluids, and a urinary catheter.

At approximately 10:04 p.m., Patterson introduced himself to defendant as "a psychiatrist from Santa Barbara." Defendant responded, "I heard you were going to come here." Patterson told defendant "the DA's office [had] asked me to come and talk with ya." Defendant responded, "Great."

Regarding defendant's *Miranda* rights, Patterson told defendant: "And I have to advise you of your rights the same as you've probably been advised already, namely that you don't have to cooperate with us, you have the right to remain silent, don't have to talk with me or ask — tell me anything about yourself or answer any of my questions." He said further, "And anything you say could be used against you in a court of law. I will make a report of it, and you subsequently will see it, a copy of my report, and if you can't afford to provide yourself an attorney at this point, it's the responsibility of the County of Ventura to obtain such legal aid for you, get you an attorney." Patterson did not tell defendant that he had the right to have an attorney present before and during the questioning.

Patterson asked, "So, the next thing then in knowing these things, are you willing to talk with me about yourself?" Defendant declined to talk, explaining, "I don't think so. I'm facing very serious charges and I think I'd rather talk to a lawyer first." He stated further, "That be okay? I think right

now I'm in a state of shock and kind of confused and I don't know that the information I'd give you would be that accurate."

Patterson responded, "I see. Well, that's your decision, you have to make that — " Defendant repeated, "that's the decision I've made." Patterson responded, "I'm gonna just stay around here with you and let you get back from X-ray and see how you're getting along and see if you still feel, feel that way or — [¶] . . . [¶] — cause at some point you did say that you would be willing to talk to me and so —." He stated further, "And it's up to you, you can still refuse it, but you did say that at one time."

Defendant responded, "I did say that, yeah." Patterson stated, "So I, I'll wait a little bit and they're gonna take you over to X-ray and get going and get these other things, your medical condition taken care of. But I'll be around for a little while." Defendant responded, "Alright."

After this exchange, Patterson stepped out of the room momentarily to inform Deputy District Attorney Holmes, who had been waiting in the hallway, that defendant had refused to waive his *Miranda* rights. Holmes testified Patterson did not tell him that defendant had invoked counsel but instead told him that defendant had declined to talk and had said he might be willing to talk later. Holmes directed Patterson "to follow the defendant wherever he went and just observe him." Ventura County District Attorney Bradbury testified at the suppression hearing that in homicide investigations, the district attorney's office would dispatch a psychiatrist to observe the suspect even if he were unwilling to talk. Patterson followed defendant's gurney when he was transported to the X-ray room at 10:05 p.m., remained with him for about 15 minutes while his X-rays

were taken, and then followed him at 10:21 p.m. back to the observation room, where they waited for the surgery resident for about five minutes. Patterson stood near the foot of defendant's gurney about two feet to the side.

When the surgery resident returned, she explained to defendant in Patterson's presence that doctors would operate on defendant to remove lead fragments from beneath his diaphragm but that the resident would first insert a tube into defendant's chest to drain blood that had accumulated there. A few seconds after this conversation, which was approximately 20 minutes after defendant had invoked his right to counsel to Patterson, defendant turned to Patterson, who was then the only other person in the room, and said, "[s]till here, huh?" Patterson responded, "Yeah, just, just in case you're — I can, I can, whatever." Defendant said Patterson had a "kind face." Patterson thanked him. Defendant stated, "The last psychiatrist I talked to, made me very angry, you know."[2] Patterson asked defendant for the psychiatrist's name. Defendant gave the names of two psychiatrists he had seen; Patterson said he did not know them. Defendant volunteered

---

[2] The parties' transcripts interpret the audio of this comment differently. The prosecution transcript instead interprets this comment as: "The last psychiatrist I talked to, maybe you know him?" The trial court did not specifically rule on this statement. We adopt the defense version because Patterson agreed at the suppression hearing that this is what defendant said. Regardless of which version we adopt, the two statements are not substantively different for purposes of our analysis, especially since the record is undisputed that defendant began the conversation by telling Patterson, "Still here, huh?"

information about his previous efforts to seek treatment through the county mental health department.

Following a brief pause during which apparently the surgery resident had reentered the room and could be heard talking, defendant asked Patterson, "You wanna talk about it?" Patterson responded, "Sure." Defendant stated, "I'll talk, and you can listen." Patterson agreed, and stated, "Cause you, you don't mind, and we could just talk about what has happened or something."

Defendant then volunteered further information about his mental health history, including earlier diagnosis of organic delusional disorder. Defendant explained he had attempted to see a psychiatrist at the county mental health department and become "very angry" because the psychiatrist did not think defendant would become a mental health patient and did not schedule him for another appointment. Defendant explained that being in an "intense emotional relationship" had "amplified" his delusional thinking. Patterson asked defendant questions about his delusions and whether medication had helped. Defendant subsequently reiterated that being in an "emotional relationship" (referring to G.A.) had "[s]tirred things up" and that he felt like he was "in a movie" that afternoon.

Defendant volunteered that he was "aware of everything that happened that day" and after responding to Patterson's question about why defendant did what he did (defendant said he did not know why), defendant sought to limit the topics of conversation:

> "DEFENDANT: I think I'd be better off talking to you about emotional states than about actual specific facts.
>
> "PATTERSON: Okay.

"DEFENDANT:  I'm sure my lawyer wouldn't appreciate it, you know?

"PATTERSON:  Well, he can, he can get a copy of what you're talking about, you know, if that's —

"DEFENDANT:  Well, I think you, you probably deal with emotional states rather than facts anyway, but (unintelligible) if you're giving some type of a diagnosis."

They continued to discuss defendant's role as a resident manager at the dual diagnosis facility and his involvement with AA meetings.  Defendant eventually introduced a new topic, that he had had "another violent episode" about ten years earlier in which he robbed a McDonald's restaurant.  Defendant mostly talked and Patterson would ask questions including whether defendant tried to seek help for his delusions in prison and whether his delusions were part of his legal defense for the robbery.

Defendant explained that he diagnosed himself with schizophrenia after his own study and that he avoided being close to his family because the emotions would exacerbate his delusions.  Defendant explained that he married G.A. so she could get a green card, that they had not been in contact for many years, and that he recontacted her recently so he could get a divorce.  Patterson asked if G.A. was "involved in this thing tonight . . . ."  Defendant responded that he had kidnapped G.A. and continued to explain that he had shot Aguirre.  Regarding G.A., he explained, "I kidnapped her, you know" and "pulled a gun on her and I said we're gonna be together forever."  Regarding Aguirre, defendant explained that he saw Aguirre enter the home and tell defendant to put his hands up.

Defendant "just jumped out and shot" Aguirre. He explained, "I was getting what I wanted . . . ."

When medical staff had arrived to move defendant, Patterson offered to return, stating, "I'll see if I can come back, but, uh, maybe if it doesn't bother you to talk to me anyway." Defendant responded Patterson, "Yeah, you're a very good listener, that's (unintelligible)." Defendant later explained, "I'm kinda, you know, uh, self-diagnosing, nobody else will diagnose me." Patterson responded, "Trying, trying to figure yourself out, huh?" Defendant agreed, "Yeah, I mean I'm just confused, you know?" He discussed at length his own efforts, through classes, reading articles, and study of the DSM-IV, to diagnose himself and understand his condition.

After defendant explained "what happened" that day, defendant and Patterson discussed defendant's reasons for speaking with Patterson:

> "DEFENDANT: I started out by just not wanting to tell you exactly what happened —
>
> "PATTERSON: Yeah.
>
> "DEFENDANT: — but it ended up that way.
>
> "PATTERSON: Well, we went sort of round and round —
>
> "DEFENDANT: At this point I don't have anything to lose by being honest and saying what happened.
>
> "PATTERSON: Yeah.
>
> "DEFENDANT: And I understand my lawyer's really going to be pissed and so forth.
>
> "PATTERSON: Um-hum.
>
> "DEFENDANT: So then (unintelligible)

"PATTERSON:    You can certainly talk, and he'll get what we're talking about.

"DEFENDANT:  I'm sure he will, yeah.

"PATTERSON:   And uh —

"DEFENDANT:  And I don't know why they, why they say don't say nothing, because if you did something and people know you did it, there's people (unintelligible) —

"PATTERSON:   They saw you.

"DEFENDANT:  . . . you know, they saw me, right.  How are you gonna say you didn't?  I mean that, what are you accomplishing, you know, I think the situ —  I think it's best to be honest, that way you get to the root of it.

"PATTERSON:   Um-hum.

"DEFENDANT: You know, I mean it's not normal behavior.

"PATTERSON:   Um-hum.

"DEFENDANT: It's not, you know the average person wouldn't (unintelligible) something like that.

"PATTERSON:   Yeah.

"DEFENDANT:  So you know.

"PATTERSON:   But you have given me some insight into the way you were feeling and as you say a part of a —

"DEFENDANT:  Yeah, after I'd talked to you a little bit I thought well, it's probably more beneficial to me to give him as much information as I can while I'm uh —

"PATTERSON:   While you're fresh, fresh from it.

"DEFENDANT: Yeah, I, I'm not under the influence of any chemicals or drugs yet, they're gonna sedate me pretty soon. And it's fairly close to the time of the incident.

"PATTERSON: Yeah.

"DEFENDANT: And the closer the better I would think.

"PATTERSON: Yeah.

"DEFENDANT: You know. Time can alter the way you see things."

When Patterson prepared to depart, defendant stated: "Yeah, it's probably better if you write your report as quickly as possible so you can (unintelligible)" and remarked, "You had a kind face. . . . I think that's [an] asset in your business."

During various points in the conversation, the surgery resident or other medical staff entered the room to perform medical procedures on defendant including prepping him for the chest tube insertion, drawing blood, and administering local anesthesia and intravenous sedation. At one point the conversation paused, apparently while the chest tube was inserted.

### c. Trial Court Findings and Rulings

The defense moved to suppress the statements defendant made to Patterson, contending that the police and prosecution had failed to cease efforts to interrogate defendant despite his invocations of his rights to silence and counsel, and that defendant had not waived his *Miranda* rights nor initiated the discussion with Patterson.

After a multiday hearing, the trial court found that defendant invoked his right to silence when Detective Young *Mirandized* him in their first encounter, Young and Investigator

Haas violated defendant's *Miranda* rights by continuing to question him after he had given consent to search G.A.'s house, and defendant later invoked his right to counsel to Young. It excluded portions of the interview conducted by Young and Haas.

The court found, however, that defendant initiated the discussion with Patterson when he said to him, "Still here, huh," and that he invited Patterson to talk more, told him that he (defendant) would talk and that Patterson could listen, and picked the topic of conversation. The court concluded that the subsequent contact by Patterson was attenuated from defendant's earlier invocations. The court found "as a fact the defendant, for whatever reason — and I believe the reason was he wanted to talk to the psychiatrist — initiated the conversation, controlled the conversation, directed the conversation and took it to the places he wished to go."

The court concluded that Patterson's request to interview defendant after he had invoked counsel to Detective Young of the sheriff's department did not violate *Edwards* because the district attorney's office had "come down a separate path" from the sheriff's department and retained Patterson for its own purpose of evaluating defendant's mental state. The court found that Patterson went to the hospital "for the avowed purpose of evaluating defendant for purposes of a determination concerning the defendant's mental state post-incident and I think the District Attorney's Office has no alternative but to pursue a line of that nature, certainly in a case such as this."

The trial court concluded that the audio recording of the interview was "[t]he most powerful and compelling evidence of the defendant's understanding, knowledge, appreciation and

willingness to participate in the conversation . . . ." The court "wish[ed]" Patterson had taken an explicit *Miranda* waiver from defendant when defendant started talking to Patterson but concluded that defendant knowingly waived his rights because he twice stated that his lawyer was going to be upset that defendant had talked to Patterson and because defendant controlled the conversation and directed the topics for discussion. The trial court found that defendant "knew what was going on. He knew what use it would be put to. He knew with whom he was speaking. He knew what he was speaking of. He discusses that he is or is not in pain, he discusses in fact his motivations to speak at that time before he becomes anesthetized or sedated, and that was important to him, that the facts be known at the best possible time and he tells us that in his statement which would be the time in closest proximity to the time at which these events occurred." Acknowledging defendant's medical condition, the court concluded that the audio of the interview nonetheless demonstrated that defendant had knowingly and voluntarily participated in the interview. The court accordingly denied the motion to suppress.

### 2. *Analysis*

We address below three questions: (1) whether law enforcement's earlier contacts with defendant violated his *Miranda* rights; (2) whether defendant initiated the conversation that resulted in his confession; and (3) whether he did so with a knowing and voluntary waiver of his previously invoked *Miranda* rights. "The Fifth Amendment provides that no 'person . . . shall be compelled in any criminal case to be a witness against himself.' In *Miranda*[*, supra,*] 384 U.S. 436 . . ., the [United States Supreme] Court concluded that 'without proper safeguards the process of in-custody

interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' *Id.,* at 467. Accordingly, the Court formulated the now-familiar "procedural safeguards effective to secure the privilege against self-incrimination." ' *Colorado v. Spring,* 479 U.S. 564, 572 (1987) (quoting *Miranda, supra,* 384 U.S. at 444). Among these is the rule that when an accused has 'expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' *Edwards*[, *supra*]*,* 451 U.S. 477, 484–485 . . . . ." (*Arizona v. Mauro* (1987) 481 U.S. 520, 525–526, fn. omitted.) " '[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fns. omitted (*Innis*).) " '[N]ot all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' " (*People v. Hensley* (2014) 59 Cal.4th 788, 810–811 (*Hensley*).) The ban on further interrogation is intended to prevent police " ' "from badgering a defendant into waiving his previously asserted *Miranda* rights." ' " (*People v. Thomas* (2012) 54 Cal.4th 908, 926.) "If further conversations are initiated by the police when there has not been a break in

custody, the defendant's statements are presumed involuntary and inadmissible as substantive evidence at trial." (*Ibid.*)

In reviewing *Miranda* claims, we "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." (*People v. Boyer* (1989) 48 Cal.3d 247, 263 (*Boyer*); accord, *People v. Hoyt* (2020) 8 Cal.5th 892, 931.) We review *Miranda* claims under federal constitutional standards. (*People v. Sims* (1993) 5 Cal.4th 405, 440 (*Sims*).)

### a. *Earlier Law Enforcement Contacts Violated* Mosley *and* Edwards

We agree with defendant that his *Miranda* rights were violated at various points during the evening of July 17, 1996. As detailed in the factual background: (1) Haas and Young approached defendant to question him a mere 10 minutes after defendant had confirmed to District Attorney Bradbury that he did not want to speak, and within a half hour of his original invocation to Young. In that encounter, Haas and Young did not readvise defendant about his rights to remain silent and have the assistance of counsel. Their questioning concerned the same ongoing investigation and was by one of the same officers, Young, who had just recently attempted to interview defendant. (2) Less than an hour after this questioning by Haas and Young, Young again returned to defendant's gurney to ask for a statement concerning the same investigation. Young did not readvise defendant of his rights, instead informing him that according to Bradbury, defendant had stated he might be willing to talk later. Defendant responded by telling Young that he

thought he had told Bradbury that he was feeling shocked and confused "right now" and wanted to wait to talk to a lawyer, and then reasserted his *Miranda* rights to Young. (3) Nonetheless, Young again returned to defendant's gurney about 25 minutes after that encounter, to berate him for murdering Aguirre. (4) Seventy-five minutes after that, Patterson attempted to interview defendant about the same ongoing investigation. Within this three-hour timeframe, defendant invoked his right to silence each time he was asked, on four occasions, and on at least two of those occasions also requested an attorney. In sum, prior to Patterson's arrival, law enforcement officials had, within the previous three hours, twice contacted defendant about his willingness to provide a statement, impermissibly interviewed him, and angrily confronted him about Aguirre's murder (after defendant had invoked counsel to the same officer). The trial court found that defendant invoked his right to silence when Detective Young *Mirandized* him in their first encounter, and that Young and Investigator Haas violated defendant's *Miranda* rights by continuing to question him after he had given consent to search G.A.'s house. Thus, it correctly excluded portions of the interview conducted by Haas and Young.

We also agree with defendant that the district attorney's office violated *Edwards* by the manner in which Patterson requested to interview defendant after he had invoked his right to counsel. As the trial court found and the Attorney General agrees, defendant invoked his right to counsel when Detective Young returned to defendant's gurney at 8:25 p.m. to request a statement. Resuming contact with a suspect at a later time for purposes of interview, where the suspect had earlier requested the assistance of counsel and remains in custody without

counsel, is a clear violation of the rule that all efforts at interrogation must cease once the right to counsel is invoked. (*Edwards*, *supra*, 451 U.S. at p. 485.) In *Edwards*, the defendant invoked his right to counsel and questioning ended, but the police returned the next morning for an interview. (*Id.* at pp. 478–479.) Edwards then waived his rights and made statements. (*Id.* at p. 479.) The high court ruled the statements inadmissible, holding that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." (*Id.* at p. 484.) *Edwards* explicitly stated that once a suspect invokes the right to counsel, law enforcement personnel may not resume interrogation until counsel is provided or the suspect reinitiates contact. This is a bright-line rule: It requires all questioning cease after a suspect requests counsel. " 'In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching" — explicit or subtle, deliberate or unintentional — might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1022 (*Henderson*), quoting *Smith v. Illinois* (1984) 469 U.S. 91, 98.)

The Attorney General contends — as the trial court concluded below — that the district attorney's office had a "legitimate 'purpose' " in "enlist[ing] Dr. Patterson's aid in observing appellant and gathering information relevant to his mental state, whether or not appellant wished to speak to him." By this, the Attorney General can be understood to argue that because the district attorney's office had another purpose

(besides interrogation) in sending Patterson to visit defendant, which was to observe him, the office committed no constitutional violation. The Attorney General is correct, to an extent: Police officers routinely remain in the presence of suspects for custodial matters such as booking and transportation, even after the suspect has invoked his or her *Miranda* rights. (E.g., *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1042 (*Bradshaw*) [transporting suspect to police station]; *People v. Enraca* (2012) 53 Cal.4th 735, 750 (*Enraca*) [booking interview].) But the *Edwards* rule "renders a [suspect's] statement invalid if the authorities initiate any 'communication, exchanges, or conversations' relating to the case, other than those routinely necessary for custodial purposes." (*Boyer*, *supra*, 48 Cal.3d 247, 274, italics omitted.)

The evidentiary hearing established the prosecution's intention to send Patterson to interview defendant about his mental state and not merely to observe him. The district attorney's office called Patterson on the evening of the homicide and retained him to interview defendant close in time to the events that day to evaluate his mental state as a homicide suspect. District attorney staff gave Patterson a tape recorder, *Miranda* card, and instructed him to advise defendant of his *Miranda* rights. Patterson testified he went to the hospital to interview defendant to evaluate his post-event mental state. He explained that when a district attorney's office reaches out to him, "as typical when I get such a call, my question is will the suspect be willing to talk with me." Patterson did not merely *Mirandize* defendant. Instead, Patterson did more, making clear to defendant that he was there to "talk" with him, explaining that "the DA's office asked me to come and talk with ya" and after partially describing defendant's *Miranda* rights,

said, "So, the next thing then in knowing these things, are you willing to talk with me about yourself?" Patterson's communications here, violated the bright-line rule of *Edwards*. Deputy Holmes confirmed as much that Patterson was there to engage defendant in conversation, explaining that he told Patterson: "I'd like you to go in and do your usual thing, advise him of his rights, tell him who you are, who you work for, and see if he wants to talk now." Holmes testified that had he known defendant had invoked his right to counsel earlier in the evening, he would not have permitted Patterson to speak with defendant. Holmes explained, "Because it's improper. If — if someone has unequivocally invoked counsel, it's improper for law enforcement to contact him. And I would — I would stay absolutely away from there." He testified further, "[I]t's not at all proper if they've invoked their right to counsel, and I just simply stay away from — if somebody invokes the right to counsel, I would let Dr. Patterson watch and observe and that would be it."

Thus, the record clearly shows the district attorney's intention that Patterson was to interview defendant for evidence about his mental state as part of its criminal investigation. This is why Patterson arrived with a *Miranda* card and a tape recorder. Patterson did not merely observe defendant in order to evaluate his mental state: He contacted defendant, advised him of his *Miranda* rights, asked him if he was willing to talk about himself, responded to defendant's request for counsel by reminding him that he had supposedly earlier agreed to talk to Patterson, and then telling defendant he (Patterson) would remain close by in case defendant changed his mind about asserting his *Miranda* rights.

The fact that Patterson might also have intended to observe defendant does not eliminate the fact that Patterson sought to interview defendant as directed by the district attorney's office. As *Innis* explained, we consider the situation primarily from the suspect's perspective in determining whether there was interrogation. (*Innis*, *supra*, 446 U.S. at p. 301.) Even if Patterson might have permissibly gone to the hospital and sat silently in defendant's room for the purpose of observing his behavior (a fact pattern not before us here), defendant would not have understood mere silent observation to be Patterson's purpose from Patterson's words and conduct: The explanation Patterson gave defendant for his presence was to interview defendant. Patterson told defendant, "the DA's office asked me to come and talk with ya," and after addressing defendant's *Miranda* rights, asked defendant, "next thing then in knowing these things, are you willing to talk with me about yourself?" (See *Innis, supra*, 446 U.S. at p. 301 [" 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."].)

Under settled law, a psychiatric interview of a suspect is interrogation if the interview contains material later to be used in the prosecution's case, including evidence about a suspect's mental state. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 640; *Estelle v. Smith* (1981) 451 U.S. 454, 466–469 [*Miranda* advisements were required prior to defendant's pretrial examination by a court-retained psychiatrist, where the psychiatrist later testified for the prosecution]; *People v. Ghent* (1987) 43 Cal.3d 739, 750; *People v. Polk* (1965) 63 Cal.2d 443,

449; *People v. Walker* (1972) 29 Cal.App.3d 448, 451–456; *People v. Montgomery* (1965) 235 Cal.App.2d 582, 590.) In *Estelle, supra*, at pages 456–457, the trial court ordered a psychiatric examination of a defendant to determine his competency to stand trial. (*Id.* at pp. 456–457.) But the examining psychiatrist later testified for the prosecution about defendant's mental status. (*Id.* at pp. 459–460, 464.) The high court held "the Fifth Amendment privilege, therefore, [was] directly involved here because the State used as evidence against respondent the substance of his disclosures during the pretrial psychiatric examination." (*Id.* at pp. 464–465.) The court explained, "The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here. Respondent was in custody at the Dallas County Jail when the examination was ordered and when it was conducted. . . . When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting. During the psychiatric evaluation, respondent assuredly was 'faced with a phase of the adversary system' and was 'not in the presence of [a] perso[n] acting solely in his interest.' " (*Id.* at p. 467.)

In the immediate wake of the senseless murder of a beloved colleague, the police and district attorney were understandably zealous in their effort to question the apparent perpetrator. But we find concerning the multiple clear violations of *Miranda* that occurred in this case through the repeated efforts of investigating officials to solicit defendant's

waiver of his rights to silence and counsel, after he had expressed his unwillingness to talk. That defendant invoked his right to remain silent does not mean police could never again approach him and inquire whether he was still unwilling to talk. (See *Michigan v. Mosley* (1975) 423 U.S. 96, 100–104.) But it is one thing to reapproach a suspect about his willingness to talk after a "significant period of time" (*id*. at p. 106); it is another thing to reapproach the suspect to confront him or to inquire about his willingness to talk no less than five times in a roughly three-hour span. These violations not only infringed defendant's established constitutional rights, they also jeopardized the efforts of the prosecution, court, and jurors to have a jury weigh the charges against defendant and render a sentence. We emphasize the substantial costs to the justice system and the lives affected when law enforcement officials, however well-intentioned, do not conform their own conduct to the law.

### b. *Defendant Initiated the Conversation with Patterson*

Concluding that there were *Miranda* violations does not, however, resolve the question whether those violations require that defendant's later statements to Patterson be suppressed. Like the trial court concluded below, the Attorney General contends defendant initiated the conversation with Patterson. After listening to the interview tapes admitted at trial and reviewing the transcripts, we agree that defendant initiated the later discussion that produced the statements admitted at trial.

As noted, interrogation must cease once a suspect requests counsel. (*Edwards*, *supra*, 451 U.S. at pp. 484–485.) " 'However, if the defendant thereafter initiates a statement to police, "nothing in the Fifth and Fourteenth

Amendments . . . prohibit[s] the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." ' " (*Hensley, supra,* 59 Cal.4th at p. 810.) " 'After a suspect has invoked the right to counsel, police officers may nonetheless resume their interrogation if "the suspect '(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.' " ' " (*Enraca, supra,* 53 Cal.4th at p. 752.) " 'An accused "initiates" ' further communication, when his words or conduct 'can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." ' " (*People v. Molano* (2019) 7 Cal.5th 620, 656 (*Molano*).) This exception to the *Edwards* rule requires that the suspect initiate " 'further communication, exchanges, or conversations with the police' " but not necessarily "the encounter at which he does so." (*People v. Waidla* (2000) 22 Cal.4th 690, 732 (*Waidla*); see also *People v. Mickey* (1991) 54 Cal.3d 612, 652 (*Mickey*).) Defendant spoke to Patterson and, as a factual matter, began the conversation that led to his various inculpatory statements. Patterson remained in defendant's presence after their initial exchange but did not speak to him. Around 20 minutes later, after X-rays and a brief conversation with his doctor, defendant asked Patterson, "Still here, huh?" He engaged Patterson in a conversation about psychiatrists who had treated him and then, after some pauses, reconfirmed his desire to speak, asking, "You wanna talk about it?" Suspects in custody have initiated further questioning by asking, " 'Well, what is going to happen to me now?' " (*Bradshaw, supra,* 462 U.S. at pp. 1045–1046), or " 'What can I do for you[?],' 'What do you want from me?,' and 'What can I do to help you[?],' " (*Waidla,* at p. 731). Defendant's question to Patterson, "Still here, huh?," followed by defendant's

question to Patterson if he wanted to "talk about it," squarely falls within the kinds of statements we have found to constitute an initiation of further communication by the accused. As the trial court found after an eight-day evidentiary hearing, defendant "initiated the conversation, controlled the conversation, directed the conversation and took it to the places he wished to go."

We must next resolve whether defendant's renewed contact with Patterson should be deemed effective or instead the tainted product of the earlier *Miranda* violations, considering all the relevant surrounding circumstances. "[W]e have never found that an initial failure to honor a defendant's invocation — whether of the [right] to remain silent or the right to have counsel present — poses a categorical bar to the admission of any subsequent statement regardless of the circumstances. Instead, in case after case, we have held that despite the initial failure to honor a *Miranda* invocation, a voluntary confession obtained during a subsequent interrogation is admissible." (*People v. Krebs* (2019) 8 Cal.5th 265, 314, italics omitted (*Krebs*).) However, as a general rule, "where law enforcement officers have disregarded a suspect's previously-invoked rights by continuing to interrogate him, a renewal of contact by the defendant will be considered an 'initiation' only if the decision to renew contact was not a 'response to' or 'product of' the prior unlawful interrogation." (*Mack v. State* (Ga. 2014) 765 S.E.2d 896, 903 (*Mack*).) Indeed, to be valid, a defendant's initiation cannot be the product of the authorities' coercion. (E.g., *Boyer*, *supra*, 48 Cal.3d at p. 275 [holding that defendant had not initiated the communication by calling back the officer after he had turned to leave in light of the officer's comments and earlier unlawful interrogation]; *People v. Neal* (2003) 31 Cal.4th 63, 78

(*Neal*) [holding that defendant did not voluntarily initiate an interview in light of earlier impermissible interrogation and defendant's youth, isolation, and "low intelligence"]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1046 (*Bradford*) [rejecting claim that "statement was the tainted product of earlier illegal interrogations"].)  Likewise, "a defendant's decision to talk with police cannot be a product of police interrogation, 'badgering,' or 'overreaching,' whether 'explicit or subtle, deliberate or unintentional.' " (*People v. Davis* (2009) 46 Cal.4th 539, 596 (*Davis*).)  While as a matter of historical fact, a suspect may have started the contact with authorities, the totality of the circumstances might demonstrate that doing so was the product of earlier badgering in violation of *Miranda*.  (*Mack*, at p. 905; *Blake v. State* (Md. 2004) 849 A.2d 410, 413–414, 422.)  In *Mack*, police disregarded the suspect's invocation of his right to stay silent by badgering and cajoling him to come clean for more than 90 minutes, after similarly having ignored his invocation of rights on the previous day.  (*Mack*, at pp. 904–905 & fn. 8.)  Approximately 10 minutes later, the suspect relented and asked to speak with police.  (*Ibid*.)  In *Blake*, after the suspect invoked his right to counsel, a detective gave the suspect a charging document for first degree murder stating the penalty was "DEATH," even though the suspect was not eligible for the death penalty due to his youth.  (*Blake*, at p. 413.)  The Maryland high court concluded that the suspect's subsequent question about the detective's comment ("I bet you want to talk now, huh!") was a response to interrogation rather than initiation.  (*Id.* at pp. 413–414, 422.)

Because of the prior *Miranda* and *Edwards* violations described above, the defendant's contention, echoed by the dissent, that defendant did not initiate the communication with

Patterson is not without force. And although Patterson asked no more questions, his action of remaining with defendant for the stated purpose of seeing if defendant would change his mind about asserting his *Miranda* rights could have added more pressure to make a statement. Patterson remained just a few feet from where defendant was handcuffed to a gurney, twice reminded him he had earlier agreed to speak with a psychiatrist, and advised him that Patterson would "just stay around here with [defendant] and . . . see if [defendant] still feel[s]" that he wanted to assert his *Miranda* rights. In addition, defendant contends that Young's angry speech accusing defendant of murder could have added further pressure to confess. Defendant also argues that his compromised physical state and related pain, shock, and confusion, would have compromised his ability to withstand the pressure of repeated attempts to obtain a statement. (*People v. Caro* (2019) 7 Cal.5th 463, 493 (*Caro*) ["While a defendant's 'compromised physical and psychological condition' alone will not render her statements involuntary [citation], that condition is relevant to the inquiry and presents an opportunity for abuse"].)

Though these facts and circumstances make this a close case, the record, particularly the audio recording of defendant's conversation with Patterson, reflects defendant's "clear willingness and intention to talk" to Patterson. (*People v. Gamache* (2010) 48 Cal.4th 347, 386 (*Gamache*).) As a result, we cannot find that defendant's conversation with Patterson was caused by or the product of earlier violations. (See, e.g., *Bradford, supra*, 14 Cal.4th at pp. 1045–1046.)

First, the record does not reveal the sort of berating evident in other cases that might readily wear down a suspect (e.g., *Neal, supra*, 31 Cal.4th at pp. 80–83; *Boyer, supra*,

49

48 Cal.3d at pp. 273–274), but instead a handful of one- to two-minute conversations over a period of a few hours. The trial court, after an extensive hearing, including sworn testimony from Patterson and at least 16 other witnesses, found that the tape-recorded discussion was a "low-key, very, very calm, rational — perhaps unnervingly so — discussion of what transpired." At the hearing, Patterson testified "at no point did I attempt to insert any strong injunction for him to talk to me about the crime" and that defendant "was completely alert and very cognizant of what he was talking to me about and without evidence of mental confusion or disorientation." We agree with the trial court that defendant revealed no "outward sign of stress, [offering] just a straight account of what happened," and his statements were "un[e]xcited, unforced and voluntary . . . ." Examining the record as a whole, we conclude the relatively brief prior interrogations that occurred — even when considered cumulatively — did not add up to " ' 'badger[ing]' ' " that effectively wore down defendant's will to remain silent. (*Henderson, supra*, 9 Cal.5th at p. 1022.)

Second, although Patterson should not have contacted defendant to request an interview, he did not ask further questions after defendant invoked his right to counsel. *Edwards* does not bar further contact with a suspect, only further interrogation. (See *Waidla, supra*, 22 Cal.4th at pp. 728–732 [although officer went to jail and met Waidla for express purpose of interrogating him, Waidla initiated the interrogation when he repeatedly interrupted the officer with offers of assistance before the officer had a chance to address and advise him of his *Miranda* rights]; *Mickey, supra*, 54 Cal.3d at p. 652 [rejecting argument that *Edwards* requires a suspect to initiate the meeting at which he initiates the interrogation, where the

defendant had requested an interview while officers were transporting him].) Patterson immediately stopped asking questions when defendant invoked his right to counsel. Patterson soon stepped out into the hallway where Holmes directed Patterson "to follow the defendant wherever he went and just observe him."

Third, the recorded interview clearly shows that defendant was engaging Patterson — defendant initiated the conversation and Patterson only responded. (See *Mickey, supra*, 54 Cal.3d at p. 648 [an initiation occurs when a suspect's "words or . . . conduct" can be " 'fairly said to represent a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation' "].) As noted above, after defendant requested counsel, Patterson asked no more questions and there was no discussion for about 20 minutes. Defendant then asked, "Still here, huh?" Patterson responded, "Yeah, just, just in case you're — I can, I can, whatever." Defendant then remarked, "Yeah, you seem like you have a kind face." Patterson responded, "Um, thank you." Defendant then asked, "The last psychiatrist I talked to, made me very angry, you know." Patterson responded, "You know who it was?" And the two discussed briefly whether Patterson knew the psychiatrists defendant had seen. Defendant then stated, "Anyway, so two years ago I went through the county mental health system." Patterson responded, "Here in Ventura?" Defendant responded, "Yeah, the east end, thinking that I had some type of mental disorder." Patterson responded, "Hum." Defendant volunteered, "And I saw a counselor. I saw a psychologist and eventually I saw a psychiatrist. Took about six months." Patterson verified, "To get to the psychiatrist." Defendant responded, "Yeah." After a brief interruption to

perform a medical procedure, defendant asked Patterson, "You wanna talk about it?" Patterson responded, "Sure. (unintelligible) Cause you, you don't mind, and we could just talk about what has happened or something." Defendant continued the conversation, stating, "So anyway I was talking about the psychiatrist that I saw." Defendant turned the discussion toward his relationship with G.A. and the events under investigation with the comment: "But I think this emotional relationship that I've been in for the last year . . . [s]tirred things up." Soon thereafter defendant continued to direct the conversation toward the events under investigation by saying, "[Y]ou know I, about this afternoon, I'm aware of everything that happened . . . ." And from there, the conversation ensued, defendant talking about his mental health history and past diagnoses, Patterson mostly listening and asking occasional questions. Contrary to defendant's assertion, it was not Patterson's question — "you know who [your last psychiatrist] was?" — that turned the conversation to the instant crime and began the discussion about the criminal investigation. Rather, as the above description makes clear, it was defendant who turned the discussion toward his relationship with G.A. and the events under investigation. Over the course of the next hour, defendant continued to largely direct the conversation and select the topics. As the trial court properly found, defendant "picked the topic; he started the conversation."

Fourth, and most importantly, the record indicates that defendant was aware he was providing information that might be used against him, yet he viewed the tradeoff a worthwhile one. Upon meeting defendant, Patterson *Mirandized* defendant and then asked him, "So, the next thing then in knowing these

things, are you willing to talk with me about yourself?" Defendant declined to talk, explaining, "I don't think so. I'm facing very serious charges and I think I'd rather talk to a lawyer first." He stated further, "That be okay? I think right now I'm in a state of shock and kind of confused and I don't know that the information I'd give you would be that accurate." Early on in his discussion with Patterson, defendant said: "I think I'd be better off talking to you about emotional states than about actual specific facts" and "I'm sure my lawyer wouldn't appreciate it, you know?" Later on in the discussion, defendant elaborated: "I don't know why they, why they say don't say nothing, because if you did something and people know you did it, there's people . . . . [¶] . . . [¶] . . . you know, they saw me, right. How are you gonna say you didn't? I mean that, what are you accomplishing, you know, I think the situ — I think it's best to be honest, that way you get to the root of it. [¶] . . . [¶] . . . after I'd talked to you a little bit I though[t] well, it's probably more beneficial to me to give him as much information as I can while I'm uh — [¶] . . . [¶] . . . I, I'm not under the influence of any chemicals or drugs yet, they're gonna sedate me pretty soon. And it's fairly close to the time of the incident." Thus, as the trial court noted, defendant "discuss[ed] in fact his motivations to speak at that time before he [became] anesthetized or sedated, and that was important to him, that the facts be known at the best possible time and he tells us that in his statement which would be the time in closest proximity to the time at which these events occurred." The dissent posits that defendant may have doubted whether he was actually free to remain silent or to consult a lawyer before speaking with Patterson. (Dis. opn., *post*, at pp. 11–12.) But we need not speculate about defendant's thought-process as to why he chose to speak with

Patterson: defendant expressly detailed why he chose to speak to Patterson in the taped recording of the discussion. Defendant's statements showed he was making a deliberate decision to speak with Patterson because he determined that it was "best to be honest." Defendant's statements also show a clear and deliberate recognition that he wanted to speak before sedatives impacted his thinking. And, his statement that "I'm sure my lawyer wouldn't appreciate" him talking with Patterson about "specific facts," coupled with his statement (detailed below) that "I understand my lawyer's really going to be pissed . . . ." demonstrate that he understood he had the right to remain silent or consult a lawyer before talking to Patterson.

The dissent also contends that the protection of *Edwards* is not limited to cases where the suspect was berated or where law enforcement employed "overt" coercion. (Dis. opn., *post*, at pp. 2, 19.) We agree. As the dissent states, the question we must answer is whether defendant's decision to speak with Patterson was in " ' "response to" or "product of" the prior unlawful interrogation.' " (Dis. opn., *post*, at pp. 9, 20, quoting *Mack, supra*, 765 S.E.2d at p. 903; see also *Boyer, supra*, 48 Cal.3d at pp. 273–274.) Our case law makes clear that the question of whether law enforcement officials repeatedly berated or badgered the suspect will naturally be relevant in determining whether the suspect spoke *in response* to the officials' conduct. (See *Davis, supra*, 46 Cal.4th at p. 596 ["a defendant's decision to talk with police cannot be a product of police interrogation, 'badgering,' or 'overreaching,' whether 'explicit or subtle, deliberate or unintentional' "]; see also *Boyer, supra*, 48 Cal.3d at pp. 273–274.) As the dissent acknowledges: "Of course, where a suspect is berated, it is more likely his initiation was tainted by law enforcement misconduct." (Dis.

opn., *post*, at p. 20.)  We again agree.  But surely the converse is also true: where a suspect is not berated, though that fact is not dispositive, it makes it *less* likely his initiation was tainted by law enforcement misconduct.

The dissent also argues that Patterson's "understated manner" "presented [defendant] with a deliberate contrast to the impatient and even angry officers who had sought to question him earlier."  (Dis. opn., *post*, at pp. 10–11.)  The dissent argues that this fact is relevant in assessing " 'the entire sequence of events' that night."  (*Id.* at p. 10, quoting *Mack*, *supra*, 765 S.E.2d at p. 904.)  We disagree.  As the dissent acknowledges, the question we must answer is whether defendant's decision to talk was the " ' "product of" the prior *unlawful* interrogation.' "  (Dis. opn., *post*, at pp. 9, 20, quoting *Mack, supra*, 765 S.E.2d at p. 903, italics added; see also *Boyer*, *supra*, 48 Cal.3d at pp. 273–274.)  Though the dissent suggests that Patterson's "tactics" were "unethical" (dis. opn., *post*, at pp. 5–6, 11), it appears to recognize, as it must, that Patterson's conduct was lawful.  (*Illinois v. Perkins* (1990) 496 U.S. 292 296–300.)  Patterson's lawful conduct simply does not answer the question we must resolve here, i.e., whether defendant spoke to Patterson *because* the police had previously acted unlawfully.  And if defendant ultimately decided to talk because of the efficacy of Patterson's "understated manner" (dis. opn., *post*, at pp. 10–11) and because he determined that he and Patterson " 'share[d] a common interest, that their relationship is a [mutual] rather than an adversarial one' " (*id.* at p. 5), then surely defendant did not speak *because* of the prior unlawful conduct of police interrogation.

Finally, the dissent asserts that the majority's holding abrogates the "'bright-line rule'" in *Edwards* "that *all* questioning must cease after an accused requests counsel." (*Smith v. Illinois, supra*, 469 U.S. at p. 98.) We disagree. "[W]e have never found that an initial failure to honor a defendant's invocation — whether of the [right] to remain silent or the right to have counsel present — poses a categorical bar to the admission of any subsequent statement regardless of the circumstances. Instead, in case after case, we have held that despite the initial failure to honor a *Miranda* invocation, a voluntary confession obtained during a subsequent interrogation is admissible." (*Krebs, supra*, 8 Cal.5th at p. 314, italics omitted.)

In fact, the majority and dissent do not disagree on the applicable legal standard. We agree that *Edwards* establishes a bright-line rule. We agree that the question we must ultimately decide is whether defendant's decision to speak with Patterson was the "'product of' the prior unlawful interrogation." (*Mack, supra*, 765 S.E.2d at p. 903.) Where we disagree is in the application of this standard. The dissent relies heavily on its interpretation of a single sentence Patterson uttered in which Patterson reminded defendant that defendant had previously promised to speak to him and that he would wait around to see if defendant changed his mind. From this, the dissent surmises that defendant would have felt that he had to speak with Patterson or he would be "going back on his word" and that defendant would have felt that Patterson "was not satisfied with Johnson's refusal." (Dis. opn., *post*, at pp. 7–8.) This, coupled with Patterson's decision to remain present for 20 minutes without a break and without a change in location or personnel, indicates to the dissent that defendant's decision to

talk was the product of prior unlawful conduct.[3]  (*Id.* at pp. 9–14.)  But, once again, we need not rely on surmise.  We have a full tape of the interview itself.

Ultimately, the operative question is whether, when defendant began talking to Patterson at 10:20 p.m., he did so freely, or he did so because of undue coercion.  As the trial court explained, the record itself — and most notably listening to the tape of defendant's and Patterson's conversation — establishes that defendant, fully aware that his statements could later be used against him, chose to speak with Patterson because "if you did something and people know you did it . . . it's best to be honest."  Our review of the audio recording demonstrates defendant was speaking easily and comfortably and was

---

[3]  The dissent also relies on the fact that Patterson spent about an hour simply observing defendant before introducing himself and yet defendant did not attempt to engage Patterson in conversation during this time.  (Dis. opn., *post*, at p. 14.)  However, the record further indicates that Patterson was in plainclothes with nothing about his appearance that would show he was associated with law enforcement or the district attorney's office.  Defendant was on a gurney and, based upon defendant's condition, Patterson was waiting for "medically . . . the proper time for me to talk with him about why I was there."  Patterson was "not trying to establish eye contact."  Medical professionals were in and out and Patterson did not identify himself to them.  The fact that defendant did not begin a dialogue with a silent stranger under these circumstances does not inform whether he wanted to initiate further communication with Patterson once Patterson identified himself and stated that "the DA's office asked me to come and talk with ya."  Only after defendant learned that the district attorney's office sent Patterson, did defendant eventually decide to speak with him, explaining that "after I'd talked to you a little bit I though[t] well, it's probably more beneficial to me to give him as much information . . . ."

generally directing the conversation while Patterson mostly listened. As the trial court concluded, that defendant "knew what was going on. He knew what use it would be put to. He knew with whom he was speaking. He knew what he was speaking of. He discusses that he is or is not in pain, he discusses in fact his motivations to speak at that time before he becomes anesthetized or sedated, and that was important to him, that the facts be known at the best possible time and he tells us that in his statement which would be the time in closest proximity to the time at which these events occurred." We therefore need not speculate about why defendant did not speak to Patterson before Patterson identified himself (dis. opn., *post*, at p. 14), or whether defendant felt that he was not free to remain silent (*id.* at pp. 11–12), or whether Patterson's statements made defendant feel that he would be going back on his word if he did not speak with Patterson (*id.* at p. 7), or whether Patterson's "understated manner" encouraged defendant to speak to him (*id.* at pp. 10–11). We agree with the trial court's conclusion that the audio recording of the interview was "[t]he most powerful and compelling evidence of the defendant's understanding, knowledge, appreciation and willingness to participate in the conversation . . . ." On this record, considering the entire circumstances of the interview, we are persuaded that defendant freely initiated the conversation with Dr. Patterson.

### c. *Defendant Knowingly and Voluntarily Waived His* Miranda *Rights*

Apart from whether there was a legally valid initiation, there remains the question whether defendant voluntarily and knowingly waived his *Miranda* rights. We conclude he did.

As noted above, a suspect initiates "further communication, when his words or conduct 'can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." ' " (*Molano, supra,* 7 Cal.5th at p. 656.) "The initiation of further dialogue by the accused . . . does not in itself justify reinterrogation" (*Sims, supra,* 5 Cal.4th at p. 440); " 'the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation' " (*ibid.*). "The state must demonstrate that the suspect knowingly and intelligently waived his right to counsel 'under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' " (*Hensley, supra,* 59 Cal.4th at p. 810.) " 'The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" [citation], and knowing in the sense that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086 (*McCurdy*).) " '[A]n express waiver is not required where a defendant's actions make clear that a waiver is intended.' " (*People v. Frederickson* (2020) 8 Cal.5th 963, 1010.) Although a suspect's responses to further interrogation may not be used to cast doubt on the clarity of his or her initial request for counsel, "[s]uch subsequent statements are relevant only to the distinct question of waiver." (*Smith v. Illinois, supra,* 469 U.S. at p. 100.)

A prior *Edwards* violation is not by itself dispositive of whether a suspect knowingly and voluntary waived his or her

rights. As we have said before, "[W]e cannot conclude that an *Edwards* violation, 'unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.' (*Oregon v. Elstad* (1985) 470 U.S.[, 298,] p. 309.) Rather, if the statement made after an *Edwards* violation is voluntary, 'the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.' " (*Bradford, supra*, 14 Cal.4th at p. 1040.) "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Moran v. Burbine* (1986) 475 U.S. 412, 421 (*Burbine*).) Thus, our case law makes clear that earlier attempts to interrogate a defendant after an invocation of rights can violate *Edwards*, but a subsequent decision to speak with law enforcement can still be voluntary. That is the case here.

Regarding the requirement that the waiver be voluntary, we conclude that for the same reasons discussed in part II.A.2.b., *ante*, the record shows that defendant's initiation was voluntary and uncoerced by law enforcement's earlier conduct. Notably, there is no indication that Patterson " 'threatened, tricked, or cajoled' " defendant into a waiver. (*People v. Honeycutt* (1977) 20 Cal.3d 150, 160.)

Defendant relies on *Neal*, *supra*, 31 Cal.4th 63 to argue he did not voluntarily waive his *Miranda* rights when he spoke with Patterson, asserting that law enforcement authorities repeatedly disregarded defendant's efforts to remain silent and invoke his right to counsel during the three-and-a-half-hour

time frame, despite defendant's physical condition and expressed shock and confusion, and that Young berated defendant for murdering Aguirre.

In *Neal*, however, the defendant invoked his right to counsel nine times, and the officer intentionally violated the defendant's *Miranda* rights, applying an aggressive method of interrogation that he knew was improper. "[T]he officer . . . not only continued the questioning improperly but badgered defendant, accusing him of lying, and informing defendant that 'this is your one chance' to help [yourself] and that 'if you don't try and cooperate . . . , the system is going to stick it to you as hard as they can.' Despite this badgering, defendant did not admit his guilt at that session. After the session ended, however, defendant was placed in custody and kept in jail overnight without access to counsel or other noncustodial personnel and without food or drink or toilet facilities. The following morning, defendant asked to speak to the officer, who thereafter met with him, resumed questioning, and ultimately obtained two confessions from him." (*Neal*, *supra*, 31 Cal.4th at p. 68; see *id*. at pp. 73–75.) Neal was an 18-year-old high school dropout with limited intelligence and little experience of the criminal justice system. (*Id*. at p. 84.)

Here, defendant not only initiated the conversation with Patterson, he led it. Patterson asked few questions and frequently gave only one-word responses, encouraging defendant to continue speaking. For example, after a brief interruption during which the surgery resident entered the room to conduct a medical procedure, defendant started a new topic, stating, "you know I, about this afternoon, I'm aware of everything that happened (unintelligible)." After they discussed defendant's attendance at AA meetings, defendant switched to

a new topic, stating, "But this episode with me, just today (unintelligible)." The overall picture is not of a browbeaten suspect whose will was overborne by a coercive interrogator, but of a suspect eager to tell his story to a sympathetic listener, even though there might be consequences for doing so. Near the end of their conversation, defendant urged Patterson to "write [his] report as quickly as possible" and remarked, "[Y]ou had a kind face. . . . I think that's [an] asset in your business." Thus, the discussion between Patterson and defendant paints a different picture than in *Neal*. Of significance here and in contrast to *Neal*, the record before us (including defendant's statement that his lawyer was "really going to be pissed") suggests that the actions of law enforcement personnel did not cause defendant to misunderstand the nature of his rights such to undermine the validity of his waiver. (*Edwards*, *supra*, 451 U.S. at p. 485.)

Regarding the requirement that the waiver be knowing and intelligent, the record establishes that defendant made a conscious choice to talk to Dr. Patterson despite knowing he was entitled to counsel and also knowing that, by talking to Patterson, he was acting against his legal interest. First, defendant had been read his full *Miranda* rights by Detective Young at the start of the evening and had invoked those rights by refusing to talk to the police and the district attorney and asking for an attorney. Second, Patterson clearly informed defendant at the start of the encounter that his statements could be used against him. Defendant asserted his *Miranda* rights to Patterson, as he had earlier in the evening, which showed his understanding that he had the right to assert his rights to Patterson. Defendant clearly understood that his statements could be used against him, telling Patterson that he was "facing very serious charges and I think I'd rather talk to a lawyer first."

Patterson agreed, stating, "that's your decision" and "it's up to you, you can still refuse it . . . ." Third, Patterson testified at the hearing on the *Miranda* motion that defendant appeared alert and cognizant during the interview, and his participation in the interview was unimpaired by his physical condition. Fourth, and most critically, defendant's own contemporaneous statements demonstrated a knowing waiver by defendant of his *Miranda* rights. Early on in his discussion with Patterson, defendant said: "I think I'd be better off talking to you about emotional states than about actual specific facts" and "I'm sure my lawyer wouldn't appreciate it, you know?" (see p. 31, *ante*.) Toward, the end of the discussion with Patterson, defendant again reiterated this understanding, stating:

> "DEFENDANT: I started out by just not wanting to tell you exactly what happened —
>
> "PATTERSON: Yeah.
>
> "DEFENDANT: — but it ended up that way.
>
> "PATTERSON: Well, we went sort of round and round —
>
> "DEFENDANT: At this point I don't have anything to lose by being honest and saying what happened.
>
> "PATTERSON: Yeah.
>
> "DEFENDANT: And I understand my lawyer's really going to be pissed and so forth.
>
> "PATTERSON: Um-hum.
>
> "DEFENDANT: So then (unintelligible).
>
> "PATTERSON: You can certainly talk, and he'll get what we're talking about.
>
> "DEFENDANT: I'm sure he will, yeah.

"PATTERSON:   And uh —

"DEFENDANT:   And I don't know why they, why they say don't say nothing, because if you did something and people know you did it, there's people (unintelligible) —

"PATTERSON:   They saw you.

"DEFENDANT:   — you know, they saw me, right.  How are you gonna say you didn't?  I mean that, what are you accomplishing, you know, I think the situ- I think it's best to be honest, that way you get to the root of it."

These responses demonstrated defendant's awareness of his rights to silence and counsel and that his statements would be used against him and his conscious choice to speak to Patterson anyway.  Specifically, defendant's comment that his attorney would be angry "demonstrated his awareness of the consequences of talking with Dr. Patterson," as the Attorney General argues, and that defendant's agreement with Patterson's statement that defendant's attorney would "get what we're talking about" demonstrated that defendant "was aware of his right to speak without counsel and that the statements would be used against him, yet he voluntarily chose to do so anyway."  Defendant's statement that "I understand my lawyer's really going to be pissed and so forth" demonstrates an understanding that he would have a lawyer in the future and is a direct acknowledgment by defendant that what he was doing contradicted what that future lawyer would advise him to do.  Defendant's statement that he "started out . . . not wanting to tell [Patterson] exactly what happened" but concluding, "[a]t this point [he did not] have anything to lose by being honest and saying what happened" further illustrates his awareness that he did not have to speak and that he was waiving this right, as

did his comment, "I don't know why they . . . say don't say nothing, because if you did something and people know you did it."

Defendant even knew Patterson would prepare a report at the conclusion of the interview: When Patterson said he was going to leave defendant to rest before surgery, defendant replied, "Yeah, it's probably better if you write your report as quickly as possible . . . ." Thus, he acknowledged that Patterson would be writing a report on what had been said, but he spoke with Patterson anyway. As the trial court observed, defendant's statements make it clear defendant understood he could have a lawyer and that his statements could be used against him in legal proceedings.

Relying upon *Bradshaw, supra*, 462 U.S. 1039 and *Waidla, supra*, 22 Cal.4th 690, defendant argues that an additional round of *Miranda* warnings were necessary here after any initiation in order to ensure that his statement to Patterson was voluntary. While initiation and waiver are indeed separate inquires that should not be "meld[ed]" together (*Bradshaw*, at p. 1045), these cases do not require a new *Miranda* advisement after a suspect initiates dialogue. As the trial court acknowledged, an express *Miranda* waiver would certainly make this an easier case. However, it is well settled that a suspect initiates "further communication, when his words or conduct 'can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." ' " (*Molano, supra*, 7 Cal.5th at p. 656.) " 'In the event he does in fact "initiate" ' such further communication, exchanges, or conversations, 'the police may commence interrogation if he validly waives his [*Miranda*] rights.' " (*Waidla*, at pp. 727–728; see also *Bradshaw*, at p. 1044

["if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation"].)  For the reasons stated above, the waiver here was valid.

Nonetheless, we acknowledge that certain aspects of the interaction between Patterson and defendant make this question close.  First, defendant never expressly revoked his invocations.  Instead, the waiver here was more subtle:  When defendant asked Patterson if he wanted to talk, Patterson responded, "[I]f you don't mind and we could just talk about what has happened or something," and then a conversation ensued.  Defendant later explained that he had not wanted to discuss what had happened that day but that "it ended up that way" and that "at this point," which was after he had confessed, he had nothing to lose.  As the trial court explained, "The only thing lacking — and I think [defense counsel] argued this point and I think well argued it — was if Dr. Patterson had stopped and stated the *Miranda*, we probably wouldn't be having this conversation."

Second, defendant's medical condition — he had been shot, he was in pain, and had been given a "pretty heavy dose" of perhaps "local anesthesia" prior to his confession — raises concern about whether he would have been alert and cognizant during his encounters with Patterson.

Third, there is the possibility that law enforcement's prior violations of defendant's right to counsel may have put pressure on defendant and made him feel like he had to talk to law

enforcement or Patterson despite his prior invocations of his right to silence and to counsel.

Last, there is the possibility that defendant was unclear as to whether Dr. Patterson was there to interrogate defendant or treat him. Defendant may not have fully appreciated this distinction. Defendant spoke to Patterson only after expressing potential willingness to Haas to speak with a psychiatrist in the context of a discussion in which defendant had described his earlier efforts to see mental health specialists. In talking with Patterson, defendant seemed interested in getting answers about his schizophrenia. He explained his efforts to get treatment and described his delusions and what seemed to worsen them. He told Patterson, "I think you, you probably deal with emotional states rather than facts anyway, but (unintelligible) if you're giving some type of a diagnosis."

Nonetheless, despite these countervailing concerns, the record overall establishes that defendant made a conscious choice to talk to Patterson despite knowing he was entitled to counsel and also knowing that, by talking to Patterson, he was acting against his legal interest. Defendant had been read his full *Miranda* rights by Detective Young at the start of the evening and Patterson had clearly informed defendant at the start of the encounter that his statements could be used against him. Defendant asserted his *Miranda* rights to Patterson, as he had earlier in the evening, which showed his understanding that he had the right to assert his rights to Patterson. Most crucially, we have the unique benefit of being able to listen to the audio of the interview, which corroborates Patterson's testimony that defendant appeared alert and unconfused, and convinces us, as it did the trial court, of "defendant's understanding, knowledge, appreciation and willingness to participate in the

conversation . . . ." (See *Burbine, supra*, 475 U.S. at pp. 422–423 ["Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law"]; accord, *People v. Mattson* (1990) 50 Cal.3d 826, 867.) We agree with the trial court's conclusion, described above, that defendant "knew what was going on. He knew what use it would be put to. He knew with whom he was speaking. He knew what he was speaking of." We further agree the conversation was "un[e]xcited, unforced and voluntary . . . ." In sum, our review of the audio recording reveals a defendant who is speaking freely, easily, and comfortably and not as the result of " ' "intimidation, coercion, or deception . . . ." ' " (*McCurdy*, *supra*, 59 Cal.4th at p. 1086.)

Accordingly, we affirm the denial of the suppression motion. Defendant's ultimate decision to speak with Patterson was not the product of the earlier efforts to question him but of his own free will and intelligent choice, knowing he was entitled to, and had the option to wait for, an attorney. Only because of an unusual record affording insight into defendant's thinking can we conclude defendant's willingness to talk was uninfluenced by the earlier *Miranda* violations. To be clear, we do not hold that, after invocation, law enforcement can return shortly thereafter and request to interrogate the suspect. That violates *Edwards*'s bright line rule. Similarly, we do not hold that law enforcement has carte blanche permission to remain present after an invocation in the hope of inducing a suspect to talk. Depending on the facts, such conduct could make a subsequent initiation and waiver involuntary. For example, we

could imagine a case where the subsequent statements by law enforcement to the suspect are more directive (e.g. "we'll just stay here or follow you around until you change your mind"), where the duration of the officer's presence is longer, where the manner in which the officer stays is more menacing or intimidating, or where the defendant's ultimate decision to talk seems coerced based upon the defendant's responses. But that is not this case. Every *Miranda* inquiry is highly fact specific, and here we have unique facts. Here, Patterson explained after defendant invoked that "it's up to you" and did not ask further questions; Patterson was present with defendant for only a limited time period before defendant started the conversation with Patterson; defendant, and not Patterson, started the conversation at issue; the recorded interview clearly shows that defendant was calm and was engaging Patterson, with defendant largely directing the conversation and selecting the topics; the record indicates that defendant was aware he was providing information that might be used against him, yet he viewed the trade-off as worthwhile; and the trial court's numerous factual findings are supported by an audio recording that we can listen to and assess for ourselves. On this unique record, we affirm.[4]

---

[4] The dissent expresses concern that this holding will encourage law enforcement to " 'simply disregard the suspect's requests for counsel' " and continue to interrogate the suspect with shifting and ever subtler tactics. (Dis. opn., *post*, at p. 21, quoting *People v. Storm* (2002) 28 Cal.4th 1007, 1046 (dis. opn. of Chin, J.).) We disagree. First, it is worth noting that we here hold that the trial court properly excluded portions of defendant's prior interviews conducted by Haas and Young. Moreover, we acknowledge above that this is a close case and,

## B. Exclusion of Portions of Patterson's Interview of Defendant

After the trial court denied defendant's suppression motion, the parties litigated what portions of the Patterson interview were admissible, with defendant arguing for admission of the entire interview but the court generally ruling with the prosecution in admitting only limited portions. Defendant challenges the trial court's ruling, contending that excluding a majority of the interview violated Evidence Code section 356 and his federal constitutional right to due process. The Attorney General argues the excluded portions were irrelevant to the question of defendant's mental state and that regardless, any error was harmless. We conclude the trial court acted within its discretion in redacting the statements as it did.

### 1. *Version of Interview Presented to Jury*

The redacted interview submitted to the jury described in the statement of facts *ante* is recounted in more detail here. In the redacted interview, defendant explained that he would become overwhelmed by "intense emotions" and that he had recently been in a monthlong "very intense emotional relationship" with G.A. that had "[s]tirred things up." He

on different facts, suppression of defendant's statements to Patterson could have been required. This fact alone, involving the possibility — litigated over several decades — of suppressing statements used at the trial of a defendant convicted of the senseless murder of a law enforcement officer, serves as a stark warning. No one should take from this opinion the lesson that violations of constitutional rights carry no consequences. Every violation jeopardizes the ability to place before a jury anything a suspect might say, and jeopardizes any conviction that might be obtained if matters that should have been excluded are erroneously admitted.

explained he had married G.A. some years before as a favor so she could obtain a green card and that they had had no contact nor began dating until recently. The week before the shooting, he had accused G.A. of cheating on him and she had denied it. He explained to Patterson that he had become intensely jealous of G.A. and determined to never be physically separated from her again. He then confessed to kidnapping G.A. at gunpoint.

The portion submitted to the jury also included Patterson and defendant's discussion of the events surrounding the shooting of Aguirre. Defendant recalled observing the police pull G.A. out of the house and realizing then that her family must have called the police. He saw Aguirre enter the residence and heard Aguirre tell him to put his hands up. Defendant explained that he "was kinda looking out" from behind a wall and "just jumped out and shot [Aguirre]," explaining that that was how he "reacted" to the situation.

The submitted portions of the interview also included some explanation of defendant's experience of the events that day. He told Patterson that on the day of the shooting, he felt as if he "was in a movie." He recounted earlier conversations with G.A. in which she had urged him to write a movie because defendant had "done some writing" in school. That afternoon when they were driving in the car after leaving G.A.'s employer's residence, G.A. had reminded defendant about writing a movie and he had explained to her that he was writing the movie at that moment and that they were in the movie "acting it out." He told Patterson, "[W]hen you have guns, then that's how you write a movie . . . " and that he kept telling G.A., "[Y]ou're in [the movie] right now, isn't it exciting?" But he explained to Patterson that he was "aware of everything that happened" and "know what I did . . . ." He explained that he was "getting what

[he] wanted" and that the "movie was going the way [he] wanted it to." He explained that his actions against the police that day had been a "passive suicide attempt."

### 2. *Portions of Interview not Presented to Jury*

In the portions of the interview excluded from the jury, defendant and Patterson discussed defendant's experiences with paranoid delusions, efforts to seek mental health treatment, self-diagnosis of schizophrenia, recognition that close emotional relationships would intensify his delusions, and description of prior criminal activity and incarceration as it related to his delusions. Defendant stated, "I think you, you probably deal with emotional states rather than facts anyway, but (unintelligible) if you're giving some type of a diagnosis."

Defendant told Patterson he had paranoid delusions. He explained that about two years before Patterson's interview of defendant, defendant had contacted the county mental health department because he thought he had a mental disorder. He saw psychologist Lisa Kus (who testified in defendant's penalty defense) at the county's mental health department, and she diagnosed him with organic delusional disorder. Kus referred defendant to a psychiatrist who prescribed Haldol. Defendant stopped taking the medication after three days because it caused "a lot of hallucinations" that were "real frightening." Patterson told defendant that sometimes Haldol worsens hallucinations. When defendant went back to the county's mental health department, he was seen by another psychiatrist who did not schedule defendant for another appointment because he did not think defendant "was going to be a mental health patient."

Defendant told Patterson he also attended "12-step meetings and recovery programs" for drug addiction and

alcoholism and enrolled in a drug and alcohol counselor's certificate program at Oxnard Community College. He told Patterson about his job working as a resident manager at the facility for residents with dual diagnosis of mental disorder and chemical dependency. Through information gained in these experiences, defendant determined he had schizophrenia.

Defendant provided some descriptions of his delusions. He explained that when he saw Kus, he had been living with his parents and had formed the belief they were "Nazi agents . . . trying to reprogram [defendant] through chemicals" by poisoning his food. Defendant said he had a "paranoid episode" for three months after that. Defendant responded affirmatively to Patterson's question whether defendant still believed his father was poisoning his food.

He described experiencing an "intense" paranoid delusion about three to six months before the interview with Patterson, in which defendant formed the belief that his father had molested defendant's son when his son was approximately 7 years old. Defendant felt "intense" anger and avoided his father, thinking he would have to kill him, until he realized he was having a delusion.

Regarding defendant's accusation to G.A. a few days before the shooting, that she was cheating on him, defendant told Patterson that G.A. responded, "You're sick, Mike, you're sick in the head, you need treatment, you should go [see] the doctor."

Defendant explained he had "another violent episode" about 10 years earlier, in which he committed armed robbery of a McDonald's restaurant while he was under the influence of drugs. Patterson asked if the armed robbery was "a fall off with

the paranoid delusional thing." Defendant responded, "Well you know the armed robbery thing was, and I, this is all in my files over at Hillmont, but I had the delusion — I sorta had that delusion today too, but uh, I was doing a religious thing. It was a religious battle. (unintelligible). Ever heard of Krishna? The Indian God, Krishna?" Defendant explained he was Hindu and robbed the McDonald's restaurant because, "I thought they were the demons of this world selling billions and billions of hamburgers. I wanted to harm them, so I was gonna rob 'em. . . . I wanted to scare all the people in the restaurant."

Patterson and defendant discussed his incarceration following the robbery. Defendant told Patterson that when he was pending release from incarceration, he told a staff psychiatrist that he thought he would be harmful to himself and society and should not be released. Defendant told prison staff that he was continuing to have "delusions with Krishna."

Defendant explained that he was not feeling "remorse now" and this was "normal" for him when he was "emotionally excited, to shut down." He described feeling like "there's no emotion" but also that there was "too much emotion. You don't realize you have emotions, then you feel that controls your actions."

In addition to explaining to Patterson, in the portion submitted to the jury, that the intense emotions defendant experienced were overwhelming, defendant had also explained in the excluded portions of the interview that close emotional relationships "amplified the delusional thinking." He explained that the paranoid episodes were "triggered by, by uh, people that . . . are real close . . . ." Defendant avoided seeing his son, at the time age 22, because it would be a "pretty emotional"

experience, and emotions would "amplif[y] the delusional thinking, you know." He experienced his emotions as "disorienting and confusing and . . . uncomfortable."

In response to Patterson's question about whether defendant's delusions had "entirely disappear[ed]," defendant explained that he still had "paranoid . . . episodes." The episodes would "come[] and go[]."

### 3. *Procedural and Legal Background*

The prosecution sought to admit portions of defendant's statements "to explain the defendant's actions" on the day of the shooting and argued that the remaining portions concerned evidence of defendant's criminal, family, educational, and mental health history that was irrelevant "to what the defendant was thinking or doing on the day in question and do not shed any light on the issues in the case." The prosecution specifically objected on hearsay grounds to defendant's comments relaying statements made by his previous treating clinicians.

The defense contended that admission of the entire interview was necessary under his federal constitutional due process and confrontation rights because it was defendant's explanation of why the shooting occurred. The defense argued that defendant's statements in the interview — his descriptions of his symptoms and earlier episodes of delusions, recounting of diagnosis by former mental health clinicians, and explanation that his paranoid delusions were amplified by intense emotional relationships and had resulted in earlier criminal activity — were in response to Patterson's questions and an explanation that his paranoid delusions were present in the days leading to, and had resulted in, the shooting and thus were evidence of his

mental state. Defendant also argued that the remaining portions of the interview were connected to the portions offered by the prosecution to show defendant's thoughts and actions that day, including the admitted portion in which defendant stated that he "just reacted" to the situation, and that the statements added corroboration and credibility to the admitted statements. The defense argued that exclusion of the statements, and in particular the detailed parsing of the statements, would create a misleading impression that defendant confessed to shooting Aguirre absent any mental illness and that the admitted portions were all that defendant had told Patterson, a psychiatrist, about why he shot Aguirre. In sum, the defense argued that excluding all references to defendant's mental illness would create a misleading impression of defendant's state of mind and deprive the jury of a complete evaluation of defendant's explanation of his mental state.

The prosecution objected to admission of the entire statement as containing multiple layers of hearsay and that the defense was not calling a mental state expert in the guilt phase or declaring an intent to present a defense based on a mental disease.

The trial court denied the defense motion to include the entire interview, admitting the portions requested by the prosecution, some additional passages the court determined to admit, and two specific portions requested by the defense in response to the court's ruling. Specifically, on its own, the court admitted portions of the discussion between Patterson and defendant in which defendant described feeling "these intense emotions that were kind of overwhelming," that his relationship with G.A. had "[s]tirred things up," that defendant had felt like he was "in a movie" that day but that he was "aware of

everything that happened," and that his conduct that day was his "reaction to the situation" and had possibly been a "passive suicide attempt," and that defendant was "getting what [he] wanted, the movie was going the way [he] wanted it to." In response to defense requests, the court admitted portions in which defendant said he had accused G.A. of cheating on him the week before, which she denied, but it declined to admit the additional portion in which G.A. further told defendant, "You're sick, Mike, you're sick in the head, you need treatment, go to the doctor."

The court reasoned that the portions it was admitting were relevant to the prosecution's offer to show defendant's "state of mind" and actions that day but that defendant's "subjective evaluation of his own psychological state as it reflects back upon what he thought he was doing in the context of the psychoanalysis and other treatment he had received throughout, other therapists" (*sic*) was inadmissible. The court ruled that the defense could otherwise contest the state's case on state of mind, malice, and premeditation such as through expert testimony, but could not present expert opinion through defendant's statements. The defense could also inquire into the circumstances of the interview, such as defendant's condition and the representations made by Patterson. In response to the court's ruling, the defense reiterated its contention that admission of the entire interview was required and argued that nonetheless, the inclusion of 15 additional lines from the interview was at least admissible under the trial court's own theory of admissibility. As noted above, the trial court admitted some of the requested lines.

During its opening statement, the prosecution quoted from defendant's statements to Patterson that he felt like he

was in a movie on the day of the shooting. The prosecution stated this "wasn't a hallucination" and quoted defendant's further comments from the interview in which defendant stated that he had told G.A. that he was writing a movie. The defense renewed its motion under Evidence Code section 356 to have the entire audiotape played during cross-examination, arguing in response to the prosecution's comment that defendant had not been hallucinating, that the excised portions of the interview supported the defense theory that defendant was experiencing delusions that day, noting specifically that defendant had explained that he had earlier had a delusion that he was in a Hindu religious battle and that he had told Patterson that he " 'sort of had that delusion today too.' " The trial court denied the motion, explaining:

"It is one thing for a person to express subjectively, 'This is my state of mind at the time,' that is, this is what I know, this is what I said, this is what I did, which is what the present offer is, what is before the jury. It's a wholly different thing for them to have him engage in psychoanalytic theory on why he did what he did.

"And, in substance, what the defense would have the Court do is have Mr. Johnson become his own expert. Not on his state of mind at the time, which is — you know, one is allowed to give one's impressions about one's own physical condition under oath. But this is really ramblings of someone about former events, former states of mind, former matters which are wholly outside of, in my estimation, what is before the Court.

"Now, let me be clear. I think this has all really been rather thoroughly explored. I am comfortable with the idea and

the reason I allowed his expression of his then existing state of mind in because I think you have a right to argue whether a person who sees himself in a movie is a person who has actually formed malice. I think ultimately I'm going to hear that argument from you.

"And inasmuch as he was recounting the events and his then existing state of mind, that is all that is before the jury. However, to then allow a foray into Mr. Johnson's subjective psychoanalytic theory concerning what moves him in times past and how that may have some nexus with times present is not 356. It's just — it's not part of the same package. It's a wholly different issue.

"As to his cognitive functions at the time, you know, the evidence will be whatever the evidence is. And Dr. Patterson's examination at this point has been markedly circumspect. It's been: I was there, there was the person, this is what he said. And it was redacted to confine itself to the very narrow issues before the Court.

"I could go on and give you some self-serving comments about how I'm comfortable with this ruling, but I'm more comfortable than I was before with it. I think it's a very clear, almost bright line distinction between his evaluative thinking reflectively and his declarative thinking about what in fact occurred.

"So, the objection — the motion to offer the greater portion of evidence is denied, and the Court stands on its earlier ruling."

Evidence Code section 356 provides that "[w]here part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may

be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence .” “ ‘ “The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.” ’ ” (*People v. Hardy* (2018) 5 Cal.5th 56, 104.) “ ‘ “ ‘[T]he courts do not draw narrow lines around the exact subject of inquiry. “In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with,* the admission or declaration in evidence. . . .” ’ ” ’ ” (*People v. Clark* (2016) 63 Cal.4th 522, 600 (*Clark*).) This includes admission of portions “of the same interview or conversation, even if they are self-serving” so long as they “ ‘have some bearing upon, or connection with, the admission . . . in evidence.’ ” (*People v. Arias* (1996) 13 Cal.4th 92, 156.) “Evidence Code section 356 ‘ “is founded on the equitable notion that a party who elects to introduce a part of a conversation is precluded from objecting on confrontation clause grounds to introduction by the opposing party of other parts of the conversation which are necessary to make the entirety of the conversation understood.” ’ ” (*People v. Melendez* (2016) 2 Cal.5th 1, 26.) “The section permits introduction only of statements ‘on the same subject’ or which are necessary for understanding of the statements already introduced. The ‘other conversation’ referred to in Evidence Code section 356 must have some bearing upon, or connection with, the admission or

declaration in evidence." (*People v. Breaux* (1991) 1 Cal.4th 281, 302.) Evidence Code section 356 "applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced. [Citation.] Statements pertaining to other matters may be excluded." (*People v. Samuels* (2005) 36 Cal.4th 96, 130; accord, *People v. Chism* (2014) 58 Cal.4th 1266, 1324.) "Section 356 is indisputably ' "subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced." ' [Citations.] 'The rule is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy . . . .' (Witkin, Cal. Evidence (2d ed. 1966) § 320, p. 283.)" (*People v. Williams* (1975) 13 Cal.3d 559, 565.)

Further, under section 352, "a trial court has broad discretion to exclude evidence it deems irrelevant, cumulative, or unduly prejudicial or time-consuming." (*People v. Pride* (1992) 3 Cal.4th 195, 235; see *People v. Zapien* (1993) 4 Cal.4th 929, 960 [affirming trial court's ruling to admit portions of earlier testimony sought by the prosecution for context under Evid. Code § 356 where the court also considered and rejected the defense's challenge to admission of the statement under § 352].)

A trial court's ruling under Evidence Code section 356 is reviewed for abuse of discretion. (*People v. Farley* (2009) 46 Cal.4th 1053, 1103.) " ' "[T]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." ' " (*Williams v. Superior Court* (2017) 3 Cal.5th

531, 540.) "To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 .)

### 4. Analysis

Defendant contends on appeal that the trial court erred in excluding a majority of his statement to Patterson because the redacted statement gave the jury an incomplete, prejudicial view of his mental state on the day of the crime as well as during the interview with Patterson.

In the interview, defendant had explained his belief that he had been plagued by paranoid delusions throughout his life and that they had resulted in criminal activity similar to the events that day. He explained that his perceptions of reality would be incorrect due to his mental illness. Defendant observed that his delusions were worsened by close relationships, such as his parents and his son, and had previously resulted in homicidal thoughts. He explained that as the delusions were happening, he would believe they were real, such as that his parents were Nazi agents trying to poison his food or that his father had molested defendant's son. Defendant argues these explanations were part of his explanation in the admitted portions about becoming overwhelmed with feelings for G.A.; he highlights that he had told Patterson that his intense feelings for G.A. had amplified

his delusional thinking. Defendant had told Patterson that he had considered going to see a psychiatrist a week before the shooting because when he accused G.A. of cheating on him, she had said he was mentally ill and needed to see a doctor. Thus, defendant argues, his complete statement gave meaning to his behavior and mental state at the time of the kidnapping, sexual assault, and murder. He argues exclusion of the statements was prejudicial because it created a misleading impression that he shot Deputy Aguirre absent any mental illness and because it allowed the prosecution to argue defendant committed cold-blooded first degree special-circumstances murder by urging the jury to "listen to that tape to hear the cold and to hear the ice" in defendant' statements without the benefit of hearing the rest of the interview, which he argues would have given the jury context to evaluate the prosecution's characterization of defendant's demeanor and intent.

We conclude the trial court acted within its discretion to redact the statements as it did. First, the court admitted defendant's statements that described his mental state on the day of the shooting. Defendant described that he "felt these intense emotions that were kinda overwhelming." He described that "what happened this afternoon was like I was in a movie." He described, "it was going on and I was living life and that was a movie." The court reasonably decided that defendant's self-diagnosis regarding prior events was unrelated to the current events and his description of what he was experiencing that day. The trial court chose to distinguish between statements reflecting past unrelated events versus the events on the day of the shooting and defendant's analytic statements as to his mind versus declarative statements of what he was experiencing. Thus, it excluded the portions of the interview that covered

defendant's criminal, educational, psychiatric, and family history. As the Attorney General argues, these portions were irrelevant to what defendant was thinking on the day of the shooting. Second, the trial court informed the defense that the whole interview was not admissible and that the defense needed to be more specific about which parts it sought to admit, and then it considered further the specific portions the defense identified as admissible. The court explained that because the defense had sought to admit the entire interview, "I had to do it essentially on my own, I felt. I felt somewhat at sea on that. [¶] I've made the ruling. Are there things specifically you feel should come in that I'm not allowing in? Having said, 'I want it all,' can you be more precise?" The record shows the trial court acted carefully in seeking to narrowly admit the portions related to the portions sought by the prosecution. Third, the trial court informed the defense that it could present an expert to testify about defendant's mental condition on the day of the shooting. Counsel apparently chose not to do so. The record shows that the trial court carefully reviewed the interview transcript and discussed its reasoning with the parties and provided the defense an additional opportunity to argue for the inclusion of specific statements, before it reasonably concluded it had included all statements that related to defendant's statement of mind on the day of the shooting. The trial court's decision to include statements that related to the defendant's mental state on the day of the shooting but to exclude statements regarding his mental state prior to the shooting (in some cases ten years or more prior to the shooting) was not an abuse of discretion.

Because the court acted within its discretion under Evidence Code section 356 in excluding portions of the statements, defendant's related claim that the trial court

violated his due process rights by excluding relevant evidence also fails. " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 683; accord, *People v. Frye* (1998) 18 Cal.4th 894, 948.) While the court excluded the portions of the interview it found unrelated to defendant's statements about the events on the day of the shooting, it informed the defense it could otherwise contest the state's case on state of mind, malice, and premeditation such as through presentation of expert testimony. Thus, the defense was not precluded from presenting a defense about his state of mind.

## C. Admission of Defendant's Prior Serious Felony Convictions as Evidence of Motive

Defendant contends the trial court's admission in the guilt phase of evidence of his prior crimes to demonstrate his "Three Strikes" status as proof of motive violated Evidence Code sections 1101 and 352, depriving him of his rights to a fair trial and due process of law, and rendering the penalty determination unreliable in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He also raises related prosecutorial misconduct and abuse of discretion claims. Without resolving the substantive claims, we conclude any error was harmless.[5]

---

[5] As he argued below, defendant also argues that the other crimes evidence was inadmissible to show intent, as distinct

### 1. *Factual and Legal Background*

To support its theory of premeditated murder, the prosecution moved to admit evidence that defendant had suffered two prior convictions in 1987 that qualified as serious felonies, and that he had signed a parole form in 1991 stating that possession of a firearm would constitute a felony. (Evid. Code, § 1101, subd. (b).) The prosecutor reasoned that if defendant knew he faced a 25-year-to-life sentence for possessing firearms, then his awareness of his status supported an inference that he quickly shot Deputy Aguirre and attempted to kill Deputy Fryhoff to avoid arrest and a potential life sentence.

The defense argued that such inference was speculative because there was no evidence defendant understood and was motivated by the possibility that he faced a Three Strikes sentence. Defense counsel further argued that defendant may not have understood that his concurrent convictions in 1987 were separate strikes since he had committed the offenses "on the same occasion."

Acknowledging that defendant's knowledge of his status was "to some degree speculative," the trial court nonetheless

_____

from motive, because his prior offenses were insufficiently similar to his current charges to support an inference that he was acting with the same intent in the current charges as he was in the previous offenses. However, the prosecution did not argue that defendant killed Deputy Aguirre because he was motivated by the same intent he harbored when he committed the past offenses. The prosecution only used the prior offenses to argue motive, i.e., defendant killed Aguirre to escape a life sentence because the existence of his prior convictions exposed him to a potential life sentence, and the jury was accordingly instructed only on this theory.

granted the prosecution's motion to admit the evidence of defendant's prior offenses and the parole advisement, concluding defendant's criminal history was "significant circumstantial evidence" of motive, the absence of which would "misrepresent the picture of the facts" and render the killing of Deputy Aguirre apparently senseless. The court explained, "the point is that in the space of but moments, the defendant, it is alleged, shot and killed a police officer with premeditation and deliberation. [¶] Operating in a vacuum, it is arguable that makes little, if any, sense. The district attorney's correct. The Court is also mindful that if it admits evidence concerning the defendant's criminal history, it's terribly prejudicial. [¶] The role — the status of the defendant as a person who just happens to be taking a shower when police arrive and sees them, arms himself and shoots and kills a police officer — on its face makes little, if any, sense in and of itself. [¶] There is a total package here that the jury is entitled to consider. The Court has to weigh how you put that together, understanding that the People's theory is this is a motive-driven killing, if I understand [the prosecutor's] position. [¶] The Court therefore is of the opinion that to deny the People the opportunity to show something about the defendant's history would be to disable the People from arguing significant circumstantial evidence that runs to motive, which would otherwise be completely absent, and that would be a mis[re]presentation of the picture of the facts as they existed at the time. [¶] The Court therefore is of the opinion that the People will be permitted to show that the defendant had suffered unspecified convictions."

The court concluded defendant's experience with the criminal justice system supported a reasonable inference that he understood the consequences of possessing a firearm. Due to

the prejudicial nature of the criminal history, the court decided to sanitize the convictions as "unspecified priors" and give the jury a limiting instruction.

In response to the ruling, the defense asked the court not to sanitize the two convictions, which were for assault with a firearm and robbery with a firearm, withdrew its request to bifurcate the trial of the prior conviction sentencing allegations and request to stipulate to defendant's status as a convicted felon (which was an element of the charge of felon in possession of a firearm), and requested that the parties avoid the phrase "Three Strikes." Granting the requests, the court instructed the jury that defendant had been convicted of the offenses and would be subject to a 25-year-to-life sentence if he were convicted of possessing a firearm or committing any felony.

The court also instructed the jury three times during the trial to consider the priors not as propensity or character evidence, but only as evidence of motive for murder and for proof of the charge of felon in possession of a firearm. This first occurred after the prosecution presented evidence about defendant's criminal record to show that defendant faced a potential life sentence when he armed himself on the day of the shooting and that his former parole officer would have advised defendant that possessing a firearm was a felony. The trial court instructed the jury not to use the evidence to conclude defendant had a disposition to commit the crimes, and gave a similar caution before deliberations. Second and third, the court also instructed the jury in the guilt and penalty phases that statements made by the attorneys during the trial were not evidence.

" 'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.  Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.)  'Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity.  [Citations.]  The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667 (*Fuiava*).)   When reviewing the admission of other crimes evidence to show motive, " 'a court must consider:  (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant.' " (*Ibid.*)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  " ' "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one

side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Powell* (2018) 6 Cal.5th 136, 162–163 (*Powell*).)

" ' "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." ' " (*Fuiava*, *supra*, 53 Cal.4th at pp. 667–668.) As noted above, "[t]he court's ruling will not be disturbed unless made 'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Powell*, *supra*, 6 Cal.5th at p. 162.)

### 2. *Analysis*

Assuming without deciding that the admission of the prior crimes evidence under Evidence Code section 1101, subdivision (b) in the guilt and penalty phases was error, any error was harmless. Considering the evidence's impact in the guilt phase first, we review state law errors for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Harris* (2013) 57 Cal.4th 804, 842; *People v. Malone* (1988) 47 Cal.3d 1, 22.) This requires us to examine whether it was "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.)

Our review of the record shows it was not "reasonably probable" defendant would have received a more favorable result had his prior convictions been excluded. To prove defendant premeditated Deputy Aguirre's murder, the prosecution sought to introduce evidence of defendant's prior Three Strikes offenses to show defendant was motivated to shoot

at the officers in order to escape and avoid a life sentence. But the evidence was strong that defendant killed Deputy Aguirre under all three theories of first degree murder. Defendant had confessed to the details of shooting Deputy Aguirre and kidnapping G.A., and acknowledged his awareness that Aguirre was a police officer. He had explained seeing the police officers pulling G.A. out of the house and understanding then that her daughter had called the police. Defendant's confession was corroborated by G.A.'s testimony about the kidnapping and by defendant's further actions as witnessed by Deputy Fryhoff that defendant fired several rounds at Fryhoff as defendant ran out of the house. Further, expert testimony on gunshot wounds and blood splatter established that Deputy Aguirre was shot in the head at very close range, likely while he was on or near the ground. Given all of this evidence, the jury likely would have concluded defendant fired at the officers while he was running out of the house in order to escape and avoid arrest, and regardless, that he premeditated the ambush murder of Deputy Aguirre while kidnapping G.A. Thus, the evidence was strong that he premeditated the killing of Deputy Aguirre, as well as killed him in the course of kidnaping G.A. (felony murder theory), as well as jumped out from behind a wall and ambushed the deputy (lying-in-wait theory).

The prior crimes evidence was not a significant part of the prosecution's case; rather, the prosecutor largely focused on defendant's confession as proof of his mental state and conduct. Defendant's confession was a focal point of the prosecutor's case on premeditation (as well as the other theories of murder). The prosecutor discussed defendant's admissions in his opening statements at the start of trial, played the statements for the jury during the trial, used them in cross-examining defense

witnesses, and emphasized how the statements supported the prosecution's case during closing and rebuttal arguments. In the opening statement, for example, the prosecutor highlighted that the jury was "going to hear in [defendant's] own words the cold, matter-of-fact way in which he describes this murder of Peter Aguirre." The prosecutor then quoted defendant's statements extensively, about kidnapping G.A. from work at gunpoint, going to her house and ordering her 15-year-old daughter to leave, observing the arrival of the police when he and G.A. were in the shower, observing the police pull G.A. out the front door, and hearing Aguirre telling him to put his hands up. During the trial itself, the prosecutor played the entire audiotape of the redacted interview for the jury to hear. In the portions played by the prosecutor, the jury heard defendant confess that he kidnapped G.A. from her workplace, stating, "I would say actually I, I kidnapped her, you know?" The jury also heard defendant describe looking out from behind a wall, seeing the police pull G.A. out of the front door of the home, and hearing Deputy Aguirre tell him to put his hands up in response to which defendant "just jumped out and shot" him. In the portion the prosecutor played for the jury, it also heard defendant explain that he shot Deputy Aguirre because he "just reacted" to the situation and that he believed he had attempted a "passive suicide" by his actions that day. These direct admissions by defendant regarding his culpable state of mind were far more consequential than reference to the fact that defendant might have faced a life sentence for committing the crimes.

Defendant argues admission of the evidence at the guilt phase was prejudicial because it permitted the jury to use defendant's prior convictions as propensity evidence, increasing the likelihood defendant was convicted for his status as a prior

offender. However, the jury was twice instructed at the guilt phase not to treat the evidence as propensity evidence. "We must assume, contrary to defendant's theory of prejudice, that the jury obeyed the express language of the instruction not to use the other-crimes evidence to establish defendant's character or his disposition to commit crimes." (*People v. Hayes* (1990) 52 Cal.3d 577, 625.)

Defendant also contends the prosecutor committed misconduct by repeatedly arguing falsely in the guilt and penalty phases that defendant signed a parole form that advised him that he faced a 25-year-to-life sentence on possession of a firearm. It is misconduct for a prosecutor to argue facts that are not in the evidence. (*People v. Linton* (2013) 56 Cal.4th 1146, 1207 (*Linton*); *People v. Mendoza* (2016) 62 Cal.4th 856, 906.) Regardless, without deciding whether the comments were misconduct, for the reasons described above, these comments would have been harmless because the prosecution largely focused on defendant's confessions and generally argued defendant would have shot at the police officers to facilitate his escape. Moreover, even assuming the prosecutor improperly conveyed to the jury that the parole form stated that defendant faced a 25-year-to-life sentence for possessing a firearm, it was undisputed that defendant was advised that possessing a firearm was a felony, which would have potentially subjected defendant to further sentencing. In this way, even without the assumed error, the jury still would have heard uncontradicted evidence that defendant had been advised that possessing a firearm was a felony. Thus, defendant would have been aware that he could be convicted of a felony if he, a convicted felon,

were ever apprehended with a firearm. Thus, any error was harmless.[6]

Defendant also argues admission of the Three Strikes evidence was prejudicial at the penalty phase. Specifically, he argues that his "defense in the penalty phase was that [he] was suffering from the debilitation of paranoid schizophrenia. The improper admission and use of the evidence — in light of the prosecution's concealment that appellant was in fact suffering from paranoid schizophrenia, while also denigrating the defense expert on this subject and arguing to the jury that appellant was not suffering from paranoid schizophrenia — utterly destroyed the defense." Defendant appears to be arguing that the claimed error in admitting the Three Strikes evidence into the trial, and the claimed error in denigrating his expert psychologist during the penalty phase, had the cumulative prejudicial effect of persuading the jury to conclude at the penalty phase that defendant killed Deputy Aguirre because he wanted to avoid arrest and prison and to reject the defense's expert testimony that defendant killed Deputy Aguirre because he was experiencing schizophrenia.

For state law errors, we review whether there was a "reasonable possibility" the error affected the penalty verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 447; *People v. Ashmus* (1991) 54 Cal.3d 932, 965.) As discussed in part II.G.4., we conclude the prosecutor's efforts to denigrate the defense expert would have been harmless. The jury, moreover, learned about defendant's prior violent offenses (that were the basis for the

---

[6] For the same reasons, defendant's related claim that he was prevented from responding to the prosecutor's argument, even if it has merit, was also harmless error.

Three Strikes convictions) as part of the prosecution's presentation of Penal Code section 190.3, factor (b) and factor (c) evidence on defendant's prior criminal activity. Thus, the jury would have heard about the prior convictions that were the basis for the Three Strikes allegations as routine penalty phase evidence regardless of whether they were admissible under the guilt phase theory that defendant shot Deputy Aguirre because he knew he faced a life sentence and thus sought to avoid arrest.[7] We therefore conclude there was no reasonable possibility that any error in admitting defendant's Three Strikes convictions prejudicially affected the penalty phase verdict.

### D. Deputy District Attorney's Testimony About Defendant's Criminal Record

Defendant contends his state and federal rights to due process and a fair trial were violated by Deputy District Attorney Terence Kilbride's testimony about defendant's criminal record. Specifically, he contends the testimony usurped the jury's role in determining defendant's prior convictions. He also contends the testimony usurped the court's role in instructing the jury. We conclude there was no prejudicial error.

As part of the prosecution's evidence that defendant faced a potential life sentence when he armed himself on the day of the shooting, Kilbride testified, as an expert on sentencing, that defendant had served a prison term and had convictions for five

---

[7] In determining the penalty, factor (b) of Penal Code, section 190.3 permits the jury to consider evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Factor (c) permits the jury to consider evidence of defendant's prior felony convictions. (*Id.*, subd. (c).)

felonies. Kilbride had worked as a deputy prosecutor for 23 years and was trained and experienced in California sentencing law. He explained that Penal Code sections 667 and 1170.12 were sentencing schemes under which "a serious felony conviction [has] substantial effects on the amount of sentence a person would serve." He explained that "serious felonies" were "certain statutory felonies" identified in the Penal Code. Kilbride testified that in reviewing defendant's conviction records, he "determine[d]" that defendant was convicted of several felonies. He reviewed several of defendant's conviction records in the jury's presence, explaining what information each document showed and explaining that two of defendant's convictions, for robbery with a firearm and for assault with a firearm, qualified as serious felonies under the "statutory definition." He then explained that under Penal Code sections 667 and 1170.12, a person with two prior serious felonies faced a sentence of 25 years to life upon conviction of a new felony. In addition to admitting defendant's conviction records and Kilbride's testimony to show that defendant was motivated to kill Deputy Aguirre to avoid a life sentence, the prosecution offered the evidence to show defendant's status as a convicted felon to support the charge of felon in possession of a firearm, and as proof of prior convictions for the sentencing enhancements.[8]

---

[8]  As explained above, after the trial court ruled against defendant on whether to admit defendant's prior convictions to show motive, defendant withdrew his motion to bifurcate the trial of his prior convictions allegations, which were the basis of the sentencing enhancement allegations, and withdrew his similar request for a stipulation that defendant was a convicted

At the conclusion of Kilbride's testimony, the trial court instructed the jury that it was to determine (1) "whether in fact the defendant did suffer the felony convictions," (2) whether the convictions established a motive for Deputy Aguire's murder, and (3) "whether such felony convictions, if true, establish[ed]" that defendant was a convicted felon for purpose of the charge of felon in possession of a firearm.  During closing argument, the prosecutor informed the jury about its role in completing the verdict forms.  The prosecutor explained "there is a step-by-step process intellectually that you will need to go through to reach the various verdicts that the law instructs you [that] you should in this case."  The prosecutor stated the jury would have to make several findings on the verdict form with respect to the several charges including a "number of findings" regarding the prior conviction allegations and that "all the appropriate findings are laid out very, very well" in Kilbride's uncontested testimony.  The prosecutor also told the jury, "You must find he was convicted, served a prison term, that they were serious felonies.  And again, I submit to you that an examination of Mr. Kilbride's uncontested testimony in this will serve you well."

First, defendant argues Kilbride's opinion — that defendant had five felony convictions including for two serious felonies, and that he faced a 25-year-to-life sentence upon conviction of another felony — violated his federal constitutional right to have a jury find beyond a reasonable doubt every element of the charged offenses.

"All criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of

_____

felon, which was an element of the charge of felon in possession of a firearm.

the crime with which he is charged, beyond a reasonable doubt.' (*United States v. Gaudin* (1995) 515 U.S. 506, 510 (*Gaudin*); accord, *Apprendi v. New Jersey* (2000) 530 U.S. 466, 477.)" (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) Though "a witness may not express an opinion on a defendant's guilt," the Evidence Code makes clear that "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.)

While Kilbride's testimony aided the jury in understanding defendant's criminal records, it was the records themselves that established the facts of defendant's convictions for several felonies. Kilbride reviewed the records in the jury's presence to aid the jury in its understanding of the records. His testimony did not take away the jury's function of itself determining from the evidence whether defendant was in fact a convicted felon of the several prior offenses. The fact that Kilbride's testimony — that he had determined that defendant's criminal records showed that defendant had committed the prior convictions and that some qualified as Three Strike offenses — might have "embrace[d] the ultimate issue," Evidence Code section 805, of whether defendant was guilty of those convictions, did not make the testimony inadmissible. As the jury was instructed by the trial court and informed by the prosecutor to do so, it determined whether defendant had suffered the prior convictions. "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (*Ibid.*)

Defendant's cited authorities fail to support his claim that he was denied his right to a jury determination of every element

of the charges. The cited authorities generally address questions regarding a defendant's right to a jury trial, which defendant was provided. (*Gaudin, supra,* 515 U.S. at p. 507 [whether defendant's constitutional rights were violated by omission from the jury's consideration of an element of an offense]; *Duncan v. Louisiana* (1968) 391 U.S. 145, 146 [whether the defendant had a right to a jury trial on an offense subjecting him to punishment of up to two years]; *Sandstrom v. Montana* (1979) 442 U.S. 510, 512 [whether a jury instruction took away an element of an offense from the jury's consideration by creating a conclusive presumption on the element].) In keeping with the cited authorities, defendant was given a jury trial on all of the charges; the court instructed the jury on all of the elements of the charges and that it was to determine "what facts have been proved from the evidence received in the trial" and whether the offenses had been proved beyond a reasonable doubt; and the jury entered verdicts on each count. As such, defendant's convictions as to these offenses "rest[ed] upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." (*Gaudin, supra,* at p. 510.)

Second, defendant contends Kilbride's expert opinion testimony — that defendant had two felonies that qualified as serious felonies and so he faced a 25-year-to-life sentence upon conviction of another felony — was an impermissible opinion on the law and thus usurped the trial court's role to instruct the jury on the law. Defendant did not preserve this claim. He contends he preserved it through his Evidence Code section 1101 challenge to the other crimes evidence addressed in part II.C., *ante.* However, when defendant argued below at the hearings and in his briefing, that the evidence of his prior

convictions was inadmissible as motive evidence under Evidence Code section 1101, defendant did not specifically raise this distinct and unrelated legal challenge — that Kilbride's opinion testimony usurped the trial court's role in instructing the jury. (*People v. Lindberg* (2008) 45 Cal.4th 1, 48 [defendant forfeited his claim on appeal when, even though he "objected to the admission of the expert's testimony as a whole, he failed to object specifically on the ground he now advances and thereby deprived the trial court of an opportunity to make a fully informed ruling on the issue"].)

Regardless, defendant's claim that Kilbride's expert testimony usurped the trial court's role to instruct the jury about the law, even were we to conclude the claim has merit, is harmless for the reasons we discussed in part II.C, *ante.* (*People v. Prieto* (2003) 30 Cal.4th 226, 247, quoting *Watson*, *supra*, 46 Cal.2d at p. 836 [inadmissible expert testimony warrants reversal only if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached' " absent the error].) As we said in part II.C., *ante*, it was not reasonably probable defendant would have received a more favorable result had his prior convictions evidence been excluded because even without the evidence, the prosecution was able to present strong evidence of defendant's guilt.

### E. Jury Selection Issues

#### 1. *Denial of For Cause Challenges*

Defendant contends the trial court committed prejudicial error in denying 10 for-cause challenges to prospective jurors. We disagree.

Defendant used peremptory challenges to remove nine of the ten jurors at issue, asked for and was denied an additional

peremptory challenge to use against seated juror (Juror No. 3121, and expressed dissatisfaction with the jury, explaining that he would have used his peremptory challenges to remove her and other jurors on the panel had he not been forced to use the peremptory challenges to remove the other jurors he had challenged for cause. Defendant has thus preserved his challenge for review. (*People v. Rices* (2017) 4 Cal.5th 49, 75 (*Rices*) [to preserve a claim of wrongful denial of a challenge for cause, "the defendant must (1) exercise a peremptory challenge to remove that prospective juror, (2) exhaust all peremptory challenges or somehow justify the failure to do so, and (3) express dissatisfaction with the jury that is ultimately selected"].)

On appeal, defendant contends he was prejudiced by the trial court's rulings on his for-cause motions that resulted in the seating of Juror No. 3121. "A criminal defendant is entitled to an impartial jury." (*People v. Mickel* (2016) 2 Cal.5th 181, 215 (*Mickel*).) As discussed below, the trial court's ruling was supported by substantial evidence.

"A prospective juror's opinions on the death penalty may support an excusal for cause if those opinions would ' "prevent or substantially impair the performance" ' of the prospective juror's duties. ([*Wainwright v.*] *Witt* [(1985)] 469 U.S. [412,] 424.) A prospective juror who is incapable of ' " 'conscientiously consider[ing]' " ' the full range of sentencing options, including the death penalty, should be excluded from service. [Citation.] An inability to carefully and sincerely consider all sentencing options is distinct, however, from merely holding views about the death penalty, including personal opposition to capital punishment. [Citation.] Rather, so long as a prospective juror is willing to ' "temporarily set aside [his or her] own beliefs" ' and

fairly consider the sentencing alternatives presented under the law, the prospective juror may properly serve on a capital jury." (*Mickel*, *supra*, 2 Cal.5th at p. 215.)

"On appeal, we review the trial court's 'for cause' juror excusals deferentially.  If the juror's voir dire responses conflict or are equivocal, we accept the trial court's findings if supported by substantial evidence."  (*Caro*, *supra*, 7 Cal.5th at p. 481.) "Where a trial court conducts in-person voir dire, we generally defer to the trial court's determination as to a prospective juror's true state of mind.  [Citations.]  Unlike the reviewing court, the trial court that has conducted voir dire has the unique benefit of observing a prospective juror's credibility, tone, attitude, and demeanor — factors we have described as of ' " 'critical importance' " ' in determining whether a prospective juror is capable of performing his or her duties as a juror." (*Mickel*, *supra*, 2 Cal.5th at p. 215.)

Juror No. 3121 stated in her questionnaire that the death penalty was used too seldomly and that she would be unwilling to consider defendant's background in determining the appropriate penalty.  She circled 10 on the scale of being strongly in favor of capital punishment.  However, during voir dire she explained that while her "philosophical opinion" would be that the death penalty was automatically appropriate in the case of a police officer killing, that she would not automatically vote for that sentence because "Judge Perren says that we need to listen to the mitigating circumstances."  Juror No. 3121 explained that that she could honestly consider the mitigating evidence:  She explained that she earlier would have automatically thought the death penalty was appropriate for the murder of a police officer based on the publicity she had read about the case, but she would not automatically apply the death

penalty now after hearing the trial court's explanation to the potential jurors that "we need to listen to the mitigating circumstances." When asked if she could "honestly tell us as you sit here now today" that she "could disregard what [she] heard before," Juror No. 3121 responded she could if she "heard and saw everything presented, yes." When pressed further, she explained that prior to entering the courtroom, she had had a "preconceived notion that the death penalty was appropriate," but upon seeing defendant, she recognized the "human element," and realized she was not the "hanging judge" that she thought she was. Juror No. 3121 said she could weigh the aggravating and mitigating factors before reaching a decision. Juror No. 3121 reiterated this response, that she could set aside her philosophical view and consider the evidence and give defendant a fair trial, the two more times she was asked about this.

During voir dire, defendant challenged Juror No. 3121's qualification to serve as a juror "based upon her comment that in a case of a first degree murder with special circumstances the death penalty is automatically appropriate." The trial court denied the motion. It explained, "I think there are actually two moments of lucidity. One was when she finally understood what the process was. And she made one of the more profound statements I think we're ever going to hear. I had a real strong opinion until I actually had to look at a human being. Then I had to question actually how strong I felt. Right on the money."

We conclude the claim fails because substantial evidence supports the trial court's ruling. While Juror No. 3121 stated in her questionnaire that the death penalty was not applied enough, that she would be unwilling to consider defendant's background in determining the appropriate penalty, and that

she was strongly in favor of capital punishment, her voir dire responses amply demonstrated her ability to set aside her views on capital punishment and consider both sentencing options. She explained that while her philosophical view was that the death penalty was automatically appropriate in the case of a police officer killing, she would not automatically vote for that sentence and would consider the mitigating evidence. When pressed further, she explained that she reconsidered her views upon seeing defendant in the courtroom, and that she would weigh the aggravating and mitigating evidence before reaching a decision. As described above, Juror No. 3121 gave similar responses when asked again about this. Juror No. 3121's comments at voir dire showed that she understood that she needed to consider the evidence presented at trial and not automatically vote for a death sentence based on her views about the death penalty. Juror No. 3121's comments thus demonstrated that she was willing to " ' "temporarily set aside" ' " her beliefs and "fairly consider the sentencing alternatives presented under the law . . . ." (*Mickel, supra*, 2 Cal.5th at p. 215.) Thus, substantial evidence supports the trial court's ruling and defendant's claim fails. (*Caro, supra*, 7 Cal.5th at p. 481.)

### 2. *Denial of Additional Peremptory Challenges*

In a variation of the preceding claim, defendant contends the trial court erred in denying his request for additional peremptory challenges in violation of his constitutional right to a fair trial before an impartial jury.

"[T]o establish the constitutional entitlement to additional peremptory challenges argued for here, a criminal defendant must show at the very least that in the absence of such

additional challenges he is reasonably likely to receive an unfair trial before a partial jury." (*People v. Bonin* (1988) 46 Cal.3d 659, 679; accord, *People v. DePriest* (2007) 42 Cal.4th 1, 23.) Defendant bases this claim on the contention that Juror No. 3121 was a partial juror, which is belied by the record as shown above. Defendant's claim thus fails for the same reason, that he fails to show that a partial juror sat on his jury.

### 3. *Asserted* Witt *Error*

Defendant contends the trial court erred in granting the prosecution's for-cause challenge to Prospective Juror Ann I. because the record fails to support the court's conclusion that Ann I.'s capital punishment views impaired her ability to serve as a juror. Defendant also argues that reversal of the guilt phase is required because exclusion of Ann I. in conjunction with the inclusion of Juror No. 3121 resulted in an unfair jury. We need not reach that issue because, as shown above, the court's ruling on the challenge to Juror No. 3121 is supported by the record.

As for Prospective Juror Ann I., the test for *Witt* error is the same whether it involves " 'erroneous juror exclusion or inclusion.' " (*Clark, supra*, 63 Cal.4th at p. 564.) As outlined above, a prospective juror must be excused for holding views on capital punishment that would " ' "substantially impair" ' " the juror's ability to serve. (*Mickel, supra*, 2 Cal.5th at p. 215.) "A ruling on a cause challenge will be upheld if it is fairly supported by the record." (*People v. Leon* (2015) 61 Cal.4th 569, 590 (*Leon*).) "[W]here the trial court has had an opportunity to observe the juror's demeanor, we uphold the court's decision to excuse the juror so long as it is supported by substantial

evidence." (*People v. Spencer* (2018) 5 Cal.5th 642, 659 (*Spencer*).)

The prosecution challenged Prospective Juror Ann I. based on her religious view that the death penalty should be limited to extreme cases such as multiple murders, which, as she explained, was "about the only time I think I could vote for it." The trial court granted the challenge, concluding that while Ann I. had stated her willingness to "make every effort" to perform her duties as a juror, each such statement was followed by expressions of doubt about whether she could do so.

The record fairly supports the trial court's determination that Prospective Juror Ann I.'s views on the death penalty would substantially impair her ability to consider both sentencing options. In her questionnaire, Ann I. wrote that the death penalty should be a "last resort," expressed doubt about whether she could "personally recommend the death sentence for another human being," and felt that a life sentence was her "punishment of choice for all but the most extreme cases." During voir dire, she explained that she did not believe the murder of a police officer was the type of "extreme case" that warranted the death penalty. While Ann I. stated that she would "listen to the evidence first," and "hear everything" before voting, she felt that her belief system would make it difficult to keep an open mind toward the death penalty in a case involving only one murder. For example, she stated, "I feel that the death penalty should be reserved for somebody who is a habitual criminal in a serious way, such as someone who has murdered many times, who is a danger not only to one person but to many people. And that's about the only time I think I could vote for it." She also said she "could not guarantee" that her "conscience [would] allow [her] to have an open mind, to weigh the circumstances of this one

particular murder and make a decision fairly to both sides here." When asked by the court whether she could place the "principles of law" above her "religious scruples," Ann I. responded that she felt her religious beliefs would be "foremost." When asked if she could follow the rules of law and apply them to the facts and give both sides an equal hearing in the penalty phase, Ann I. responded, "I think so. It's very, very difficult because I don't really believe in the death penalty as — as a good penalty." She said further, "I really don't know whether I could do it or not. I have a feeling it would be something that would weigh on me terrible." "[A]nd if I made that decision, having to live with that decision for the rest of my life. I think it would be very difficult." She could not see herself in a case involving one murder voting for death.

Prospective Juror Ann I.'s comments support the trial court's conclusion that her religious views would make it difficult for her to fairly consider the death penalty as a sentencing option in a case such as this one that involved only one murder. While Ann I. said she would try to follow the rules and consider both options, she expressed serious doubt about her ability to do so. "Time and again, [Ann I.] expressed uncertainty as to whether [she] could set aside [her] personal antipathy to the death penalty and follow the law as instructed." (*Spencer, supra,* 5 Cal.5th at p. 659.) Ann I.'s views on the death penalty appeared sufficiently fixed that she could not set them aside and fairly consider both sentencing options as they pertained to the particular facts of this case. Critically, she stated that her "religious scruples," rather than "principles of law," would be "foremost," and when asked if she could follow the law, she responded: "I really don't know whether I could do it or not. I have a feeling it would be something that would

weigh on me terrible." Therefore, the trial court's ruling is "fairly supported" by the record. (*Leon*, *supra*, 61 Cal.4th at p. 590.)

### F. Prosecution's Use of Defense Expert in a Demonstration

Defendant contends the trial court abused its discretion and violated his state and federal due process and fair trial rights by allowing the prosecutor, over a defense objection, to ask the defense wound ballistics expert to demonstrate with a mannequin representing Aguirre, the possible position and location of the gun during the firing of the two shots to Aguirre's forehead. The claim lacks merit.

Dr. Martin Fackler had testified for the defense that based on his review of the evidence — the autopsy report, crime scene diagram, photographs, police reports, and witness statements — it was impossible to determine the sequence of the two shots fired to Aguirre's forehead, the position of his head and whether he was in motion on impact of the bullets, and whether the bullet found in the floor had caused the entry into Aguirre's left forehead. He opined that the evidence supported two or more scenarios — that the shots were fired in a deliberate manner while Aguirre's head was near the floor or fired when Aguirre was in motion and defendant was running past him. The distance and angles from which the shots were fired did not permit Fackler to form an opinion as to whether the parties were still or in motion. In examining Fackler, the defense asked him to make various assumptions based on the evidence, about which bullet to the forehead was fired last and about the rapidity of the gunfire.

In turn, the prosecution had Fackler participate in a hypothetical demonstration using the murder weapon and a mannequin representing Aguirre lying on the ground. The prosecutor asked Fackler to make assumptions, based on bullet ejection and trajectory patterns evidence that was provided in prosecution expert testimony.

During the testimony, the defendant objected several times for lack of foundation and Fackler's lack of expertise on the prosecutor's area of inquiry. The prosecutor explained that it was asking Fackler to assume facts based on the earlier testimony of the prosecution ballistics expert and then to answer the questions posed based on the assumed facts. The trial court ultimately allowed Fackler to answer the questions. It instructed the jury that the prosecution was presenting Fackler with a hypothetical based on the earlier prosecution ballistics expert's testimony and to respond to the questions about the hypothetical based on his own expertise.

On redirect examination, Fackler reiterated that it was difficult to conclude from the facts whether defendant fired the gun while standing over Aguirre or whether when he was running by Aguirre. He explained that he was not an expert in ejection patterns.

"'"Experimental evidence has long been permitted in California trial courts . . . ."'" (*People v. Bonin*[, *supra*,] 47 Cal.3d 808, 847.) '"Admissibility of experimental evidence depends upon proof of the following foundational items: (1) The experiment must be relevant [citations]; (2) the experiment must have been conducted under substantially similar conditions as those of the actual occurrence [citation]; and (3) the evidence of the experiment will not consume undue time,

confuse the issues or mislead the jury [citation].” ’ (*Ibid.*) The proponent of the experimental evidence has the burden to show that the conditions were substantially similar but need not show that they were absolutely identical.” (*People v. Jackson* (2016) 1 Cal.5th 269, 342.) “Admissibility also depends on proof, ‘with some particularity,’ of ‘the qualifications of [the] individual[] testifying concerning [the] experimentation . . . .’ ” (*People v. Bonin, supra,* 47 Cal.3d at p. 847 (*Bonin*).) “We review the trial court’s decision to admit experimental evidence for abuse of discretion.” (*Jackson, supra,* at p. 342.)

The trial court acted within its discretion in admitting the testimony because the record supports a conclusion that the experimental evidence was relevant, substantially similar to the actual conditions, and was not confusing or unduly time consuming. First, the prosecution’s cross-examination of Fackler to demonstrate the position and location of the gun in relation to the mannequin, the ejection pattern, and the bullet trajectory into the floor, related to and rebutted Fackler’s testimony on direct examination, that it was impossible to determine the sequence of the forehead shots and whether the parties were in motion. The evidence was thus relevant and met the first criterion for experimental evidence. Second, Fackler had maintained this opinion on the basis of various assumptions the defense posed to him about the rapidity and sequence of the shots. Seemingly in an effort to support its theory that defendant fired the final shot execution-style while Aguirre lay incapacitated on the ground, the prosecution likewise asked Fackler to make certain assumptions about the ejection pattern and trajectory of the bullets based on the testimony of the prosecution ballistics expert and asked him to demonstrate the position and location of the gun consistent with these

assumptions. As such, the trial court would have acted within its broad discretion to conclude that the testimony met the second criterion for experimental evidence because it was based on the evidence of what took place during the shooting as provided by the testimony of the prosecution ballistics expert. The testimony was brief and Fackler clarified that he was not an expert in ejection patterns or firearms and that the position he was demonstrating was just one position but that there could be several that were consistent with the evidence about the trajectory and ejection patterns. Therefore, the evidence met the third criterion for experimental evidence because it did not unduly consume time and would not have misled or confused the jury, given Fackler's qualifications. Fackler limited his testimony to his own knowledge and the assumptions he was given, clarifying where he lacked expertise. His testimony as to the position of the gun did not contradict the *Bonin* requirement that the testifying individual have sufficient qualification concerning the experimental evidence.

## G. Asserted Prosecutorial Misconduct Throughout the Trial

Defendant contends the prosecutor committed multiple acts of prejudicial misconduct throughout the trial in violation of his state and federal constitutional rights. Defendant's claims fall into three general categories: Attacking the integrity of defense counsel, intimidating the trial court as well as county staff, and attacking the integrity of defense witnesses. At the hearing on defendant's new trial motion, the trial court found that several of the prosecutor's actions were improper but concluded that because almost all of the conduct took place outside the jury's presence, there was no prejudice. We agree. The allegations solely concern the lead prosecutor. While we

agree with the trial court that the prosecutor's conduct was at times "out of bounds," most of the conduct took place outside the jury's presence or otherwise was not prejudicial or not misconduct.

Defendant also presents additional misconduct claims that we discuss in parts II.C., II.H.1., and II.H.2.

### 1. *Attacking the Integrity of Defense Counsel*

Defendant identifies several instances in which the prosecutor attacked the integrity of defense counsel, which attacks he contends were cumulatively prejudicial because they created "a toxic trial atmosphere." The prosecutor, for example, accused trial counsel of having no basis in "any honest argument," taking "some pretty cheap shots" at prosecution witnesses, and making "pretty nasty attacks" on an earlier judge. As defendant acknowledges, all of the comments at issue took place outside the jury's presence.

" ' "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." [Citations.] "In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks" [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion [citation]. ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1336–1337.)

At the new trial hearing, the trial court concluded that while the prosecutor's conduct during the trial, "was out of bounds in a variety of areas in this case," it was not prejudicial because almost all instances took place outside the jury's presence. (The prosecutor's conduct that took place in front of the jury concerned his cross-examination of defense experts,

discussed in pt. II.G.4., *post*.)  This case is thus different than *People v. Hill* (1998) 17 Cal.4th 800, 845 (*Hill*), on which defendant relies and in which the prosecutor committed several acts of misconduct by disparaging defense counsel in front of the jury.  " 'An attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself . . . .' " (*Id.* at p. 832.)  Although the court here heard the prosecutor's disparaging remarks toward defense counsel, the record demonstrates that the court was unaffected by the prosecutor's comments:  In responding to defense counsel's argument below that the lead prosecutor's conduct toward trial counsel would have caused the trial court to "view counsel whose reputation [was] being slandered with a jaundiced eye," the trial court responded that he observed that both defense counsel conducted themselves with "high ethics" throughout the trial and "I never sensed for a moment any of them shrunk or balked at their task because of [the prosecutor] who did not, retrospectively, conduct himself as he ought to have done.  [¶]  . . . [I]f you think I will gild the [lily] about [the prosecutor], it ain't gonna happen.  [The prosecutor's] conduct was not acceptable.  Ultimately, I told him to sit down at one point when he exploded.  Ultimately, in your presence . . . I told him to knock it off, his conduct was unprofessional."  Thus, no prejudice is apparent because the record makes clear that the trial court was uninfluenced by the prosecutor's comments towards defense counsel, and the jury did not hear the comments because they were made outside its presence.

### 2. *Intimidating the Trial Court*

Defendant contends the lead prosecutor attempted to intimidate the trial court on two occasions.  " ' "A prosecutor's misconduct . . . violates California law if it involves 'the use of

deceptive or reprehensible methods to attempt to persuade . . . the court . . . .' " ' " (*Powell, supra,* 6 Cal.5th at p. 172.) First, defendant asserts the prosecutor tried to persuade the court to deny defendant's *Miranda* motion by arguing that suppressing defendant's statements would "operate a — fraud upon the jury." Second, he asserts the prosecutor sought to intimidate the court into denying a motion to limit the number of uniformed officers as well as visible signs of mourning in the courtroom. The prosecutor urged the court to find the officers' presence necessary "to make sure that the atmosphere in this courtroom is . . . conducive to the ascertainment of justice," arguing, "we have to make sure that the law enforcement community trusts that what happens here isn't going to exist in an atmosphere of prejudice . . . and that the 12 people chosen from this community to decide what happens to the killer of Peter Aguirre really got a fair shake at what they had a right to hear . . . . I don't know what authority you'd have to enforce it anyway."

Defendant's claim lacks merit. Though the prosecutor's statements were perhaps hyperbolic, there is nothing directly threatening in the prosecutor's remarks. The trial court considered the prosecutor's comment that suppressing defendant's statements to Patterson would "operate a — fraud upon the jury" as an attack on the defense rather than the court. The trial court explained that "defense counsel's motion is fully within the ambit of the law and is properly brought before the Court. [¶] And I perceive no improper motive by either the government or the defense at this point litigating what are customarily motions brought before the Court routinely. And so I don't perceive this to be a fraud." With respect to the motion to limit officer presence, the court responded pointedly to the

prosecutor that it would not allow anything in the courtroom that "might influence the jury in its decision." At a later hearing on the defense motion for a new trial in which the defense raised these events as a basis for its claim that the prosecutor had attempted to intimidate the trial court into ruling in the prosecutor's favor, the trial court responded that it had "attributed nothing" to the prosecutor's comments. Although defendant refers to several purportedly erroneous trial court rulings addressed elsewhere in his brief, which he claims are evidence of the prosecutor's success in intimidating the court, these assertions are generally without merit and none of the trial court's rulings appear to be the product of intimidation. (See pts. II.C., II.G.4., II.H.1.)

### 3. *Intimidating County Counsel and a Witness*

Defendant next asserts the prosecutor attempted to intimidate county counsel and, indirectly, defense witness Lisa Kus, a county psychologist represented by county counsel, by his comments to counsel and the court in the midst of a protracted legal battle regarding whether the prosecution had a right to access defendant's mental health records. According to Assistant County Counsel Patricia McCourt, who represented the Ventura County Mental Health Department, the prosecutor approached McCourt while seated in the courtroom prior to a hearing and "leaned over me in a very angry way, sort of leering down at me, and said, 'Well, is it your intention to bring in perjured testimony like you always do?'" For the next several minutes, McCourt testified, the prosecutor repeatedly approached her and accused her of being "sleazy" and "unethical" and conspiring with Kus to "make up lies about the case" and hide information. According to McCourt, while the prosecutor's behavior did not influence her, his "physical

presence was at all times angry, intimidating, imposing . . . ." The courtroom bailiff interceded on McCourt's behalf until the judge arrived for the hearing on defendant's mental health records. At the hearing, the prosecutor then accused the county of obstruction of justice, asserting that Kus, who had previously interviewed defendant and would testify as a defense penalty phase witness, had purportedly removed some "raw data" from defendant's file and wrote a report "covering her butt" in response to prosecution efforts to obtain defendant's files. The trial court, upon learning of the prehearing encounter between the prosecutor and McCourt, advised counsel for both parties that intimidation would not be permitted in his courtroom. The prosecutor responded that "this case may get very ugly before it's over."

Defendant contends that the prosecutor intimidated Kus, citing as proof her testimony that she did not diagnose defendant with schizophrenia. " 'Governmental interference violative of a defendant's compulsory-process right includes, of course, the intimidation of defense witnesses by the prosecution. [Citations.] [¶] The forms that such prosecutorial misconduct may take are many and varied. They include, for example, statements to defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the course of their testimony. [Citations.]' [Citation.] Threatening a defense witness with a perjury prosecution also constitutes prosecutorial misconduct that violates a defendant's constitutional rights." (*Hill, supra*, 17 Cal.4th at p. 835.)

Nonetheless, defendant's claim fails for lack of prejudice. As defendant acknowledges, McCourt testified that the prosecutor's behavior did not influence her, and, as defendant concedes, "no evidence has yet been adduced that the

prosecution's threat of an investigation affected" Kus's testimony. There is no evidence that Kus omitted a schizophrenia diagnosis because she was intimidated by the lead prosecutor's comments. To the contrary, Kus testified she had not diagnosed defendant with schizophrenia because she did not have enough information to make such a diagnosis. In addition, she testified to defendant's benefit that defendant did suffer from a delusional disorder. It does not appear that the prosecutor's behavior, while reprehensible, prevented Kus from evaluating defendant and testifying about her findings. Because Kus testified for defendant and her testimony was unaltered, no prejudice flowed from the individual act of misconduct. (See, e.g., *Hill*, *supra*, 17 Cal.4th at p. 835.)

*4. Attacking the Integrity of Three Defense Experts*

Defendant also contends the prosecutor committed misconduct by impermissibly impugning the integrity of three defense experts. First, the prosecutor allegedly committed misconduct by asserting facts not in evidence when he cross-examined Roger Clark, the defense expert on police practices, about purported findings of nepotism and other irregularities in his department, and then again in arguing to the jury that the expert had falsified records.

Clark's testimony had addressed whether Aguirre acted within the course and scope of his duties as an officer of the law when he entered G.A.'s home prior to being shot. During his cross-examination of Clark, the prosecutor asked him whether an "audit" of a unit he had formerly supervised had revealed "a number of irregularities" about the unit including "improprieties in keeping time cards." He asked Clark if the audit report had specifically found Clark "guilty of nepotism."

He asked Clark whether each of the allegations in the audit report were false and whether he believed himself to be a victim of false allegations. He asked Clark if he did not feel bitter toward the Sheriff's office. The trial court responded to defense counsel's several objections to the prosecutor's cross-examination by instructing the prosecutor to frame questions in terms of whether Clark had heard or read about the audit claims rather than whether the audit contained those claims. During the defense's redirect examination, Clark testified that the audit of his department that took place after he had left the department did not cause him to feel "disgruntled" toward the Los Angeles Police Department and that he kept in touch with his colleagues and peers, and that his fellow administrators had also provided several "very favorable reviews" of his performance.

During closing argument, the prosecutor argued that there was "an audit of [Clark's] department [that] found things like nepotism and irregularities in overtime cards" and discredited Clark's testimony regarding whether Aguirre was acting in the course of his duties by commenting that Clark was "too busy falsifying records." The defense objection to the argument for misstating the evidence was overruled. The trial court later acknowledged this was an erroneous ruling because the prosecutor had in fact argued facts outside the evidence. In its own closing argument, the defense argued there was no evidence that the expert was guilty of the audit claims and reminded the jury of the court's earlier instruction not to consider the allegations for the truth but only whether they affected the expert's state of mind.

" ' "[S]tatements of facts not in evidence [that are asserted] by the prosecuting attorney in his argument to the jury

constitute misconduct." ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 335 (*Rivera*).) As to the prosecutor's argument, "They did an audit of [Clark's] department and found things like nepotism and irregularities in overtime cards," Clark acknowledged that he read or heard the audit made these findings, but testified they were false allegations. Even though it appears the prosecutor improperly referred to facts not in the record by asserting that the defense expert had falsified records, this error was harmless. The expert's testimony concerned a weak part of the defense case — the contention that Aguirre was not acting within the course of his duties as a police officer when he entered the house in response to a highly volatile and dangerous 911 domestic disturbance call. Further, the expert was still able to testify at length for defendant on this topic and the defense questioned him on redirect about his lack of ill feelings towards the police department as a result of the audit. Moreover, defense counsel was allowed to address the impeachment in closing argument where he argued there was no evidence of the audit claims and reminded the jury of the court's instructions to only consider the audit allegations for how they would have affected the expert and not for their truth.

Defendant second contends the prosecutor "made unsubstantiated accusations against" the defense's prison expert, James Park, to the trial court during a hearing out of the jury's presence, and during cross-examination, and that the prosecutor's behavior infected the trial with unfairness. Prior to the start of Park's testimony, the prosecutor alleged out of the jury's presence that Park, when previously employed at San Quentin State Prison, had allowed an attorney to smuggle a gun to an inmate, who then murdered several security guards. The trial court denied the prosecutor's request to inquire into that

specific area of alleged misconduct, directing him to limit his inquiry generally to the expert's career, promotions, and demotions. In the cross-examination that defendant points us to, the prosecutor questioned Park about whether he had taken a stress retirement and whether he was transferred and had stopped working in prisons. Defendant also points us to cross-examination in which the prosecutor addressed prison photographs Park had brought to court and asked him about prison rules prohibiting photographs of prison facilities because such photographs would render the facilities less secure. This questioning was in response to Park's testimony during direct examination, during which he had displayed photographs he brought with him of various prison structures, to demonstrate the security features at facilities where prisoners sentenced to life without the possibility of parole are housed. Park explained in response to the prosecutor's cross-examination that he took the photographs with the warden's consent. The trial court later commented that the prosecutor's behavior toward the expert was "vitriolic, unnecessary and pointless."

" 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.) However, " 'harsh and colorful attacks on the credibility of opposing *witnesses* are permissible. [Citations.] Thus, counsel is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent "lie." ' " (*Rivera, supra*, 7 Cal.5th at pp. 334–335.) Defendant fails to explain how the prosecutor's effort to

discredit Park by questioning his employment history and by attempting to discredit Park's testimony regarding the security features of prisons by asking whether he had permission to take the prison photos qualifies as misconduct. While, as the trial court's comments suggest, the prosecutor's questioning may well have been "vitriolic, unnecessary and pointless," he did not question Park about topics prohibited by the trial court. Thus, his cross-examination did not result in " 'such unfairness as to render the . . . denial of due process, or involve[] deceptive or reprehensible methods . . . .' " (*Silveria, supra,* at p. 306.)

Defendant's last contention is that the prosecutor gestured disparagingly at defense psychology expert Charles Hinkin, who testified during the penalty phase that defendant was a paranoid schizophrenic. As part of its motion for a new trial, the defense included declarations from two jurors, who stated that the prosecutor made "eye contact with some of the jurors in the jury box and he was smirking and rolling his eyes at the testimony of Dr. Hinkin." In his opposition to the motion for new trial, the prosecutor wrote that the expert's "effeminate mannerisms and weak testimony, limited as it was by his failure to ask basic questions of the defendant during his interview of him, caused understandable reaction from the prosecution." The trial court concluded the prosecutor's conduct was "wrong-headed and unacceptable."

The prosecutor's attack of Hinkin based on, as he sees it, the expert's "effeminate mannerisms," was wholly improper and clearly falls outside the boundaries of permissible attack " 'focused on the evidentiary reasons why [an expert's opinions] could not be trusted.' " (*Rivera, supra,* 7 Cal.5th at p. 335.) This statement is, by any measure, offensive and inappropriate. Such language has no place in pleadings, in courtrooms, or

anywhere else. Nonetheless, for purposes of our analysis here, i.e., potential prejudice, the statement was not made in front of the jury and therefore could not prejudice defendant.

As for the prosecutor's smirking and eye-rolling in the presence of the jury, the Attorney General acknowledges that this is "unsuitable" conduct by counsel. We agree. This conduct is unacceptable. (*People v. Williams* (2006) 40 Cal.4th 287, 322–323 [prosecutor's action of slamming a writing pad and rolling eyes was misconduct]; *Hill, supra*, 17 Cal.4th at p. 834 [audibly laughing during defense examination of several witnesses was misconduct].) Such tactics distract the jury and risk prejudice to the defense. (*Hill, supra*, at p. 834.)

"If we do find misconduct occurred during the penalty phase, 'we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred.'" (*People v. Ghobrial* (2018) 5 Cal.5th 250, 289 (*Ghobrial*).) We conclude there is no reasonable possibility that the prosecutor's attempt to discredit this witness by smirking and rolling his eyes at the jurors would have influenced the jury in deciding its penalty verdict. The prosecutor's conduct in smirking and rolling his eyes, while inappropriate, does not rise to the level of a case like *Hill*, in which the prosecutor subjected the jury to an "onslaught of . . . misconduct," embarking on a campaign of misleading the jury and denigrating defense counsel. (*Hill, supra*, 17 Cal.4th at pp. 845.) This momentary facial gesture by the prosecutor, though inappropriate, simply is not significant enough to compel us to conclude that, because of it, there was a "reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict." (*Ghobrial, supra*, at p. 289.)

## H. Additional Penalty Phase Claims

### 1. *Deputy Fryhoff's Testimony About Failing to Kill Defendant*

Defendant contends the following penalty phase testimony by Deputy Fryhoff was irrelevant, inflammatory, and an impermissible opinion as to the appropriate sentence, and thus violated his Fifth, Eighth, and Fourteenth Amendment rights and corresponding state constitutional rights:

"Q. [Prosecutor]: Describe your emotions for us regarding that part of the incident, the fact that you shot Michael Johnson.

"A. Um, I'm very upset with myself that I didn't kill him.

"Q. Is that something that you think about often?

"A. That's something I have to live with every day.

"Q. Does it make you feel that somehow you were a failure as an officer?

"A. Yeah. It makes me very hostile that I wasn't able to do it."

Prior to this testimony, defendant had objected and asked for a sidebar after the prosecution asked Fryhoff how he felt about not having killed defendant. The trial court clarified the permitted area of inquiry, that Fryhoff could testify about the event's impact on him, and that the court would instruct the jury on how it was to consider the evidence.

At the penalty phase, "evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense . . . ." (Pen. Code, § 190.3.) "A State may legitimately conclude that

evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." (*Payne v. Tennessee* (1991) 501 U.S. 808, 827.) "Although victim impact testimony is admissible, the victim's view as to the proper punishment is not." (*People v. Smith* (2003) 30 Cal.4th 581, 622 (*Smith*).) " 'The views of a crime victim . . . regarding the proper punishment has no bearing on the defendant's character or record or any circumstance of the offense.' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 487.) "We review a trial court's decision to admit victim impact evidence for abuse of discretion." (*Spencer*, *supra*, 5 Cal.5th at p. 677.)

Fryhoff's testimony was not about the appropriate penalty verdict but rather about his own remorse and perceived failure concerning the shootout with defendant. The testimony constituted relevant victim impact evidence because it demonstrated how Fryhoff felt helpless and guilty following the loss of his friend. The testimony showed Fryhoff's reasonable response to feeling grief and regret and the jury would have reasonably understood his testimony to be nothing more than an expression of that. Fryhoff was not making an "impassioned entreaty to the jury to end his suffering and kill appellant, because he had passed up the chance to do so himself," as defendant argues.

The trial court further instructed the jury at the close of Fryhoff's testimony that it was not to consider the testimony as opinion evidence on the verdict but rather as victim impact testimony and that the jury alone was charged with the decision of verdict that it was to determine after considering the factors in aggravation and mitigation. The court similarly instructed during the penalty phase instructions. We presume jurors

follow a court's instructions. (*People v. Dalton* (2019) 7 Cal.5th 166, 238.) We therefore conclude the trial court acted within its discretion in admitting Fryhoff's testimony.

Defendant's related claim of prosecutorial misconduct is also without merit. Defendant contends the prosecutor committed misconduct by (1) asking Fryhoff how he felt about not having killed defendant, and (2) according to defendant, bullying the trial court into allowing Fryhoff to testify he felt upset and guilty for not killing defendant, and (3) arguing to the jury that Fryhoff would feel guilty for the rest of his life for not having killed the person that killed his fellow officer.

With respect to the first misconduct contention, as discussed above, the prosecutor permissibly asked Fryhoff how he felt about not killing defendant within the parameters set by the trial court.

On the second contention — that the prosecutor bullied the court — the prosecutor commented, at a sidebar preceding Fryhoff's testimony, about the experience of officers involved in shootings that result in the death of fellow officers, stating, "Every cop that ever gets involved in a shooting carries with him a guilt, and this deputy carries with him a guilt, over the fact that he didn't kill Michael Johnson and that is a guilt that haunts him every day of the rest of his life." He acknowledged that Fryhoff could not offer an opinion as to the appropriate sentence. The defense then objected that the prosecutor had committed misconduct by inquiring into Fryhoff's feelings about not killing defendant. The prosecutor took the defense's misconduct allegation as a "personal attack" and said he would not be "threatened." The prosecutor's comments at the sidebar do not qualify as "bullying," and the court did not take them as

such, as evidenced by its neutral explanation of the type of testimony that would be permitted: "The impact upon [Fryhoff] will be permitted and in that context you may say to him, 'What are your emotions that have resulted from the events of that day?' not leading him to it and what responses he gives." After further discussion, the trial court explained that Fryhoff could testify that he wished he had killed defendant: "This witness is going to be allowed to say that in the context of what his emotions are, and this is a very dramatic piece of business if that's in fact his feeling, but the statement to him, 'Do you wish you'd killed him?' I won't let that in. [¶] On the other hand, what emotions he has, why he's feeling what he's feeling, he'll be allowed to say that . . . ."

Regarding defendant's last contention, he alleges without explanation that the prosecutor's comment during closing argument that Fryhoff would "go to his grave feeling guilty because he didn't kill the man who killed his brother officer," to which defense counsel objected, was misconduct. However, the comment merely reiterated Fryhoff's own permissible testimony. The prosecutor was making an appropriate comment on the evidence — in this case victim impact evidence concerning the trauma felt by Fryhoff following Aguirre's death. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1419 ["evidence that close friends and relatives of the victims suffered emotional trauma as a result of their deaths was permissible victim impact testimony, and the prosecutor appropriately commented on it in his closing argument"].) Accordingly, we conclude there was no prosecutorial misconduct concerning Fryhoff's testimony.

## 2. *Exclusion of Defendant's Mother's Testimony*

Defendant contends the trial court erred in excluding his mother's testimony that she did not want him sentenced to death, and further erred in its manner of admonishing the jury regarding the testimony, and that the prosecutor erred in his manner of objecting to the testimony. We find no prejudicial error.

After testifying that she loved her son "very much," defendant's mother responded negatively to the question whether she wanted him to receive the death penalty. The prosecution objected in an explosive manner. The trial court cleared the courtroom and sustained the prosecutor's objection, finding the testimony impermissible opinion testimony by a family member on the question of penalty. It then strongly admonished the jury to disregard the question and response, stating, "You are specifically and in the strongest possible terms admonished to disregard the question last asked by defense counsel of this witness and the reply she made to it. [¶] The law of this state is clear: The expressed feelings of family of the defendant are not to be considered by you on the issue of penalty or punishment. The family of Deputy Aguirre did not and could not express its desires and respected that rule of law. You can do no less."

Defendant argues in reliance on *Smith*, *supra*, 30 Cal.4th 581, that the testimony was admissible mitigating evidence in the form of character testimony by a close family member. "Citing [Penal Code] section 190.3 and the United States Constitution, we have held that testimony from somebody 'with whom defendant assertedly had a significant relationship, that defendant deserves to live, is proper mitigating evidence as

"indirect evidence of the defendant's character." ' [Citations.] This evidence is admitted, not because the person's opinion is itself significant, but because it provides insights into the defendant's character." (*Smith*, at pp. 622–623.)

Defense counsel, however, made no offer of proof as to the admissibility of the excluded testimony on this ground, instead submitting that it was admissible as "reverse victim impact" evidence (but that that was "unclear"). (By "reverse victim impact" evidence, counsel appeared to be referring to the impact defendant's death would have on his family.) The specific claim raised on appeal is thus forfeited. (Evid. Code, § 354, subd. (a); *People v. Lightsey* (2012) 54 Cal.4th 668, 727 [concluding that trial court acted within its discretion in sustaining a prosecution objection "when defendant made no offer of proof at trial explaining why the witness should have been permitted to answer the question"].)

Defense counsel was incorrect, moreover, about the admissibility of the testimony as "reverse victim impact" evidence. " '[W]hat is ultimately relevant is a defendant's background and character — not the distress of his or her family. A defendant may offer evidence that he or she is loved by family members or others, and that these individuals want him or her to live. But this evidence is relevant because it constitutes indirect evidence of the defendant's character. The jury must decide whether the defendant deserves to die, not whether the defendant's family deserves to suffer the pain of having a family member executed.' [Citation.] 'In summary, we [reiterate] that sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation, but that family members may offer testimony of the impact of an execution on them if by so doing they illuminate some positive

quality of the defendant's background or character.' " (*Rices*, *supra*, 4 Cal.5th at p. 88.) With the exception of the struck testimony about whether defendant's mother wanted defendant to receive the death penalty, she was largely permitted to testify about her positive regard and love for her son, consistent with *Smith* and *Rices*.

Defendant also contends the prosecutor committed prejudicial misconduct in his explosive manner of objecting, and that defendant was further prejudiced by the trial court's clearing of the courtroom following the objection, and its strongly worded admonishment to the jury and comment that Aguirre's family had respected the rule.

As defendant notes, the trial court concluded the prosecutor's manner of objecting was "intemperate." Putting aside the questions whether the prosecutor's actions constituted misconduct and the trial court's initial jury admonishment was error, we conclude any error was harmless because there was no " 'reasonable . . . possibility' " the jury would have rendered a life verdict (*Ghobrial*, *supra*, 5 Cal.5th at p. 289) in the absence of the prosecutor's reaction and had the trial court omitted its initial comment that the Aguirre family had respected the rule prohibiting opinions on the penalty verdict. There was no reasonable possibility the jury would have sentenced defendant to death simply because the prosecutor objected in an intemperate manner or because the trial court admonished defendant's mother for saying she did not want her son to be sentenced to death.

The court, moreover, did repeat the instruction, this time more generally, explaining that the jury was not to consider the opinion testimony of any witness including the families of either

party: "At the time Mrs. Johnson testified, you were instructed to disregard her opinion on the question of penalty or punishment. I wish to clarify that point. The question of penalty or punishment is yours to decide based upon the factors in aggravation and mitigation upon which you are now being instructed. Not included is any perception you may have of the feelings or desires of any witness on that question, including the family of Deputy Aguirre and the family of Mr. Johnson or of any other witness. [¶] To the extent that you heard evidence of the impact of defendant's conduct upon others it was not offered and cannot be considered by you as indicating the desires of the witnesses as to the proper punishment. Such evidence was received as a component of the 'circumstances of the crime' relative to the harm caused by the crime and the blameworthiness of defendant. You are expressly instructed that you are not to in any way consider what you may believe or suspect to be a witness' desire for punishment." The jury was also instructed that it could consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." We generally presume the jury would have understood, as the court instructed, that it was simply not to consider any witness's opinion regarding punishment, and it was reasonably likely the jury would have understood that it was otherwise permitted to consider in its decision defendant's mother's unobjected-to testimony describing her love and positive regard for her son. (*People v. Johnson* (2015) 61 Cal.4th 734, 770 ["We presume the jurors understood and followed the instructions"].)

### 3. *Challenges to California's Death Penalty Law*

Defendant raises numerous challenges to California's death penalty law that we have repeatedly rejected and his proffered reasons for reconsideration of our holdings are unpersuasive:

" 'Neither the federal nor the state Constitution requires that the penalty phase jury make *unanimous* findings concerning the particular aggravating circumstances, find all aggravating factors *beyond a reasonable doubt*, or find beyond a reasonable doubt that the aggravating factors *outweigh* the mitigating factors.' " (*Linton, supra,* 56 Cal.4th at p. 1215; see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1235 [Nor is the death penalty statute unconstitutional for not requiring "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence"].) " 'The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury-trial guarantee [citations] do not alter these conclusions.' " (*Linton, supra,* at p. 1215; see also *People v. McDaniel* (2021) 12 Cal.5th 97, 141–155.) We have rejected constitutional challenge to the absence of a requirement that the jury make "explicit findings as to any aggravating factors." (*People v. Famalaro* (2011) 52 Cal.4th 1, 43.) " ' "Intercase proportionality review is not required." ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 257.) " 'The death penalty law adequately narrows the class of death-eligible defendants.' " (*Id.* at p. 255.) " ' "The sentencing factor of 'circumstances of the crime' ([Pen. Code, ]§ 190.3, factor (a)) is not unconstitutionally vague and does not result in the arbitrary and capricious imposition of the death penalty." ' " (*Ibid.*)

" ' "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently." ' " (*Id.* at p. 257.)

## I. **Cumulative Error**

Defendant contends that any guilt and penalty phase error, if not individually prejudicial, is cumulatively so. We have found or assumed several errors: (1) the admission of the prior crimes evidence; (2) the related prosecutorial misconduct claim concerning argument to the jury that defendant signed a parole form advising him that he faced a 25-year-to-life sentence on possession of a firearm; (3) the related claim that the defense was prevented from responding to this argument; (4) the related claim that a deputy district attorney's expert testimony usurped the trial court's role to instruct the jury about the law; (5) the prosecutorial misconduct claim concerning efforts to denigrate defense counsel; (6) the prosecutorial misconduct claim concerning efforts to intimidate county counsel and a witness; (7) the prosecutorial misconduct claims concerning efforts to denigrate defense experts; and (8) the prosecutorial misconduct claim concerning objecting in an explosive manner and the trial court's initial jury admonishment. We found any assumed or actual error in each of these claims individually harmless. Many of the misconduct claims occurred outside the presence of the jury or would have minimal prejudicial effect. Reversal is not warranted in light of any of these errors individually, nor is there any cumulation of error that merits reversal.

## III.   CONCLUSION

We affirm the judgment.


**GROBAN, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**JENKINS, J.**

PEOPLE v. JOHNSON

S070250


Dissenting Opinion by Justice Liu


Defendant Michael Raymond Johnson was convicted of kidnapping and raping his wife, then shooting and killing one of the officers who responded to the scene, 26-year-old Ventura County Deputy Sheriff Peter Aguirre. The evidence established that Johnson killed Aguirre, but the degree of his culpability — in particular, his state of mind when he shot Aguirre — was a contested issue at trial.

In the immediate aftermath of this tragedy, law enforcement officials mishandled the investigation. After the shooting, Johnson was arrested and transported to the hospital to receive treatment for a gunshot wound to the chest. He was hooked up to an IV, with a urinary catheter inserted. Both his hands were handcuffed to a hospital gurney, and he was naked except for a cloth on his lower body. With Johnson in this condition, the police and prosecution repeatedly sought to question him in violation of his constitutional rights. (Maj. opn., *ante*, at pp. 38–45.) At various points, Johnson clearly invoked his right to remain silent and his right to an attorney. (*Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*); *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) Yet, for three hours, the interrogating officers refused to honor these invocations and continued their attempts to obtain a statement from Johnson. Ultimately, they succeeded: Johnson made a series of incriminating statements to Dr. Donald S. Patterson, a psychiatrist sent by the district attorney's office to interview

Johnson. All members of this court agree that Patterson's attempt to question Johnson clearly violated "his right to have counsel present during custodial interrogation." (*Edwards*, at p. 484; see maj. opn., *ante*, at p. 40.)

Despite the raft of constitutional violations that occurred, today's decision finds no error in the admission of Johnson's statements because Johnson, after first declining to speak with Patterson, then "initiated" the conversation that led to his confession. (Maj. opn., *ante*, at p. 45.) But when a suspect initiates conversation as a result of prior *Edwards* violations, his statements are no more admissible than if they were obtained through direct questioning in violation of *Edwards*. Here, Johnson's initiation was the product of the multiple constitutional violations earlier that night, including two violations by Patterson himself. Indeed, Patterson's presence and conduct at the hospital were the culmination of a continuous series of unconstitutional law enforcement tactics intended to get Johnson to talk.

The court says Johnson's initiation was not tainted by any prior violation of his rights because he was not badgered or berated and made the decision to speak with Patterson "freely." (Maj. opn., *ante*, at pp. 57–58.) Yet neither this court's nor the United States Supreme Court's case law has ever suggested that the protection of *Edwards* — which "set forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel" (*Smith v. Illinois* (1984) 469 U.S. 91, 98 (*per curiam*) (*Smith*)) — is limited to cases of overt coercion by law enforcement. Indeed, once a suspect has invoked the right to counsel, the authorities may not make *any* attempt to coax him into speaking, be it "explicit or subtle, deliberate or unintentional." (*Ibid.*) Were it otherwise, law enforcement

could use psychological manipulation, repeated rounds of questioning, or other tactics to "persuade [a suspect] to incriminate himself notwithstanding his earlier request for counsel's assistance." (*Ibid.*) As I explain, that is exactly what happened here.

It is understandable that law enforcement officials, after the shooting of a fellow officer, were frustrated and impatient with Johnson's refusal to talk. But the law accords every person the right to remain silent and the right to consult a lawyer before speaking to the police. I fear that the takeaway from today's decision is that even multiple violations of these basic rights will not result in the exclusion of an incriminating statement if sufficiently clever or subtle tactics are ultimately used to elicit it. Because I cannot agree that Johnson's statement was properly admitted, I respectfully dissent.

## I.

"[I]f a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent" and the "right to consult with counsel prior to questioning." (*Miranda, supra*, 384 U.S. at pp. 467–468, 470.) This safeguard is necessary because "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (*Id.* at p. 467.)

When an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless [he] himself initiates further

communication, exchanges, or conversations with the police." (*Edwards*, *supra*, 451 U.S. at pp. 484–485.) As noted, "*Edwards* set forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel." (*Smith*, *supra*, 469 U.S. at p. 98.) Allowing "the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda*," since "repeated rounds of questioning [would] undermine the will of the person being questioned." (*Michigan v. Mosley* (1975) 423 U.S. 96, 102.) By barring law enforcement from continuing to question someone who has invoked the right to counsel, "*Edwards* is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' " (*Minnick v. Mississippi* (1990) 498 U.S. 146, 150.)

On the day of the shooting in this case, Johnson was first approached by Detective Robert Young at 7:00 p.m. He declined to talk, invoking his right to remain silent. Twenty minutes later, District Attorney Michael Bradbury approached Johnson to make sure he did not wish to talk. Johnson declined to give a statement, saying he was "in shock." From there, as the court acknowledges (maj. opn., *ante*, at pp. 38–45), several *Miranda* and *Edwards* violations occurred: First, 10 minutes after the encounter with Bradbury, Young and investigator Richard Haas approached Johnson and began questioning him again. Second, less than an hour later, around 8:25 p.m., Young again approached Johnson to ask if he was willing to give a statement regarding what happened. Johnson remained firm in his refusal to speak, saying that he was "in a state of shock and . . . kinda confused," and that he wanted to speak to an attorney. No counsel was provided. Instead, Young returned half an hour

later to berate Johnson for killing Aguirre — the third violation that night.  Johnson still did not give a statement.

Undaunted, the prosecution switched gears.  Johnson had told Haas and Young that he had a history of mental health and substance abuse issues, so the investigators sent a psychiatrist, Patterson, to see if he could get Johnson to talk.  Sending in Patterson violated Johnson's rights a fourth time.  Once Johnson had invoked his right to counsel to Young, he could not be "subject to further interrogation by the authorities until counsel [was] made available to him." (*Edwards*, *supra*, 451 U.S. at pp. 484–485; see maj. opn., *ante*, at pp. 39–40.)  Yet Patterson, an agent of the district attorney's office, went to the hospital and attempted to interview Johnson in direct violation of *Edwards*.  (See *People v. Ghent* (1987) 43 Cal.3d 739, 750–751 [finding unconstitutional a psychiatrist's attempt to interview defendant after invocation of right to counsel].)

This tactic — sending in a medical professional as an agent for the prosecution — is one of the oldest in the book.  (See *Leyra v. Denno* (1954) 347 U.S. 556, 559 [after days of failing to obtain a confession, interrogators sent in a psychiatrist under the guise of providing medical treatment; the suspect confessed].)  And it is one that Patterson was familiar with.  (See *People v. Walker* (1972) 29 Cal.App.3d 448, 451 [finding defendant's self-incriminating statement invalid and reversing conviction where "Dr. Donald S. Patterson of Santa Barbara, a psychiatrist," violated *Edwards* by continuing to question him after he asked for an attorney]; *id.* at pp. 452, 455.)  To obtain a confession, police may attempt to convince a suspect "that he and the interrogator share a common interest, that their relationship is a [mutual] rather than an adversarial one." (Leo, Miranda*'s Revenge: Police Interrogation as a Confidence Game*

(1996) 30 L. & Soc'y Rev. 259, 266.) A psychiatrist can assume this position more easily than a detective or uniformed officer — particularly where, as here, the suspect has a prior history of psychiatric treatment. But the practice has been condemned as unethical by professional psychiatric organizations. (Janofsky, *Lies and Coercion: Why Psychiatrists Should Not Participate in Police and Intelligence Interrogations* (2006) J. Am. Acad. Psychiatry & L. 472, 475–476 [ethical principles adopted by the American Psychiatric Association and American Academy of Psychiatry and the Law bar psychiatrists from evaluating suspects who have not consulted with legal counsel].)

Today's opinion acknowledges and denounces these four violations but stops short of finding a fifth. As noted, Patterson should not have questioned Johnson at all because Johnson had told Young that he wanted an attorney. But separate and apart from that violation, Patterson's conduct after Johnson *again* invoked his right to counsel in response to Patterson's unlawful attempt to question him constituted a fifth violation.

After arriving at the hospital, Patterson observed Johnson for an hour before introducing himself as "a psychiatrist from Santa Barbara." By this time in the night, Johnson had resisted multiple efforts to get him to talk. But Patterson took a different, more understated approach. Without disclosing that he was a forensic psychiatrist affiliated with the district attorney's office, Patterson proceeded to give *Miranda* warnings to Johnson and asked if he wanted to talk. Johnson told Patterson he did not wish to give a statement and wanted to speak to an attorney. He said he was "in a state of shock and kind of confused" and was not sure he would be providing "accurate" information.

At this point, Patterson was required to stop interrogating Johnson, but he did not. Instead, Patterson again tried to convince Johnson to speak to him, saying, "I'm gonna just stay around here with you and let you get back from X-ray and see how you're getting along and see if you still feel, feel that way or — [¶] . . . [¶] — cause at some point you did say that you would be willing to talk to me and so — [¶] . . . [¶] — And it's up to you, you can still refuse it, but you did say that at one time." After saying this, Patterson stuck close to Johnson's side; he followed Johnson when his gurney was wheeled into X-ray, stayed with Johnson while his X-rays were taken, then followed him back to his room. Eventually, Patterson's strategy worked: Johnson turned to him and said, "Still here, huh?" The two began speaking; Johnson started telling Patterson about psychiatrists that had previously treated him, inquiring whether Patterson knew them. From there, the conversation expanded to include Johnson's mental health history, his past experiences of delusions, and, eventually, his actions related to the shooting.

Patterson's tactics were a form of interrogation. For *Edwards* purposes, interrogation includes "not only . . . express questioning, but also . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. omitted; cf. maj. opn., *ante*, at p. 37.) Patterson's conduct was reasonably likely to elicit an incriminating response in two ways. First, Patterson reminded Johnson that he had previously promised to speak to Patterson. The comment suggested that by not speaking to Patterson, Johnson was going back on his word. This type of statement has been found to constitute further questioning.

(See *People v. Harris* (1989) 211 Cal.App.3d 640, 648 [after suspect invoked right to silence, sergeant's statement, " 'I thought you were going to come back and straighten it out,' " constituted impermissible further questioning].)

Second, by saying he would wait around to see if Johnson would change his mind and then following Johnson around the hospital, Patterson conveyed that he was not satisfied with Johnson's refusal. Patterson explicitly told Johnson that he was waiting until Johnson was willing to speak. In light of his statement that he was waiting for Johnson to talk, Patterson's persistence in following Johnson around the hospital for 20 minutes was reasonably likely to elicit a response from Johnson.

" ' "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." ' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1025, quoting *Smith*, *supra*, 469 U.S. at p. 99.) Yet even after Johnson invoked his right to counsel to Patterson — Johnson's second such invocation that evening — Patterson's behavior indicated that he was there to interview Johnson and wanted him to talk. Patterson's conduct, which ultimately led to Johnson's incriminating statements, amounted to further interrogation in violation of *Edwards*.

## II.

The court concludes that Johnson's confession is admissible because after invoking his right to counsel, Johnson initiated a conversation with Patterson. It is true that after Patterson had been standing at Johnson's side for 20 minutes,

Johnson turned to him and said, "Still here, huh?" But this statement was not a valid initiation for *Edwards* purposes.

Under *Edwards*, an initiation occurs when a suspect's "words or . . . conduct" can be " 'fairly said to represent a desire' . . . 'to open up a more generalized discussion relating directly or indirectly to the investigation.' " (*People v. Mickey* (1991) 54 Cal.3d 612, 648; see *Edwards*, *supra*, 451 U.S. at pp. 484–485.) Where, as here, there has been a prior *Edwards* violation, "a renewal of contact by the defendant" constitutes an initiation "only if the decision to renew contact was not a 'response to' or 'product of' the prior unlawful interrogation." (*Mack v. State* (Ga. 2014) 765 S.E.2d 896, 903 (*Mack*).) Prior infringements of a defendant's rights, "even though unavailing at the time," might have "fatally tainted the spontaneity of [a defendant's] subsequent statement, making it instead the product of inducement, provocation or subtle coercion." (*People v. Kinnard* (N.Y.App.Div. 1983) 470 N.Y.S.2d 828, 846; see *Collazo v. Estelle* (9th Cir. 1991) 940 F.2d 411, 423 (*Collazo*) [a defendant's subsequent statement is " 'initiated' " by the police, not by the defendant, if it is the "*delayed product*" of unlawful police conduct].)

To determine whether there is a causal connection between a prior unlawful interrogation and a defendant's later renewal of contact, "the entire sequence of events leading up to the suspect's renewal of contact must be considered." (*Mack*, *supra*, 765 S.E.2d at p. 904.) Other state high courts and federal courts making this assessment have asked "whether (1) there was a break in the stream of events sufficient to insulate the statement from the effect of the prior coercion, (2) it can be inferred that the coercive practices had a continuing effect that touched the subsequent statement, (3) the passage of time, a

change in the location of the interrogation, or a change in the identity of the interrogators interrupted the effect of the coercion, and (4) the conditions that would have precluded the use of a first statement had been removed." (*Collazo, supra,* 940 F.2d at p. 421; see *State v. Yoh* (Vt. 2006) 910 A.2d 853, 862–863 (*Yoh*) [applying these factors]; *Blake v. State* (Md. 2004) 849 A.2d 410, 422 (*Blake*) [same]; *Mack, supra,* 765 S.E.2d at p. 904 [similar factors].)

Here, the Attorney General has not carried his burden to demonstrate that Johnson's conduct was not a product of prior violations. (*People v. Hensley* (2014) 59 Cal.4th 788, 810 ["The state must demonstrate that . . . ' . . . the accused, not the police, reopened the dialogue with the authorities.' "].) Several circumstances support the conclusion that Johnson's statement to Patterson — "Still here, huh?" — was the product of Patterson's *Edwards* violations.

First, Patterson's interrogation tactics "had a continuing effect that touched [Johnson's] subsequent statement." (*Collazo, supra,* 940 F.2d at p. 421.) Patterson explicitly told Johnson that he would stay and wait to see if Johnson would change his mind and provide a statement. By remaining in Johnson's presence, and especially by following Johnson as he was moved around the hospital, Patterson continued to convey that he wanted Johnson to speak to him. This behavior was ongoing when Johnson purportedly initiated the conversation with Patterson.

Moreover, Patterson's conduct must be considered against the backdrop of "the entire sequence of events" that night. (*Mack, supra,* 765 S.E.2d at p. 904.) Patterson's understated manner and " 'kind face' " (maj. opn., *ante,* at p. 62) presented

Johnson with a deliberate contrast to the impatient and even angry officers who had sought to question him earlier. The court says this contrast is not "relevant." (Maj. opn., *ante*, at p. 55.) But this shifting approach by law enforcement — "alternat[ing]" between "a show of some hostility" and " 'kindhearted[ness]' " — is a familiar psychological "ploy." (*Miranda, supra*, 384 U.S. at p. 452; see *ibid.* [describing "the 'friendly-unfriendly' or the 'Mutt and Jeff' [good cop-bad cop] act"].) As *Miranda* observed, it is one of the "effective tactics" discussed in "various police manuals and texts" that "have had rather extensive use among law enforcement agencies." (*Id.* at pp. 448, 449, fn. 9.) In other words, Patterson's tactic was made more effective by the police and prosecution's earlier unlawful attempts to question Johnson. Thus, Johnson's purported initiation to Patterson was the " 'product of' " a series of law enforcement tactics that included "the prior unlawful interrogation[s]." (*Mack*, at p. 903.)

Additionally, when a suspect's rights are violated on multiple occasions, this gives the impression that law enforcement "w[ill] not honor [the] right to silence or . . . right to counsel until [the suspect] g[ives] . . . a confession." (*People v. Neal* (2003) 31 Cal.4th 63, 82 (*Neal*); see *id.* at p. 89 (conc. opn. of Kennard, J.) [repeatedly ignoring a suspect's invocations "unmistakably implie[s] that [he] . . . ha[s] no right to counsel that [law enforcement] was bound to respect"].) Patterson was not the first person to refuse to accept Johnson's invocation of the right to silence or right to counsel. Time and again, Johnson said he did not wish to give a statement or to speak without consulting a lawyer, but law enforcement ignored his invocations. In light of this official behavior, a reasonable person in Johnson's position may well have doubted whether he was actually free to remain silent or to consult a lawyer before

speaking, despite the warnings he had been given. None of the events that happened in the hospital would have dispelled that impression; Patterson's conduct after Johnson again invoked the right to counsel only further conveyed that the authorities would not take no for an answer.

Second, there was no "break in the stream of events sufficient to insulate the statement from the effect of the prior" violations. (*Collazo, supra*, 940 F.2d at p. 421.) In some cases, questioning ends and the suspect is allowed to leave, with the interrogation resuming some days later. (Cf. *Mack, supra*, 765 S.E.2d at pp. 901–902 [no break in the stream of events even though initial interview ended and suspect left, because the interrogation resumed the following day].) Or there may be a pause in the questioning during which the suspect is permitted to leave or make a phone call. (See, e.g., *Perrine v. State* (Fla. Ct.App. 2005) 919 So.2d 520, 523 [suspect left the police station, then returned 30 minutes later and gave a statement]; cf. *Collazo, supra*, 940 F.2d at pp. 421–422 [no break in the stream of events even though suspect called his wife during a three-hour pause in questioning].) Here, by contrast, the violation was ongoing when Johnson initiated. Patterson explicitly told Johnson that he would stay and wait to see if Johnson would change his mind and speak to him. This behavior continued until the moment Johnson purportedly initiated. Aside from briefly stepping out of the room to speak to the district attorney, Patterson remained with Johnson until he made his statement. All the while, Johnson was handcuffed to a gurney with no choice but to remain in Patterson's presence. No break in the stream of events insulated Johnson's statement from Patterson's improper interrogation.

Third, neither "the passage of time, a change in the location of the interrogation, [nor] a change in the identity of the interrogators interrupted the effect" of Patterson's prior *Edwards* violations. (*Collazo*, *supra*, 940 F.2d at p. 421.) The location remained the same. Only 20 minutes passed between the improper interrogation and the supposed initiation. (See *Blake*, *supra*, 849 A.2d at p. 422 [delay of 28 minutes was too short to dispel taint from first improper interrogation].) Moreover, Johnson's initial statement — "Still here, huh?" — is naturally understood as a response to Patterson's statements and conduct indicating that he would wait to see if Johnson would change his mind. (See *ibid.* [suspect's initiation was a response to statement made by interrogating officer in the prior improper interrogation].) Patterson's response to Johnson — "Yeah, just, just in case you're . . ." — further suggests he stayed nearby in order to get Johnson to talk.

Fourth, there was no significant change in "the conditions that would have precluded the use of a first statement." (*Collazo*, *supra*, 940 F.2d at p. 421.) Johnson was in a vulnerable state from the time Patterson began interrogating him until the time he supposedly initiated. Only a few hours had passed since Johnson was involved in a violent shootout with police. He was nearly naked, handcuffed to a gurney, with a gunshot wound to the chest. The record shows he was in pain; in Patterson's presence, he twice asked medical personnel when he could obtain pain medication. In declining to give a statement, Johnson consistently told authorities that he was "in shock" and "confused." His weakened physical state, coupled with his disorientation, made him more susceptible to Patterson's interrogation tactics, and those conditions remained unchanged at the time Johnson supposedly initiated a

conversation. (See *Blake*, *supra*, 849 A.2d at p. 422 [suspect was "in a cold holding cell with little clothing"]; see also *Mincey v. Arizona* (1978) 437 U.S. 385, 396–402 [statements were involuntary in part because suspect was in the hospital, wounded and in pain, and expressed confusion during interrogation].)

Finally, the record contains an additional feature indicating that Johnson in all likelihood would not have started a conversation if Patterson had not improperly asked to interview him. Immediately after arriving at the hospital, Patterson spent an hour silently observing Johnson. It was only after that hour elapsed that Patterson introduced himself and began to interrogate Johnson in violation of *Edwards*. The record does not reveal any attempt by Johnson to engage Patterson in conversation during that hour, much less speak to him about the events of that day. We need not wonder whether Johnson would have chosen to speak if his rights had not first been violated. The answer is in the record: For the entire hour before Patterson sought to interrogate Johnson, Johnson showed no inclination to speak with Patterson. Only after Patterson unlawfully asked to question Johnson and unlawfully refused to honor Johnson's invocation of the right to counsel did Johnson initiate a conversation. On these facts, it is hard to see how Johnson's purported initiation was anything but derivative of Patterson's attempt to interrogate him in violation of *Edwards*. In sum, the trial court erred in admitting Johnson's statement to Patterson.

This error was prejudicial to Johnson's conviction for first degree murder. Unsurprisingly, Johnson's confession was a focal point of the prosecutor's case: The prosecutor discussed various parts of the confession in his opening statement, played

the entire audiotape of the redacted interview for the jury, used Johnson's statements in cross-examining defense witnesses, and underscored how the statements supported the prosecution's case during closing and rebuttal arguments. Moreover, the prosecution used Johnson's confession to support each of its three theories of first degree murder:  premeditation, lying in wait, and felony murder.  To support premeditation, the prosecutor described the shooting of Aguirre as "a cold-blooded execution," emphasizing "the cold and . . . the ice" in Johnson's voice when he spoke to Patterson.  The prosecutor also used Johnson's statement to cross-examine defense experts regarding the ballistics evidence, arguing that Johnson killed Aguirre "execution-style" while Aguirre lay disabled on the ground.  Second, regarding lying in wait, the prosecutor used Johnson's statement to argue that he knew the police were at the door and deliberately ambushed Aguirre.  Third, regarding the felony-murder theory, the prosecutor relied heavily on the fact that Johnson had confessed to kidnapping his wife to establish that the murder occurred during the course of a felony.

Because Johnson's own statements were highly probative of his conduct and state of mind, I cannot conclude "beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24; see *Neal, supra,* 31 Cal.4th at p. 86 [" '[T]he improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial . . . .' "]; *Arizona v. Fulminante* (1991) 499 U.S. 279, 296 ["A confession is like no other evidence.  Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . .   [T]he admissions of a defendant

15

come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.' "].) Accordingly, the murder conviction and death sentence cannot stand.

### III.

Today's opinion declines to consider these factors, instead focusing on the audio recording of the interview and concluding that "the record . . . reflects defendant's 'clear willingness and intention to talk' to Patterson." (Maj. opn., *ante*, at p. 49.) Citing Johnson's conduct, demeanor, and various statements, the court says his decision to initiate a conversation with Patterson was made calmly and rationally, with full understanding of his rights. (*Id.* at pp. 52–54.)

As an initial matter, I note that the standard the court applies today — i.e., there is an initiation "only if the decision to renew contact was not a 'response to' or 'product of' the prior unlawful interrogation" (*Mack, supra,* 765 S.E.2d at p. 903; maj. opn., *ante*, at pp. 47–48) — was set forth by the Georgia Supreme Court in a decision that itself evaluated causation by looking to the four factors articulated by the Ninth Circuit in *Collazo* and applied by other state high courts. (See *Mack*, at p. 904 ["In determining the causal connection between the prior unlawful interrogation and the suspect's renewal of contact, the entire sequence of events leading up to the suspect's renewal of contact must be considered, including but not limited to the lapse of time between the unlawful interrogation and the renewed contact, any change in location or in the identity of the officers involved from one interview to the next, and any break in custody between interviews. See, e.g., *Collazo*, 940 F.2d at 421; *Yoh*, 910 A.2d at 862; *Blake*, 849 A.2d at 422 . . . ."].) It is

no wonder today's opinion ignores these factors: They uniformly suggest that Johnson's decision to speak with Patterson was a product of prior *Edwards* violations. (*Ante*, at pp. 10–14.)

By focusing on the interview itself and parsing Johnson's and Patterson's statements, the court misses the overall context in which those statements were made. If Johnson had made the statements after treatment for his injury, an appreciable passage of time, or a significant change in location or setting, I might agree that he made a free and rational decision to initiate a conversation with Patterson. Even if Johnson had initiated a conversation during the initial hour when Patterson silently observed Johnson, this might be a different case. But those are not the facts here. At the time he purportedly initiated a conversation with Patterson, Johnson was half-naked and handcuffed to a gurney, late at night in an emergency room, with a gunshot wound to the chest. His *Miranda/Edwards* rights had been violated five (or, we can agree, at least four) times over a three-hour period that evening, and Patterson had been a lingering presence, following Johnson around the hospital after he had again invoked his right to counsel. There was no break in the stream of events or change in conditions that might have separated Johnson's purported initiation from law enforcement's prior unlawful attempts to question him.

The court further observes that "the record does not reveal the sort of berating evident in other cases that might readily wear down a suspect [citations], but instead a handful of one- to two-minute conversations over a period of a few hours." (Maj. opn., *ante*, at pp. 49–50.) And although Patterson did violate *Edwards* by approaching Johnson in the first place, the court says that "after [Johnson] requested counsel, Patterson asked no more questions and there was no discussion for about 20

17

minutes." (Maj. opn., *ante*, at p. 51.) In the court's telling, "[t]he overall picture is not of a browbeaten suspect whose will was overborne by a coercive interrogator, but of a suspect eager to tell his story to a sympathetic listener, even though there might be consequences for doing so." (Maj. opn., *ante*, at p. 62.)

But it is inaccurate to say there was no berating in this case; it is undisputed that Young berated Johnson earlier that night. Nor is it accurate to suggest that Patterson honored Johnson's refusal to speak. Patterson responded to Johnson's invocation of counsel by urging him to speak, reminding him that he had previously said he would speak to Patterson, and then following him around the hospital. And Patterson — who unlawfully approached Johnson to get him to talk and eventually provided crucial testimony to convict him of first degree murder — was anything but "a sympathetic listener."

The court seems to reason that Johnson's decision to speak to Patterson was untainted by the prior *Edwards* violations because the violations were, essentially, not that bad. But this reasoning cannot be squared with high court precedent. Again, "*Edwards* set forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel." (*Smith, supra,* 469 U.S. at p. 98.) This bright-line rule is necessary because any attempt to coax a defendant into speaking, regardless of how it is undertaken, can sway a defendant to confess when he otherwise would not have done so. (*Ibid.*) Coercion in interrogation settings "can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." (*Blackburn v. Alabama* (1960) 361 U.S. 199, 206 (*Blackburn*).) The high court has repeatedly stressed that neither physical violence nor overt threats are required to create a coercive atmosphere. (See, e.g., *Miranda,*

18

*supra*, 384 U.S. at p. 467 [discussing the "inherently compelling pressures" of in-custody interrogation]; *Arizona v. Mauro* (1987) 481 U.S. 520, 529–530 [same]; see also *Culombe v. Connecticut* (1961) 367 U.S. 568, 602 [a confession is involuntary when "compulsion, of whatever nature or however infused, propels or helps to propel the confession"].) Even "unintentional" behavior can cause a defendant to confess. (*Smith*, at p. 98).

By adopting a bright-line rule, the high court sought to prevent increasingly "sophisticated modes of 'persuasion' " from being used to manipulate suspects into confessing. (*Blackburn*, *supra*, 361 U.S. at p. 206.) Accordingly, this court has never suggested that the protection of *Edwards* is limited to cases of overt coercion by law enforcement. (See, e.g., *People v. Davis* (2009) 46 Cal.4th 539, 596 [recognizing principle of *Smith*].) Lower courts, too, have recognized this principle. (See *People v. Walker*, *supra*, 29 Cal.App.3d at p. 455 [finding *Edwards* violation where Patterson continued to question the defendant after he asked for an attorney, with no indication the defendant had been badgered or berated].)

The fact that Johnson was not berated, to the extent it is true, has limited relevance. The question is whether the conduct of law enforcement — including conduct that may have exerted subtle pressure — would have made a reasonable person more likely to initiate further communication. As noted, other courts have not hinged this analysis on whether a defendant was badgered or berated; they have instead considered whether various factors, such as the passage of time or a break in the stream of events, "insulate[d] the [defendant's] statement from the effect of the prior coercion." (*Collazo*, *supra*, 940 F.2d at p. 421; see *Yoh*, *supra*, 910 A.2d at p. 862 [conducting initiation analysis without discussion of berating or lack thereof]; see also

*People v. Boyer* (1989) 48 Cal.3d 247, 274 [defendant's initiation was tainted by prior violations solely because it was a result of the police's improper resumption of contact, even setting aside earlier badgering], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)  Of course, where a suspect is berated, it is more likely his initiation was tainted by law enforcement misconduct.  (Maj. opn., *ante*, at pp. 54–55.)  But the fact that a suspect was not berated simply eliminates one potential source of taint; subtle pressure can take many forms.  As the high court recognized in *Miranda*, even " 'kindness' " and "patience" can be deployed to induce a confession.  (*Miranda*, *supra*, 384 U.S. at pp. 450–451.)

In sum, I find it hard to believe that Johnson — in a clearly vulnerable state, after three hours of unlawful efforts to question him in the face of his repeated invocations of the right to silence and right to counsel — somehow made a clean break and initiated a new conversation that "was not a 'response to' or 'product of' the prior unlawful interrogation." (*Mack*, *supra*, 765 S.E.2d at p. 903.)  After today's decision, what is to prevent law enforcement from ignoring a suspect's clear invocations and engaging in repeated rounds of questioning, calling in a psychiatrist, or applying other subtle tactics to coax the suspect into "initiating" a conversation?  That is precisely the type of conduct that *Edwards*'s bright-line rule seeks to prevent, and it is precisely the type of conduct that happened here.

## IV.

This case involves not one, not two, not three, but five *Miranda*/*Edwards* violations, all of which took place while Johnson was handcuffed to a hospital bed, almost naked, with a gunshot wound to the chest.  The court calls the law enforcement

misconduct in this case "concerning." (Maj. opn., *ante*, at p. 44.) But despite its concern, the court affirms Johnson's murder conviction and death sentence.

Today's decision tells law enforcement officials that there is "nothing to lose, and a useable confession to gain, if they simply disregard the suspect's requests for counsel" and continue to interrogate the suspect with shifting and ever subtler tactics. (*People v. Storm* (2002) 28 Cal.4th 1007, 1046 (dis. opn. of Chin, J.).) "We would be naive to assume that law enforcement agencies will not take advantage of the new evidentiary door the majority's holding would helpfully open for them." (*Ibid*.; see Weisselberg, *Mourning* Miranda (2008) 96 Cal. L.Rev. 1519, 1522 [police "training materials demonstrate how the warning and waiver regime coheres with a sophisticated psychological approach to police interrogation"].) "Unfortunately, the court's opinion today will encourage precisely the sort of subterfuge by some law enforcement investigators, with the ensuing violation of constitutional rights, that *Miranda* sought to end." (*Storm*, at p. 1040 (dis. opn. of George, C. J.).)

The right to remain silent and the right to consult a lawyer when questioned by the police are among the most basic constitutional rights we have. Because today's decision makes these essential protections for our citizenry less secure, I respectfully dissent.

**LIU, J.**

**I Concur:**

**LAVIN, J.**<sup>*</sup>

---

\*       Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Johnson

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S070250
**Date Filed:** January 3, 2022

---

**Court:** Superior
**County:** Ventura
**Judge:** Richard M. Murphy*

---

**Counsel:**

Anthony J. Dain, under appointment by the Supreme Court, and Tiffany L. Salayer for Defendant and Appellant.

Edmund G. Brown, Jr., and Rob Bonta, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, Lawrence M. Daniels and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

*Retired judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Anthony J. Dain
Procopio, Cory, Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101
(619) 515-3241

Wyatt E. Bloomfield
Deputy Attorney General
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6145